1  Mark I. Labaton (Bar No. 159555)
   mlabaton@motleyrice.com
2  Robert Zabb (Bar No. 114405)
   rzabb@motleyrice.com
3  MOTLEY RICE LLP
   1801 Century Park East, #475
4  Los Angeles, CA 90067
   Telephone: (310) 552-7992
5  Facsimile: (310) 552-8054

6  Joel H. Bernstein
   jbernstein@labaton.com
7  Mark S. Arisohn
   marisohn@labaton.com
8  Martis Alex (Bar No. 77903)
   malex@labaton.com
9  Michael Woolley
   mwoolley@labaton.com
10 LABATON SUCHAROW LLP
   140 Broadway
11 New York, New York 10005
   Telephone: (212) 907-0700
12 Facsimile: (212) 818-0477

13 *Attorneys for Plaintiffs*

14                **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
15                     **WESTERN DIVISION**

16

17 In re COUNTRYWIDE FINANCIAL          Case No. 11-ML-02265-MRP
   CORP. MORTGAGE-BACKED               (MANx)
   SECURITIES LITIGATION
18

19 DEUTSCHE ZENTRAL-                   )
   GENOSSENSCHAFTSBANK AG, NEW         )
20 YORK BRANCH, d/b/a DZ BANK AG,      )
   NEW YORK BRANCH; DEUTSCHE           )
21 GENOSSENSCHAFTS-                    ) **Case No. 13-CV-01118-MRP**
   HYPOTHEKENBANK AG; and DG           ) **(MANx)**
22 HOLDING TRUST,                      )
                                       ) **COMPLAINT**
23                    Plaintiffs,      )
                                       ) **JURY TRIAL DEMANDED**
24       -against-                     )
                                       )
25 BANK OF AMERICA CORPORATION;        )
   BANK OF AMERICA, N.A;               )
26 COUNTRYWIDE FINANCIAL               )
   CORPORATION; COUNTRYWIDE            )
27 HOME LOANS, INC.; COUNTRYWIDE       )
   SECURITIES CORPORATION;             )
28 COUNTRYWIDE CAPITAL MARKETS,        )
                  (continued)          )

1
                (continued)         )
LLC; CWABS, INC.; CWALT, INC.;    )

2
MERRILL LYNCH & CO., INC.;      )
MERRILL LYNCH MORTGAGE     )

3
INVESTORS, INC.; MERRILL LYNCH )
MORTGAGE LENDING, INC.;       )

4
MERRILL LYNCH, PIERCE, FENNER & )
SMITH INC. (f/k/a BANC OF AMERICA  )

5
SECURITIES LLC); and FIRST       )
FRANKLIN FINANCIAL CORP.,     )

6

7
                   Defendants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
Case No. 13-CV-01118-MRP (MANx)

# <u>TABLE OF CONTENTS</u>

SUMMARY OF THE ACTION ............................................................. 1

PARTIES ............................................................................................ 12

JURISDICTION AND VENUE ......................................................... 17

FACTUAL ALLEGATIONS .............................................................. 18

I.     THE SECURITIZATIONS ...................................................... 18

II.    THE SECURITIZATION PROCESS ....................................... 19

III.   DEFENDANTS' PARTICIPATION IN THE
       SECURITIZATIONS ............................................................... 22

       A.   The Controlling Parent Defendants' Roles in the
            Securitizations ............................................................. 28

       B.   The Originator Defendant's Role in the Securitizations ...... 29

       C.   The Sponsor Defendant's Roles in the Securitizations ........ 30

       D.   The Depositor Defendants' Roles in the Securitizations ...... 30

       E.   The Underwriter Defendants' Role in the Securitizations ..... 30

IV.    THE DEFENDANTS' FRAUDULENT, FALSE AND
       MISLEADING STATEMENTS AND OMISSIONS
       REGARDING LOAN QUALITY ............................................ 32

       A.   Defendants Made False and Misleading Statements
            Regarding Loan-to-Value Ratios .................................... 32

            1.   Statements Regarding Loan-to-Value Ratios ............... 32

            2.   Combined Loan-to-Value Ratio Data Was Materially
                 False ..................................................................... 34

       B.   Defendants Made False and Misleading Statements
            Regarding Owner-Occupancy .......................................... 41

            1.   Statements Regarding the Owner-Occupancy Status of
                 the Borrowers ......................................................... 41

            2.   Owner-Occupancy Data Was Materially False ........... 42

V.     DEFENDANTS KNEW THAT THE REPRESENTATIONS
       IN THE OFFERING DOCUMENTS WERE FALSE .............. 45

       A.   Defendants Knowingly Placed Defective Loans in the
            Securitizations ............................................................. 45

       B.   Bank of America Knew that the Representations in the
            Offering Documents were False ...................................... 49

C. Merrill Lynch Knew that the Representations in the Offering Documents were False ........................................ 53

D. Countrywide Knew that the Representations in the Offering Documents were False ........................................ 62

   1. Countrywide's Own Documents Reveal It Knew the Falsity of Its Representations ................................ 65

   2. Countrywide Purposefully Abused Its Documentation Programs and Falsified Loan Applications ................... 68

   3. Countrywide "Cherry Picked" the Best Loans While Selling Riskier Loans to Investors .......................... 71

   4. The Countrywide Defendants Knew of the Falsity of Their Representations Regarding Loan Quality Because They Originated So Many Loans Themselves ............... 72

   5. Government Investigations Have Confirmed That Countrywide Routinely Failed to Adhere to Its Underwriting Guidelines .................................... 72

   6. Countrywide Recently Admitted to Knowing About and Ignoring Widespread Underwriting Misrepresentations During the Period the Securitizations were Issued .............................. 84

VI. DEFENDANTS' FALSE AND MISLEADING REPRESENTATIONS THAT THE LOANS IN THE LOAN POOLS COMPLIED WITH THE UNDERWRITING GUIDELINES OF THE ORIGINATORS ................................ 86

A. Representations in the Offering Documents Concerning the Originators' Adherence to Underwriting Guidelines ................... 86

B. The Originators' Abandonment of Their Underwriting Guidelines ........................................................ 88

   1. Accredited Home Lenders, Inc. ........................... 90

   2. Aegis Mortgage Corporation ............................. 91

   3. American Home Mortgage Corp. ......................... 92

   4. Ameriquest Mortgage Company ......................... 94

   5. Argent Mortgage Company, LLC ........................ 95

   6. Countrywide Home Loans, Inc. ........................... 97

   7. Decision One Mortgage Company LLC ................... 98

   8. First Franklin Financial Corporation ..................... 99

   9. Flagstar Bank, F.S.B. .................................... 100

10. Fremont Investment & Loan ........................................................... 101

11. Impac Funding Corporation ........................................................ 104

12. New Century Mortgage Corporation ............................................ 104

13. Option One Mortgage Corporation ............................................. 106

14. Ownit .......................................................................................... 107

15. People's Choice Home Loan, Inc. ................................................ 109

16. Wilmington Finance Inc. ............................................................ 109

17. WMC Mortgage Corp. ................................................................ 110

VII. ALTERNATIVELY, DEFENDANTS NEGLIGENTLY MISREPRESENTED THE CREDIT CHARACTERISTICS, UNDERWRITING STANDARDS, AND RATINGS ASSOCIATED WITH THE LOANS UNDERLYING THE TRUSTS ....................................................................................... 112

VIII. DEFENDANTS MADE MISLEADING MISSTATEMENTS REGARDING TRANSFER AND ASSIGNMENT OF THE NOTES AND MORTGAGES TO THE TRUSTS ................................... 113

A. Statements Regarding Assignments and Transfer of Notes and Mortgages to the Trusts ............................................. 114

1. Failure to Timely Transfer Notes and Mortgages To the Trusts ................................................................................. 118

2. Failure to Timely Transfer Mortgages to the Trusts ................... 118

3. Failure to Timely Transfer the Notes to the Trusts ..................... 122

B. Material Undisclosed Risks to Investors Resulting From the Failure to Assign the Mortgages and Notes to the Trusts ...................................................................................... 124

1. Foreclosure and Contractual Remedy Consequences .................. 124

2. Tax Consequences ...................................................................... 125

IX. ALTERNATIVELY, DEFENDANTS MADE NEGLIGENT MISREPRESENTATIONS CONCERNING THE MORTGAGES AND NOTES UNDERLYING THE SECURITIZATIONS ..................................................................... 127

X. DEFENDANTS KNEW THEIR REPRESENTATIONS WERE MATERIALLY FALSE AND MISLEADING AND HAD A DUTY TO DISCLOSE TO PLAINTIFFS .................................. 128

A. Defendants Knew That the Securitizations Would Not Be Mortgage-Backed as Represented ...................................... 128

B.  Having Misrepresented Certain Characteristics of the Securitizations, Defendants Had A Duty to Correct Their False and Misleading Statements .......................................................131

XI.   IN THE ALTERNATIVE, PLAINTIFFS AND THE UNDERWRITER DEFENDANT OPERATED UNDER A MUTUAL MISTAKE WITH RESPECT TO THE TRANSFER OF THE MORTGAGES AND NOTES INTO THE TRUSTS.......................................................133

XII.  THE ISSUER DEFENDANTS FAILED TO DISCLOSE THAT THEY OBTAINED THE RATINGS OF THE CERTIFICATES BY PROVIDING FALSE REPRESENTATIONS TO THE RATINGS AGENCIES.......................134

XIII. PLAINTIFFS REASONABLY RELIED ON DEFENDANTS' MISREPRESENTATIONS IN THEIR DECISIONS TO PURCHASE THE CERTIFICATES.......................................................136

A.  DZ's Investment Criteria ...............................................137

B.  Plaintiffs' Reliance on the Offering Documents was Reasonable ...................................................................139

XIV.  PLAINTIFFS SUFFERED SIGNIFICANT LOSSES DUE TO DEFENDANTS' MISCONDUCT .......................................................142

XV.   THE SUCCESSOR LIABILITY OF THE BANK OF AMERICA DEFENDANTS.......................................................144

A.  BOA Is Liable as a Successor-in-Interest to Countrywide.................144

B.  The Structuring of Bank of America's Merger with Countrywide....................................................................145

C.  Countrywide Ceases Doing Business and Is Rebranded as Bank of America .................................................................149

D.  Bank of America Takes Steps To Expressly and Impliedly Assume Countrywide Financial's Liabilities .........................152

FIRST CLAIM FOR RELIEF Common Law Fraud (Against All Defendants)..........................................................................158

SECOND CLAIM FOR RELIEF Fraudulent Concealment (Against All Defendants)..........................................................................160

THIRD CLAIM FOR RELIEF Aiding and Abetting Fraud (Against the Underwriter Defendants, the Originator Defendant, and the Controlling Parent Defendants) ...........................................161

FOURTH CLAIM FOR RELIEF Negligent Misrepresentation (In the Alternative Against All Defendants) ..........................................162

FIFTH CLAIM FOR RELIEF Rescission Based Upon Mutual Mistake (Against the Underwriter Defendants) .......................163

1

PRAYER FOR RELIEF ......................................................................... 165

2

DEMAND FOR JURY TRIAL ............................................................... 165

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Plaintiffs Deutsche Zentral-Genossenschaftsbank AG, New York Branch,

2    d/b/a DZ Bank AG, New York Branch, Deutsche Genossenschafts-

3    Hypothekenbank AG, and DG Holding Trust (collectively "DZ" or "Plaintiffs"),

4    by and through their attorneys, Labaton Sucharow, LLP, for their Complaint

5    against Bank of America Corporation ("BOA Corp."), Bank of America, N.A.

6    ("BOA N.A.") (collectively, the "Bank of America Defendants" or "BOA

7    Defendants"); Countrywide Financial Corporation ("Countrywide Financial"),

8    Countrywide Home Loans, Inc. ("Countrywide Home Loans"), Countrywide

9    Securities Corporation ("Countrywide Securities"), Countrywide Capital Markets,

10   LLC ("Countrywide Capital Markets"), CWABS, Inc. ("CWABS"), CWALT, Inc.

11   ("CWALT") (collectively, the "Countrywide Defendants" or "Countrywide");

12   Merrill Lynch & Co., Inc. ("ML & Co."), Merrill Lynch Mortgage Investors, Inc.

13   ("MLMI"), Merrill Lynch Mortgage Lending, Inc. ("MLML"), Merrill Lynch,

14   Pierce, Fenner & Smith Inc. (f/k/a Banc of America Securities LLC) ("MLPF&S")

15   and First Franklin Financial Corp. ("First Franklin") (collectively, the "Merrill

16   Lynch Defendants" or "Merrill Lynch" and together with the BOA Defendants and

17   Countrywide Defendants, the "Defendants") allege upon personal knowledge as to

18   their own actions and documents, and upon information and belief as to all other

19   matters, based on congressional records and testimony, governmental and

20   regulatory investigations, news reports, scholarly articles, and investigation of

21   counsel and its agents, as follows:

## **SUMMARY OF THE ACTION**

23   1.    This action arises out of Defendants' pervasive fraudulent conduct in

24   connection with the offer and sale to Plaintiffs of certain residential mortgage-

25   backed securities ("RMBS").  In reliance upon Defendants' material false

26   statements and omissions, and active concealment of material information,

27   Plaintiffs purchased approximately $505,569,509 in RMBS certificates (the

28   "Certificates") in connection with 21 securitizations (collectively, the

"Securitizations") originated, sponsored, arranged, marketed, and/or sold to DZ by Defendants and entities they controlled.  Plaintiffs' purchases of the Securitizations, including purchase dates and amounts invested, are detailed in Table 1, *infra* Section I.  As a result of Defendants' repeated and knowing material misrepresentations and omissions, Plaintiffs have suffered significant losses on their investments.

2.     To induce Plaintiffs and other investors to purchase the Certificates, Defendants gave investors information about the Certificates through offering materials that included registration statements, prospectuses, prospectus supplements, free writing prospectuses, term sheets, and other draft and final written materials (the "Offering Documents").  Each Certificate was offered for sale pursuant to a registration statement filed with the United States Securities and Exchange Commission ("SEC").  Each registration statement includes a prospectus ("Prospectus"), which explains the general structure of the investment, and one or more prospectus supplements ("Pro. Supp."), which contain detailed descriptions of the mortgage loans purportedly underlying the Securitizations.  As described in the Offering Documents, the Securitizations were purportedly backed by the principal and income payments received from mortgage loans.  The mortgage loans in the Securitizations were divided into loan pools or groups (the "Loan Groups"), with each tranche of the Securitization receiving distributions from specific Loan Groups.

3.     While the precise role for each Defendant in the Securitizations is set forth below, Defendants as a group participated in the creation of the RMBS trusts (the "Trusts"), the structuring of the Securitizations, and the preparation of the Offering Materials, pursuant to which the Certificates were marketed to Plaintiff. The Issuer Defendants, defined *infra* at ¶ 75, prepared, distributed and/or publicly filed the Offering Materials for the Securitizations.

4.      In the Offering Documents, the Defendants knowingly misrepresented the credit quality and characteristics of the pools of loans that comprised the Securitizations.  Extensive investigation and analysis by Plaintiffs into a large sample of the individual loans that purportedly comprised each of the Securitizations, and were tied to the Certificates purchased by Plaintiffs, has revealed that the Offering Documents materially misrepresented the loan-to-value ratios ("LTV"), the combined loan-to-value ratios ("CLTV"), and the rates of owner-occupancy for the various pools of loans purportedly underlying the Securitizations.  These are crucial and material metrics that Defendants knew and intended that prospective investors would rely upon, and which Plaintiffs did rely upon in making their decision to purchase the Certificates.

5.      The Offering Materials also stated that the mortgaged properties would be appraised (or otherwise valued) using a particular standard, such as the Uniform Standards of Professional Appraisal Practice or the appraisal standards of the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac").  *See*, *e.g.*, ABFC 2006-OPT1 Pro. Supp. dated August 8, 2006 at S-42; Appendix A (containing similar representations from the remaining Securitizations).  The appraisals were then used to calculate important statistics about the LTV and CLTV ratios of the loans.  *See infra* at IV.A.1.

6.      By reviewing a large sample of loans drawn from the loan group or pool associated with the particular Certificate(s) Plaintiffs purchased and comparing the information revealed by those reviews with the representations made about those loans in the Offering Documents, Plaintiffs have discovered, using industry-standard Automated Valuation Models ("AVMs"), that the Offering Documents understated LTV/CLTV by more than 10 percentage points in between 22% and 55.7% of the sampled loans for each of the Securitizations.  Plaintiffs have similarly discovered that the actual weighted average LTV/CLTV ratios were

1   up to 17.3 percentage points higher than the reported weighted average

2   LTV/CLTV ratio for the loans purportedly underlying the Securitizations.

3   Plaintiffs' investigation has also revealed that the Offering Documents overstated

4   owner-occupancy rates by approximately 7.6 to 55.3 percentage points in the

5   Securitizations, based on the sampled loans.  These misrepresentations

6   significantly altered the risk profile of Plaintiffs' investments.  Plaintiffs

7   unknowingly invested in securities that were materially different and far riskier

8   than the securities that were represented to them by Defendants.

9       7.      The Offering Materials also contained material representations, relied

10   on by Plaintiffs, that the underlying mortgage loans complied with specified

11   underwriting guidelines employed by the loan originators, including with respect to

12   appraisals of the mortgaged properties and the creditworthiness of the borrowers of

13   the underlying loans.  These statements were material to Plaintiffs' decision to

14   invest in the Certificates.

15       8.      These representations were false.  Among other things, a significant

16   percentage of the mortgage loans purportedly backing the securities were not

17   originated in accordance with the stated underwriting standards and had materially

18   poorer credit quality than what was represented in the Offering Materials.  The

19   Offering Documents falsely represented that the underlying mortgage loans and

20   properties complied with certain underwriting guidelines and standards of their

21   originators (the "Originators") or had compensating factors to offset such non-

22   compliance.

23       9.      In fact, there was a widespread and systematic departure from the

24   Originators' underwriting guidelines, and the Defendants were fully aware of that

25   fact at the time they made the misrepresentations and omissions in the Offering

26   Documents relied upon by Plaintiffs and other investors.  In fact, Countrywide has

27   recently admitted in a legal dispute with a bond insurer that their own internal due

28   diligence routinely showed that a substantial portion of the loans they securitized

1   during the same period that Plaintiffs purchased their Certificates did not conform

2   to Countrywide's stated guidelines.  Countrywide has also admitted in court filings

3   that they knew or should have known that a large percentage of the loans that they

4   never bothered to review also were non-conforming.  *See* Section V.D.6 *infra*.

5   These facts were never disclosed to investors such as Plaintiffs, who relied on the

6   false information reported in the Offering Documents because they were not given

7   access to the due diligence results.

8          10.    Defendants also knew they were securitizing and selling large

9   volumes of loans that failed to meet stated underwriting guidelines based on the

10   due diligence performed for them by third parties.  During at least 2006 and 2007,

11   Defendants used Clayton Holdings LLC ("Clayton") to perform due diligence on

12   the pools of mortgages that went into their RMBS securitizations.  Clayton told

13   Defendants that many loans were defective, but Defendants securitized and sold

14   them to Plaintiffs and other investors nonetheless.  In performing due diligence on

15   loans to be securitized, Clayton gave loans that deviated from underwriting

16   guidelines and did not have any "compensating factors" a failing grade of "3".

17   Clayton reported these grades, and the basis for them, to clients including

18   Defendants on a daily basis.  Thus, Defendants could see, in real time, exactly how

19   many defective loans they were purchasing.  A report obtained by the Financial

20   Crisis Inquiry Commission (the "FCIC"), a bipartisan commission of independent

21   experts tasked with investigating the causes of the financial crisis, confirmed that

22   Clayton reviewed securitizations for BOA, Countrywide and Merrill Lynch during

23   the 18-month period from the first quarter of 2006 through the second quarter of

24   2007.  *See* Clayton Holdings LLC, All Clayton Trending Report:  1st Quarter 2006

25   - 2nd Quarter 2007, at 6 (2007) (the "Clayton Report"), *available at* http://fcic-

26   static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-

27   Trending-Report.pdf.  According to the Clayton Report, Clayton informed

28   Defendants that between 23% and 30% of the loans that Clayton reviewed during

this period failed to meet underwriting guidelines and lacked compensating factors, but Defendants nonetheless "waived in" between 12% and 32% of these loans and included those loans in their securitizations.  Not only was this undisclosed to investors such as Plaintiffs, but Defendants represented exactly the opposite -- that all the loans in the securitizations would comply with the originators' underwriting guidelines or have compensating factors.

11.     Based on their due diligence prior to the issuance of the Certificates, the Defendants knew or were reckless or negligent in not knowing that large numbers of loans that they securitized and/or sold did not conform to the stated underwriting guidelines – including some of the Defendants who originated loans themselves – with respect to, *inter alia*, LTV/CLTV ratios and owner-occupancy.

12.     In particular, the growing disparity between Countrywide's representations concerning the characteristics and quality of the loans they originated and securitized, and the reality that these loans were, in the words of Countrywide CEO Angelo Mozilo, "toxic," is well-documented.  Congressional investigations have found that as "early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in 'catastrophic consequences.'"  *See* ¶ 186 *infra*.  Even Countrywide's internal documents readily acknowledge that during the time the Securitizations were issued, "[t]he focus of [loan] production was volume and margin, not credit risk." *See* ¶ 193 *infra.*

13.     Countrywide was able to proceed with making such risky loans only because it almost immediately transferred the risk of these bad loans to RMBS investors such as Plaintiffs.  Testimony of Countrywide's senior management confirms that saleability was the sole criteria used to determine whether a loan should be made.  *See* ¶ 160 *infra*.  The ability to sell off bad credit risk was, in turn, made possible by the gross misrepresentation of the data that investors rely upon to

1    measure credit risk, such as LTV, CLTV, owner-occupancy, and adherence to

2    underwriting guidelines.

3         14.    The Issuer Defendants (defined at ¶ 75 *infra*) are directly responsible

4    for the misstatements and omissions of material fact contained in the Offering

5    Documents concerning LTV, CLTV, owner-occupancy or adherence to

6    underwriting guidelines because they prepared and publicly filed these documents

7    in order to market and sell the Certificates to Plaintiffs and other investors.

8         15.    Alternatively, if the Issuer Defendants did not know that the

9    statements in the Offering Documents were false, then they negligently

10   misrepresented the LTV or CLTV, owner-occupancy, and adherence to

11   underwriting guidelines of the underlying loans, by failing to take basic measures

12   to discover their accuracy, despite having exclusive access to the loan files and

13   knowing that Plaintiffs and other investors were relying on them to conduct a

14   reasonable due diligence of the loans prior to securitization.

15        16.    The Underwriter Defendants (defined at ¶ 76 *infra*) also knew or was

16   reckless, or in the alternative, negligent, in not knowing of the falsity and

17   inaccuracy of the statements in the Offering Documents concerning the LTV or

18   CLTV, owner-occupancy, and Originators' adherence to underwriting guidelines,

19   because they had also reviewed the due diligence reports identifying these

20   inaccuracies and distributed Offering Documents containing representations they

21   knew, or should have known, to be false.  The Underwriter Defendants are

22   therefore directly liable for fraud and negligence as to these misrepresentations,

23   and aiding and abetting fraud.

24        17.    The Controlling Parent Defendants (defined at ¶ 62 *infra*) are likewise

25   responsible for the misstatements and omissions of material fact contained in the

26   Offering Documents concerning LTV or CLTV, owner-occupancy, and

27   Originators' adherence to underwriting guidelines given their direct participation

28   in, and dominion and control over, the business operations of other Defendants.

They are thus liable for fraud, negligent misrepresentation, and aiding and abetting fraud.

18.     The Originators, including the Originator Defendant (defined at ¶ 71 *infra*) and an internal unit within Defendant Defendant MLML (*see* ¶ 134 *infra*), originated the loans in the Securitizations.  Defendants were therefore fully aware of the misrepresentations concerning the loan characteristics on the vast majority of loans because Defendants themselves made those loans.  In particular, the Countrywide Defendants' own internal documents, as well as numerous government investigations and civil litigations, overwhelmingly show that Countrywide was not only aware of its deteriorating loan quality, but actively encouraged it as a means to increase its market share.  *See* Section V.D.1. *infra*. As to the minority of loans that were purchased from third-party originators, Defendants knew of the deficiencies in the quality of the loans being bought from the Originators, including misstated LTV or CLTV ratios and owner-occupancy percentages, as a result of the due diligence Defendants conducted prior to issuance of the Certificates.  *See* Section V. *infra*.  Therefore, Defendants knew that a great many of the loans they securitized, regardless of their origin, did not comply with or support the statements Defendants made in the Offering Documents concerning LTV or CLTV, owner-occupancy, and adherence to stated underwriting guidelines.

19.     Defendants also falsely represented that the securities being offered were mortgage-backed because, contrary to statements made in the Offering Documents and the underlying pooling and service agreements ("PSAs"), the notes and mortgages underlying the Securitizations were not transferred to the Trusts upon closing.

20.     Through investigation of a large sample of publicly recorded mortgage documents, Plaintiffs have discovered evidence that the vast majority of the sampled mortgages in each of these Securitizations were not transferred to the Trusts at closing of the Securitizations.  In particular, many of these mortgages

1  remain in the name of the loan's Originator or its nominee, and have never been

2  transferred to the Trusts.  While other mortgages were purportedly transferred to

3  the Trusts through assignments, those purported assignments were executed long

4  after the certificates were issued, contrary to representations in the Offering

5  Documents.  Additionally, most of the purported assignment documents reference

6  a contemporaneous transfer of the note, which in every instance was also untimely.

7  The purported transfer of notes and mortgages to the Trust years after the

8  Securitization closed means that the mortgage-backed securities Defendants

9  represented that they were selling to Plaintiffs were not even mortgage-backed at

10  the time of the closing of the Securitization.

11      21.    The failure to timely and properly transfer notes and mortgages to an

12  RMBS trust prevents the trust from legally collecting the principal and interest

13  payments from the borrowers and impairs and may eliminate the trust's ability to

14  foreclose on the collateral – *i.e.*, the mortgaged property – in the event of a

15  borrower default.  This resulted in impaired cash flow to the Trusts, thereby

16  lessening the value of Certificates for subsequent resale.

17      22.    The Defendants knew or were reckless, or in the alternative negligent,

18  in not knowing of the falsity of the representations in the Offering Documents

19  concerning transfer of notes and mortgages.  The Defendants misrepresented and

20  omitted material facts concerning those representations, thus defrauding, or in the

21  alternative negligently misleading, Plaintiffs into purchasing the Certificates.

22      23.    The Issuer Defendants are directly responsible for the misstatements

23  and omissions of material fact contained in the Offering Documents concerning

24  transfer of notes and mortgages to the Trusts because they prepared and/or publicly

25  filed these documents in order to market and sell the Certificates to Plaintiffs and

26  other investors.  The Issuer Defendants knew, or were reckless, or in the alternative

27  negligent, in not knowing that transfers of notes and mortgages to the Trusts had

28  not been properly made – especially since, unbeknownst to DZ, the same failure

1  had occurred with respect to Defendants' securitizations from prior years. The

2  Issuer Defendants misrepresented and omitted material facts concerning the lack of

3  valid transfer of notes and mortgages to the Trusts, thus defrauding Plaintiffs into

4  making these investments.

5        24.    The Underwriter Defendants also knew or were recklessly (or in the

6  alternative negligently) indifferent to the accuracy of the statements concerning the

7  transfer of mortgages and notes to the Trusts. Upon information and belief, the

8  Underwriter Defendants not only reviewed the Offering Documents but also

9  assisted in the preparation of the Offering Documents and were required to

10  perform due diligence in connection therewith. Therefore, the Underwriter

11  Defendants distributed Offering Documents to Plaintiffs' in order to solicit

12  Plaintiffs' investment in the Securitizations knowing that the Offering Documents

13  contained false and misleading information. Further, with respect to the vast

14  majority of the Securitizations, the Underwriter Defendants were affiliated with the

15  Issuer Defendants and shared officers and directors with them. Thus, the

16  Underwriter Defendants are liable for fraud, as well as aiding and abetting the

17  other Defendants' fraud through their substantial assistance in the preparation of

18  the Offering Documents and knowledge of the due diligence results for each of the

19  Securitizations prior to the time they solicited Plaintiffs' investment in the

20  Securitizations.

21        25.    The Controlling Parent Defendants are likewise responsible for the

22  misstatements and omissions of material fact contained in the Offering Documents

23  concerning failure to transfer notes and mortgages given their direct participation

24  in, and dominion and control over, the business operations of other Defendants.

25  They are thus liable for fraud, negligent misrepresentation, and aiding and abetting

26  fraud.

27        26.    The Defendants' various misrepresentations concerning the

28  characteristics of the loans underlying the Securitizations, and their transfer to the

Trusts, were not only material, but central to Plaintiffs' decisions to invest in the Securitizations.  Had Plaintiffs known that the quality and characteristics of a large number of loans purportedly underlying the Securitizations were materially worse than represented in the Offering Documents – and, indeed, that the notes and mortgages were never intended to be, and in fact most never were, properly transferred to the Trusts – Plaintiffs would not have purchased the Certificates.

27.     The Issuer Defendants conducted their due diligence using loan files and other information gathered when they purchased the loans from the Originators, none of which was accessible to Plaintiffs prior to their purchase of the Certificates or at any point in time thereafter.  The misrepresentations in the Offering Documents with respect to LTV or CLTV ratios, owner-occupancy rates, Originators' adherence to underwriting guidelines, and transfer of notes and mortgages could not have been discovered through the exercise of reasonable diligence or ordinary intelligence by Plaintiffs at the time of the purchases.  Rather, the matters misrepresented in the Offering Documents were particularly within the exclusive knowledge of the Defendants, which originated, purchased, reviewed, and securitized the underlying loans and sold the resulting Certificates to Plaintiffs.

28.     Moreover, the Defendants knew that investors such as the Plaintiffs would receive and rely on the representations in the Offering Documents in deciding whether to invest in the Securitizations.  The Plaintiffs were part of a specific group to whom Defendants' misrepresentations were directed.  The Securitizations were targeted at a group of buyers comprised of institutional investors like Plaintiffs.  They were sold by means of a direct solicitation by the Underwriter Defendants to investment managers acting as agents of the Plaintiffs, whom Defendants knew were agents of the Plaintiffs and whom Defendants knew would pass on to Plaintiffs information regarding those Securitizations.  The Underwriter Defendants made solicitations to Plaintiffs' agents, by means of the

1   Offering Documents, for the purpose of inducing Plaintiffs (among others) to
2   invest in the Securitizations.

3        29.    As a direct result of Defendants' misrepresentations, Plaintiffs have
4   suffered massive losses on the Certificates it sold -- exceeding $29.6 million -- and
5   the Certificates Plaintiffs hold continues to suffer realized principal write-downs
6   and concomitant decreases in market value.  Plaintiffs purchased the Certificates at
7   prices that were inflated by Defendants' misrepresentations and omissions.  Over
8   time the prices for the Certificates adjusted substantially lower to account for the
9   true nature of the collateral purportedly backing the Certificates and when
10  Plaintiffs sold their Certificates, Plaintiffs incurred substantial losses.  Plaintiffs
11  therefore seek rescission and/or compensatory damages from Defendants for fraud,
12  fraudulent concealment, negligent misrepresentation, aiding and abetting fraud and
13  mutual mistake.

14       30.    Defendants' wanton and reckless misconduct was part of a pattern of
15  similar conduct of defrauding investors in numerous other securitizations they
16  issued.  Those other securitizations, like the ones at issue here, were aimed at other
17  investors and the public generally.  Plaintiffs are therefore entitled to punitive
18  damages.

19                                    **PARTIES**
20  **Plaintiffs**

21       31.    Plaintiff Deutsche Zentral-Genossenschaftsbank AG, d/b/a DZ Bank
22  AG, New York Branch, is a commercial bank incorporated in Germany with an
23  office and separate financial base at 609 Fifth Avenue, New York, New York,
24  10017.  Plaintiff operates in New York pursuant to a license issued by the New
25  York Department of Financial Services (previously known as the New York State
26  Banking Department) under the New York Banking Law.  Plaintiff's New York
27  Branch occupies 36,000 square feet and currently employees 85 employees.  All of
28

1    Plaintiff's activities must be, and have been, authorized and regulated by the New

2    York Department of Financial Services and the Federal Reserve Bank.

3        32.    Plaintiff Deutsche Genossenschafts-Hypothekenbank AG ("DG

4    HYP") is a stock corporation organized under German law with its principal place

5    of business at Rosenstrasse 2, D-20095 Hamburg, Federal Republic of Germany.

6    DG HYP purchased the CWALT 2007-OH2 Certificate listed in Table 1.

7        33.    Plaintiff DG Holding Trust is a statutory business trust formed under

8    the Delaware Business Trust Act with its principal place of business at 609 Fifth

9    Avenue, New York, New York, 10017.  DG Holding Trust purchased the CWALT

10   2006-OC1 Certificate listed in Table 1.

11   **Defendants**

12       34.    Defendant BOA Corp. is a Delaware corporation having its principal

13   place of business at 100 North Tryon Street, Charlotte, North Carolina 28255.

14   BOA Corp. is an indirect parent corporation of Defendant BOA N.A.

15       35.    Defendant BOA N.A. is a federally-chartered bank having its

16   principal place of business at 100 North Tryon Street, Charlotte, North Carolina

17   28255.  BOA N.A. is an indirect, wholly-owned subsidiary of Defendant BOA

18   Corp.  All allegations made against BOA N.A. are also made against BOA Corp.

19       36.    Defendant Countrywide Financial is a Delaware corporation having

20   its principal place of business at 4500 Park Granada, Calabasas, California 91302.

21   As described below, Countrywide Financial is either the direct or indirect parent of

22   each of the Countrywide Defendants.  Pursuant to a merger completed on July 1,

23   2008, Countrywide Financial has been merged into and is now a part of BOA

24   N.A..  All allegations made against Countrywide Financial are also made against

25   BOA Corp. and BOA N.A. as its successors-in-interest.  *See* Section XV. *infra*.

26       37.    Defendant Countrywide Home Loans (d/b/a Bank of America Home

27   Loans) is a New York corporation having its principal place of business at 4500

28   Park Granada, Calabasas, California 91302.  Countrywide Home Loans is a direct,

1   wholly-owned subsidiary of Defendant Countrywide Financial.  All allegations

2   made against Countrywide Home Loans are also made against Countrywide

3   Financial, as well as BOA Corp. and BOA N.A. as Countrywide Financial's

4   successors-in-interest.

5        38.    Defendant Countrywide Securities is a California corporation having

6   its principal place of business at 4500 Park Granada, Calabasas, California 91302.

7   Countrywide Securities is an indirect subsidiary of defendant Countrywide

8   Financial.  All allegations made against Countrywide Securities are also made

9   against Countrywide Financial, as well as BOA Corp. and BOA N.A. as

10  Countrywide Financial's successors-in-interest.

11       39.    Defendant Countrywide Capital Markets is a California corporation

12  having its principal place of business at 4500 Park Granada, Calabasas, California

13  91302.  Countrywide Capital Markets is a wholly-owned subsidiary of

14  Countrywide Financial, and is also now part of Bank of America by virtue of the

15  merger of Countrywide Financial into Bank of America.  Countrywide Capital

16  Markets operates through its two main wholly-owned subsidiaries, Defendant

17  Countrywide Securities and non-party Countrywide Servicing Exchange.  As the

18  wholly-owning parent of Defendant Countrywide Securities, Countrywide Capital

19  Markets had the practical ability to direct and control the actions of Countrywide

20  Securities and did in fact exercise control over Countrywide Securities related to

21  the issuance and sale of the Certificates.

22       40.    Defendant CWABS is a Delaware corporation having its principal

23  place of business at 4500 Park Granada, Calabasas, California 91302.  CWABS is

24  a limited-purpose finance subsidiary of Defendant Countrywide Financial.  All

25  allegations made against CWABS are also made against Countrywide Financial, as

26  well as BOA Corp. and BOA N.A. as Countrywide Financial's successors-in-

27  interest.

28

41.     Defendant CWALT is a Delaware corporation having its principal
place of business at 4500 Park Granada, Calabasas, California 91302.  CWALT is
a limited-purpose finance subsidiary of Defendant Countrywide Financial.  All
allegations made against CWALT are also made against Countrywide Financial, as
well as BOA Corp. and BOA N.A. as Countrywide Financial's successors-in-
interest.

42.     Defendant ML & Co. is a holding company incorporated under the
laws of Delaware with its principal executive office located at 4 World Financial
Center, 250 Vesey Street, New York, New York 10080.  It is the parent company
of all of the Merrill Lynch Defendants, as defined below.  Through its various
subsidiaries, ML & Co. engages in capital markets, advisory and wealth and
investment management services, purports to be a leading global trader and
underwriter of securities and derivatives across a broad range of asset classes and
serves as a strategic advisor to corporations, governments, institutions and
individuals worldwide.  On January 1, 2009, ML & Co. became a wholly-owned
subsidiary of BOA Corp.

43.     Defendant MLMI is a Delaware corporation having its principal place
of business located at 4 World Financial Center, 250 Vesey Street, New York,
New York 10080.  It is a direct, wholly-owned subsidiary of Merrill Lynch
Mortgage Capital, Inc., which in turn is a wholly-owned, indirect subsidiary of ML
& Co.  MLMI served as the depositor for several of the Securitizations at issue
here, and was therefore also responsible for preparing and filing the Offering
Documents and other filings required under the Securities Act of 1933.  On
January 1, 2009, MLMI became a wholly-owned, indirect subsidiary of BOA
Corp. as a result of BOA Corp.'s acquisition of ML & Co. and its subsidiaries.  All
allegations against MLMI are also made against its controlling parent company,
ML & Co.

44.     Defendant MLML is a Delaware corporation having its principal place of business located at 4 World Financial Center, 250 Vesey Street, New York, New York 10080.  MLML is a direct, wholly-owned subsidiary of Merrill Lynch Mortgage Capital, Inc., which in turn is a wholly-owned, indirect subsidiary of ML & Co.  MLML served as the sponsor for several of the Securitizations at issue here, and was therefore also responsible for preparing and filing the Offering Documents and other filings required under the Securities Act of 1933.  On January 1, 2009, MLML became a wholly-owned, indirect subsidiary of BOA Corp. as a result of BOA Corp.'s acquisition of ML & Co. and its subsidiaries.  All allegations against MLML are also made against its controlling parent company, ML & Co.

45.     Defendant MLPF&S is a Delaware corporation and SEC-registered broker-dealer having its principal place of business located at 4 World Financial Center, 250 Vesey Street, New York, New York 10080.  MLPF&S is a direct, wholly-owned subsidiary of ML & Co.  Plaintiffs purchased Certificates from MLPF&S in its capacity as underwriter for certain of the Securitizations at issue here.  On January 1, 2009, MLPF&S became a wholly-owned, indirect subsidiary of BOA Corp. as a result of BOA Corp.'s acquisition of ML & Co. and its subsidiaries.  All allegations against MLPF&S are also made against its controlling parent company, ML & Co.  MLPF&S is also liable as successor-in-interest to Banc of America Securities LLC ("BOA Securities"), which was the underwriter for several of the Securitizations at issue here.  On November 1, 2010, BOA Securities – at the time a Delaware corporation and wholly-owned subsidiary of BOA Corp. – was merged with and into MLPF&S, with MLPF&S as the surviving corporation.  As a result of this merger, all of the issued and outstanding capital stock of MLPF&S remained outstanding and all of the issued and outstanding membership interests of BOA Securities were cancelled with no consideration paid with respect thereto.  Following this merger, MLPF&S remained a direct, wholly-

1    owned broker-dealer subsidiary of ML & Co., and an indirect subsidiary of BOA

2    Corp.  Defendant MLPF&S is liable as a matter of law as successor-in-interest to

3    BOA Securities by virtue of its status as the surviving entity in its merger with

4    BOA Securities.

5        46.    Defendant First Franklin is a Georgia corporation having its principal

6    place of business located at 2150 North 1st Street, San Jose, California 95131. First

7    Franklin is a direct, wholly-owned subsidiary of Merrill Lynch Mortgage Capital,

8    Inc., which in turn is a wholly-owned, indirect subsidiary of ML & Co.  First

9    Franklin served as the sponsor for one of the Securitizations at issue here, and was

10   therefore also responsible for preparing and filing the Offering Documents and

11   other filings required under the Securities Act of 1933.  All allegations against

12   First Franklin are also made against its controlling parent company, ML & Co.

13   **Relevant Non-Party**

14       47.    Asset Backed Funding Corporation ("ABFC") was the depositor in

15   the ABFC 2006-HE1 and ABFC 2006-OPT1 Securitizations.  ABFC is a direct

16   subsidiary of BOA N.A. and an indirect wholly-owned subsidiary of BOA Corp.

17   Defendants BOA N.A. and BOA Corp. dominated and controlled ABFC's actions

18   and are therefore liable for ABFC's actions as the controlling parent companies.

19                      **JURISDICTION AND VENUE**

20       48.    Defendants removed this case from the New York State Supreme

21   Court to the United States District Court for the Southern District of New York

22   asserting federal jurisdiction on the basis of 28 U.S.C. §§ 1452(a) and 1334(b) and

23   Fed. R. Bankr. P. 9027, and 28 U.S.C. §§ 1332, 1441 and 1446.  The case was then

24   transferred under 28 U.S.C. §1407 to the United States District Court for the

25   Central District of California pursuant to Rule 7.1 of the Rules of Procedure of the

26   United States Judicial Panel on Multidistrict Litigation.

27       49.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

28   Many of the acts charged herein, including the preparation and dissemination of

materially false and misleading information, occurred in substantial part in this District.

**FACTUAL ALLEGATIONS**

**I.      THE SECURITIZATIONS**

50.     Plaintiffs invested in Certificates.  Each of the Certificates was purchased from the Underwriter Defendants, as set forth in Table 1 below.  Plaintiffs suffered losses as a result of Defendants' misrepresentations in connection with their purchases of the Certificates.  With respect to the ABFC 2006-HE1, CBASS 2006-CB6, FFMER 2007-3, FFML 2005-FF12 and MLMI 2007-HE1 Certificates, Plaintiffs sold those Certificates at a substantial loss.  Plaintiffs continue to hold the remaining Certificates as of the date hereof.

51.     The Certificates issued and sold by Defendants that Plaintiffs invested in are set forth in Table 1 below:

**Table 1**

| Deal Name and Tranche | CUSIP | Trade Date | Issue Date | Amount Invested | Sale Date | Loss from Sale[1] |
|---|---|---|---|---|---|---|
| CWL 2005-14 3A2 | 126670LM8 | 12/1/2005 | 12/21/2005 | $22,000,000 | | |
| CWL 2005-IM3 A3 | 126670JD1 | 11/17/2005 | 12/21/2005 | $33,000,000 | | |
| CWALT 2006-OC1 2A2[2] | 12668BJT1 | 1/26/2006 | 1/30/2006 | $30,000,000 | | |
| CWL 2006-IM1 A2 | 126670SP4 | 1/18/2006 | 1/30/2006 | $28,000,000 | | |
| CWL 2006-IM1 A2 | 126670SP4 | 5/31/2007 | 1/30/2006 | $15,000,000 | | |
| CWL 2007-BC2 2A1 | 12669QAB5 | 4/27/2007 | 4/27/2007 | $30,000,000 | | |
| CWL 2007-9 2A3 | 12670FAD2 | 6/5/2007 | 6/8/2007 | $25,000,000 | | |
| CWL 2007-10 2A3 | 23246BAJ0 | 6/22/2007 | 6/29/2007 | $40,000,000 | | |
| CWALT 2006-OC1 2A2 | 12668BJT1 | 1/25/2006 | 1/30/2006 | $20,000,000 | | |
| CWALT 2007-OH2 A2A[3] | 02151RAC7 | 6/27/2007 | 6/29/2007 | $20,000,000 | | |

---

[1]  "Loss From Sale" does not include interest or other damage amounts, it is simply the amount of the purchase price minus the amount of the proceeds received in the sale.

[2]  Purchased by Plaintiff DG Holding Trust.

[3]  Purchased by Plaintiff DG HYP.

| Deal Name and Tranche | CUSIP | Trade Date | Issue Date | Amount Invested | Sale Date | Loss from Sale[1] |
|---|---|---|---|---|---|---|
| ABSHE 2004-HE6 A1 | 04541GLG5 | 7/27/2006 | 9/2/2004 | $25,004,422 | | |
| IMM 2005-6 1A1 | 45254NQG5 | 9/27/2006 | 9/9/2005 | $ 9,673,087 | | |
| MSHEL 2007-1 A3 | 61751QAC9 | 5/25/2007 | 2/28/2007 | $ 2,700,000 | | |
| ABFC 2006-HE1 A2C | 00075WAC3 | 12/4/2006 | 12/14/2006 | $19,192,000 | 7/12/2011 | $12,858,640 |
| ABFC 2006-OPT1 M1 | 00075QAE2 | 8/8/2006 | 8/10/2006 | $10,000,000 | | |
| CBASS 2006-CB6 A23 | 14986PAD5 | 7/27/2006 | 7/31/2006 | $13,000,000 | 12/4/2012 | $3,502,825 |
| FFMER 2007-3 A2B | 59024VAF6 | 5/24/2007 | 5/30/2007 | $20,000,000 | 12/3/2012 | $3,600,074 |
| FFML 2005-FF12 A2B | 32027NXU0 | 12/15/2005 | 12/28/2005 | $40,000,000 | 11/19/2012 | $699,811 |
| MLMI 2007-HE1 A2A | 59024EAB3 | 3/6/2007 | 3/8/2007 | $48,000,000 | 11/19/201 | $8,995,167 |
| SURF 2006-BC1 M1 | 84751PKC2 | 2/3/2006 | 2/21/2006 | $15,000,000 | | |
| SURF 2006-BC4 M1 | 84751YAF7 | 9/8/2006 | 9/27/2006 | $10,000,000 | | |
| OOMLT 2007-6 2A2 | 68403KAB1 | 5/18/2007 | 5/30/2007 | $15,000,000 | | |
| OOMLT 2006-2 M1 | 68402CAF1 | 6/23/2006 | 6/29/2006 | $15,000,000 | | |

## II.   THE SECURITIZATION PROCESS

52.    RMBS securitization is the process by which investment banks pool typically thousands of residential mortgages together in a trust, which then issues securities in the form of certificates to investors.  The certificates entitle the holders to a portion of the monthly revenue stream produced by principal and interest payments made by the mortgage borrowers.  This monthly revenue stream is overseen and managed by the appointed trustee of each Trust (the "Trustee").

53.    The process begins when a lending institution makes a home loan, secured by a mortgage, to a borrower.  The lender, also known as the "originator," then sells such loans, typically in bulk, to a separate securitizing entity, typically an affiliate of the investment bank arranging the securitization, called the "sponsor" or "seller."  The sponsor or seller in turn sells the loans to the "depositor," typically

also an affiliate of the same investment bank.  Both the sponsor and depositor may be considered an "issuer" of the securities.

54.     Since many of the originating lenders did not have other sources of capital, their source of capital and funding to make mortgage loans to borrowers usually came from warehouse lending facilities extended by financial institutions such as Bank of America.  In other words, the originating lenders borrow money from financial institutions such as Bank of America to lend money in the form of home loans.  The financial institutions providing warehouse lending facilities perform extensive due diligence on, *inter alia*, the originating lender's operations and the underlying collateral, which consists of the mortgage loans.  This due diligence process is conducted as a matter of course by any prudent lender providing what is typically a multi-million dollar credit facility.

55.     When the issuer purchases loans from an originator, the issuer gains access to all of the loan files, which contain the underlying documentation that the borrowers submitted in connection with their loan applications, together with any additional information, such as appraisals and credit assessments.  Plaintiffs and other investors did not have access to the loan files, prior to, at, or subsequent to the time of their purchase.

56.     The issuer conducts a due diligence review of the loan files associated with the pool of mortgages it is purchasing to ensure that the loans were made in accordance with the stated underwriting guidelines of the originator or originators.  Typically, the issuer conducts the review through a third-party vendor, such as Clayton, which reviewed loans for Defendants' securitizations.  The third-party review of the loan files includes verification of, *inter alia*, the reported appraisal value of the home, the primary residence of the borrower (*i.e.*, whether the property is owner-occupied), the borrower's debt-to-income ratio, the loan documentation level and other data points.

57.     The purpose of this due diligence review is to ensure that the loans in the securitization were originated in compliance with the originators' stated underwriting guidelines.  After its review, the due diligence vendor provides the issuer with a report summarizing its due diligence of the pool of loans that it reviewed and advises the issuer which loans complied with underwriting guidelines and which failed.  The Offering Documents represent that any loan which does not comply with the stated underwriting guidelines cannot and will not be included in the securitized loan pool unless it is specifically found to have certain compensating factors.

58.     Based on the results of the due diligence review, the issuer determines which loans to include in the loan pools for each securitization and prepares offering materials describing the characteristics of the securitized loans.  As discussed in greater detail below, the issuer makes representations to investors in the offering materials concerning, among other things, LTV/CLTV ratios of the mortgages, the owner-occupancy status of the mortgaged properties, the originators' adherence to underwriting guidelines, ratings, and the fact that the notes and mortgages are to be assigned to the trusts on or before the closing date. The results of the due diligence review itself, however, are not included in the offering materials and are therefore not available to investors like Plaintiffs.

59.     According to the offering materials, once the due diligence review is complete, and prior to the issuance of the certificates, the depositor must "deposit" all of the loans into the trust by transferring and assigning each of the notes and mortgages to the trust in accordance with all applicable state and local laws.

60.     The trust then issues certificates of varying seniority, called "tranches," which entitle the certificate-holder to receive a portion of the principal and interest payments that the borrowers make on their mortgage loans.  In the event that a borrower defaults on his or her loan obligation, the trust is entitled to

1  foreclose on the property, and will then distribute the sale proceeds to certificate-
2  holders according to the priority specified in the offering materials.

3        61.    The certificates are initially allocated to one or more underwriters,
4  which identify potential investors, market the certificates to those investors based
5  on the offering materials, and ultimately sell the certificates to the investors.

6  **III.    DEFENDANTS' PARTICIPATION IN THE SECURITIZATIONS**

7        62.    BOA Corp., Countrywide Financial and ML & Co. (collectively, the
8  "Controlling Parent Defendants") each owned and controlled the respective
9  Defendants in this action:  During the time period when Plaintiffs purchased the
10  Certificates, BOA Corp. directly or indirectly owned and controlled each of the
11  other BOA Defendants, Countrywide Financial directly or indirectly owned and
12  controlled each of the other Countrywide Defendants, and subsequent to Bank of
13  America's merger with Countrywide in 2008, BOA Corp. directly or indirectly
14  owned and controlled each of the Countrywide Defendants, as well as the
15  remaining BOA Defendants, and ML & Co. directly or indirectly owned and
16  controlled each of the other Merrill Lynch Defendants.

17        63.    Moreover, the BOA Defendants, Countrywide Defendants and Merrill
18  Lynch Defendants shared officers, directors, executives, and high-level employees
19  within their groups (as shown on Tables 2-4 below).  Because of the substantial
20  overlap in executives and high-level personnel, the knowledge of each entity with
21  an overlap can be attributed to the others with which it overlaps:  a director,
22  officer, or high-level employee does not forget what he or she knows about the
23  operations of an entity when he or she changes hats to work for its affiliates.  Each
24  such employee takes the knowledge learned in one position with them as they
25  fulfill their roles for the various other Defendants.

26
27
28

## Table 2 – BOA Defendants

| Name | Bank of America Corporation (Controlling Parent) | Bank of America, National Association (Originator, Sponsor) | Banc of America Securities LLC (n/k/a MLPF&S) (Underwriter) | ABFC (Non-Party Depositor) |
|---|---|---|---|---|
| George C. Carp | Managing Director, Capital Markets Finance Executive | | Employee | Treasurer;, Chief Accounting Officer; Chief Financial Officer |
| George E. Ellison | | | Managing Director, Global Structured Finance | Director; President |
| Daniel B. Goodwin | | | Managing Director | President; Chief Executive Officer |
| Bruce W. Good | | Vice President, Principal | | Vice President |

## Table – 3 Countrywide Defendants

| Name | Countrywide Financial Corporation (Controlling Parent) | Countrywide Home Loans, Inc. (Originator and Sponsor) | Countrywide Securities Corporation (Underwriter) | CWALT, Inc. (Depositor) | CWABS, Inc. (Depositor) |
|---|---|---|---|---|---|
| Stanford L. Kurland | Executive Vice President, Chief Operating Officer | Chief Executive Officer | | President, Chief Executive Officer, Chairman of the Board | President, Chief Executive Officer, Chairman of the Board |
| David A. Spector | Senior Managing Director, Secondary Marketing | | | Vice President, Director | Vice President, Director |
| Eric P. Sieracki | Executive Vice President, Chief Financial Officer | | | Executive Vice President, Chief Financial Officer, Treasurer, and Director | Executive Vice President, Chief Financial Officer, Treasurer, and Director |
| N. Joshua Adler | | | | President, Chief Executive Officer, and Director | President, Chief Executive Officer, and Director |
| Ranjit Kripalani | Executive Managing Director, Capital Markets | | President, Chief Executive Officer, Managing Director | Director | Director |

| Name | Countrywide Financial Corporation (Controlling Parent) | Countrywide Home Loans, Inc. (Originator and Sponsor) | Countrywide Securities Corporation (Underwriter) | CWALT, Inc. (Depositor) | CWABS, Inc. (Depositor) |
|---|---|---|---|---|---|
| Jennifer S. Sandefur | | Senior Managing Director, Treasurer | | Director | Director |
| David A. Sambol | President, Chief Operating Officer | Chairman of the Board, Chief Operating Officer | | | |
| Thomas Keith McLaughlin | Executive Vice President, Chief Financial Officer | | | Executive Vice President, Chief Financial Officer, and Treasurer | Executive Vice President, Chief Financial Officer, and Treasurer |
| Thomas H. Boone | Senior Managing Director, Chief Administrative Officer | | | Director | Director |
| Jeffrey P. Grogin | | | | Director | Director |

## Table 4 – Merrill Lynch Defendants

| Name | ML & Co. (Controlling Parent) | MLMI (Depositor) | MLML (Sponsor) | MLPF&S (Underwriter) |
|---|---|---|---|---|
| Matthew Whalen | Managing Director, ABS | President; Chairman of the Board | | |
| Brian T. Sullivan | Employee | Vice President; Treasurer; Controller | | |
| Michael M. McGovern | Senior Counsel | Director | | |
| Paul Park | Managing Director | President; Chairman of the Board | | Authorized signatory |
| Tom Saywell | Managing Director | Authorized signatory | | Director, Securitization; Authorized signatory |
| Harley S. Bassman | Managing Director | | President; Chairman of the Board | |
| Jonathan Santelli | Assistant Secretary | | | Assistant Secretary |
| Rosemary T. Berkery | Executive Vice President | | | Executive Vice President |
| Robert McCann | Executive Officer | | | Executive Vice President |

| Name | ML & Co. (Controlling Parent) | MLMI (Depositor) | MLML (Sponsor) | MLPF&S (Underwriter) |
|---|---|---|---|---|
| Do Woo (Dow) Kim | Senior Vice President, Global Debt Markets | | | Director; Executive Vice President |
| Michael Blum | Managing Director; Head of Global Asset Based Finance | | | Employee |

64.     The overlapping and interconnected nature of the directorships, officerships, and executive positions among each defendant group better enabled the Defendants to control and dominate their RMBS securitization businesses and thereby increase overall revenues.  Indeed, the Controlling Parent Defendants each treated their securitization activities as an integrated whole to which their various respective subsidiaries made undifferentiated contributions.  In their Consolidated Financial Statements for 2007, for example, BOA Corp., Countrywide Financial and ML & Co. each reported their proceeds from and gains on "Securitizations" in the aggregate, without attribution to any particular subsidiaries.  *See* Consolidated Financial Statements – BOA Corp. 2007 10-K at p. 110; Consolidated Financial Statements – Countrywide Financial 2007 10-K at p. F-24; Consolidated Financial Statements – ML&Co. 2007 10-K at 117.  As such, the Controlling Parent Defendants are each jointly and severally liable for the misrepresentations and omissions in the Offering Documents generated and distributed by their respective subsidiaries.  Further, BOA Corp. and BOA N.A. are liable as the successors-in-interest to the Countrywide Defendants, each of which is jointly and severally liable for the misrepresentations and omissions in their Offering Documents.

65.     The Defendants participated in the structuring, arranging, modeling, pricing, and/or the sale of Certificates at issue here.  As discussed above, an essential part of this process is the origination or acquisition of loans and the timely transfer to a trust that is created to take legal ownership over the pool of mortgage loans and to issue the certificates backed by those loans.  Defendants were also responsible for underwriting the offering of the Certificates and

marketing and selling the Certificates to investors, including Plaintiffs. Accordingly, each Defendant is jointly and severally liable for the misstatements and omissions of material fact alleged herein.  The relevant entities for each of the Securitizations are set forth in Table 5 below.

## Table 5

| TRUST NAME | SPONSOR | DEPOSITOR | COUNTERPARTY/ UNDERWRITER | ORIGINATOR(S) |
|---|---|---|---|---|
| CWL 2005-14 | | CWABS, Inc. | Countrywide Securities Corporation | Countrywide Home Loans, Inc. |
| CWL 2005-IM3 | | CWABS, Inc. | Countrywide Securities Corporation | Impac Funding Corporation |
| CWALT 2006-OC1 | Countrywide Home Loans, Inc | CWALT, Inc. | Countrywide Securities Corporation | Countrywide Home Loans, Inc. American Home Mortgage Decision One Mortgage LLC First National Bank of Arizona |
| CWL 2006-IM1 | Countrywide Home Loans, Inc | CWABS, Inc. | Countrywide Securities Corporation | Impac Funding Corporation |
| CWL 2007-BC2 | Countrywide Home Loans, Inc | CWABS, Inc. | Countrywide Securities Corporation | Countrywide Home Loans, Inc. Quick Loan Funding Inc. Wilmington Finance Incorporated |
| CWL 2007-9 | Countrywide Home Loans, Inc | CWABS, Inc. | Countrywide Securities Corporation | Countrywide Home Loans, Inc. |
| CWL 2007-10 | Countrywide Home Loans, Inc | CWABS, Inc. | Countrywide Securities Corporation | Countrywide Home Loans, Inc. |
| CWALT 2007-OH2 | Countrywide Home Loans, Inc | CWALT, INC. | Non-party/ Countrywide Securities Corporation | Countrywide Home Loans, Inc. Flagstar Bank, FSB |
| ABSHE 2004-HE6 | | Asset Backed Securities Corporation | Countrywide Securities Corporation | Argent Mortgage Company, LLC New Century Mortgage Corporation |

| TRUST NAME | SPONSOR | DEPOSITOR | COUNTERPARTY/ UNDERWRITER | ORIGINATOR(S) |
|---|---|---|---|---|
| IMM 2005-6 | | | Non-party/ Countrywide Securities Corporation | Impac Mortgage Holdings, Inc. |
| MSHEL 2007-1 | | | Countrywide Securities Corporation | Accredited Home Lenders, Inc.<br><br>Wilmington Finance, Inc.<br><br>Fremont Investment & Loan<br><br>First NLC Financial Services, LLC |
| ABFC 2006-HE1 | Bank of America, National Association | Asset Backed Funding Corporation | Countrywide Securities Corporation/ Banc of America Securities LLC | Accredited Home Lenders, Inc.<br><br>Ameriquest Mortgage Company<br><br>NC Capital Corporation<br><br>Option One Mortgage Corporation<br><br>WMC Mortgage Corp. |
| ABFC 2006-OPT1 | Bank of America, National Association | Asset Backed Funding Corporation | Countrywide Securities Corporation/ Banc of America Securities LLC | Option One Mortgage Corporation |
| CBASS 2006-CB6 | Credit-Based Asset Servicing and Securitization LLC | Asset Backed Funding Corporation | Countrywide Securities Corporation/ Banc of America Securities LLC | Ameriquest Mortgage Company<br><br>New Century Mortgage Corporation<br><br>Ownit Mortgage Solutions, Inc.<br><br>Wilmington Finance Inc. |
| FFMER 2007-3 | First Franklin Financial Corporation | Merrill Lynch Mortgage Investors, Inc. | Countrywide Securities Corporation/ Merrill Lynch, Pierce, Fenner & Smith Inc. | First Franklin Financial Corporation |
| FFML 2005-FF12 | | Merrill Lynch Mortgage Investors, Inc. | Countrywide Securities Corporation/ Merrill Lynch, Pierce, Fenner & Smith Inc. | First Franklin Financial Corporation |

| TRUST NAME | SPONSOR | DEPOSITOR | COUNTERPARTY/ UNDERWRITER | ORIGINATOR(S) |
|---|---|---|---|---|
| MLMI 2007-HE1 | Merrill Lynch Mortgage Lending Inc. | Merrill Lynch Mortgage Investors, Inc. | Countrywide Securities Corporation/ Merrill Lynch, Pierce, Fenner & Smith Inc. | First NLC Financial Services, LLC  People's Choice Home Loan, Inc.  Aegis Mortgage Corporation |
| SURF 2006-BC1 | Merrill Lynch Mortgage Lending, Inc | Merrill Lynch Mortgage Investors, Inc. | Countrywide Securities Corporation/ Merrill Lynch, Pierce, Fenner & Smith Inc. | Merrill Lynch Mortgage Lending Inc. through its Specialty Underwriting and Residential Finance Unit |
| SURF 2006-BC4 | Merrill Lynch Mortgage Lending, Inc. | Merrill Lynch Mortgage Investors, Inc. | Countrywide Securities Corporation/ Merrill Lynch, Pierce, Fenner & Smith Inc. | Merrill Lynch Mortgage Lending Inc. through its Specialty Underwriting and Residential Finance Unit |
| OOMLT 2007-6 | | | Countrywide Securities Corporation/ Banc of America Securities LLC | Option One Mortgage Corporation |
| OOMLT 2006-2 | | | Countrywide Securities Corporation/ Banc of America Securities LLC | Option One Mortgage Corporation |

### A.    The Controlling Parent Defendants' Roles in the Securitizations

66.    Defendants BOA Corp., Countrywide Financial and ML & Co. improperly utilized their direct and indirect subsidiaries at every stage of the securitization process to assemble, market, and derive income from the Securitizations, which they knew or should have known were grounded in misrepresentations.

67.    Defendant BOA Corp. directly or indirectly owned and controlled each and every one of the other BOA Defendants, who served as sponsors, depositors, and an underwriter on several of the Securitizations.  In its capacity as the parent corporation and owner of the other BOA Defendants, BOA Corp. had

1   the ability to, and did in fact, exercise dominion and control over the other BOA

2   Defendants.

3        68.   Defendant Countrywide Financial directly owned defendant

4   Countrywide Home Loans, indirectly owned all of the remaining Countrywide

5   Defendants, and controlled all of the Countrywide Defendants, who served as

6   originators, sponsors, and depositors on several Securitizations, and as an

7   underwriter and counterparty that sold the Certificates to Plaintiffs.  In its capacity

8   as the parent corporation and direct or ultimate owner of the other Countrywide

9   Defendants, Countrywide Financial had the ability to, and did in fact, exercise

10   dominion and control over the other Countrywide Defendants.

11        69.   Defendant ML&Co. directly or indirectly owned and controlled each

12   and every one of the Merrill Lynch Defendants, who served as sponsors,

13   depositors, and underwriters on several of the Securitizations.  In its capacity as the

14   parent corporation and direct or ultimate owner of the other Merrill Lynch

15   Defendants, ML&Co. had the ability to, and did in fact, exercise dominion and

16   control over the other Merrill Lynch Defendants.

17        70.   As a result of the merger between them, BOA Corp. became the

18   owning parent of, and a successor-in-interest to, all of the Countrywide

19   Defendants.

20   **B.**   **The Originator Defendant's Role in the Securitizations**

21        71.   Originators are loan companies that make mortgage loans to

22   borrowers which are then sold and/or pooled with other mortgage loans to be

23   securitized.  Loans purportedly pooled in the Securitizations were originated by

24   several originators.  Defendant Countrywide Home Loans (the "Originator

25   Defendant"), originated a large percentage of the loans purportedly included in the

26   Securitizations, and in many of the Securitizations was the sole originator.  The

27   Originator Defendant was affiliated with and shared common high-level executives

28   with other Countrywide Defendants.  *See* Table 3, *supra*.

COMPLAINT                                                                            29
Case No. 13-CV-01118-MRP (MANx)

### C. The Sponsor Defendant's Roles in the Securitizations

72. In their capacity as sponsors and/or sellers, Defendants BOA N.A., Countrywide Home Loans, First Franklin and MLML (the "Sponsor Defendants"), purchased loans from the Originator Defendant and other originators and then sold them to the depositors to be deposited into the respective Trusts. The Sponsor Defendants collected fees and made profits for its role in the Securitizations.

### D. The Depositor Defendants' Roles in the Securitizations

73. In their capacity as depositors, Defendants CWABS, CWALT and MLMI (the "Depositor Defendants"), were responsible for purchasing the underlying mortgage loans and for transferring, selling, or otherwise conveying the notes and mortgages to the respective Trusts that issued the Certificates.

74. The Depositor Defendants were also responsible for forming the issuing Trusts that were to hold the notes and mortgages for the benefit of the Certificate-holders, and for preparing and filing the Offering Documents with the SEC, pursuant to which the Certificates were offered. The Depositor Defendants collected fees and made profits for their role in the Securitizations.

75. Together, the Sponsor and Depositor Defendants (collectively, the "Issuer Defendants") were primarily responsible for the statements in the respective Offering Documents and the due diligence of the underlying loans they purchased from the originators and included in the respective Securitizations.

### E. The Underwriter Defendants' Role in the Securitizations

76. Defendants BOA Securities, Countrywide Securities and MLPF&S (the "Underwriter Defendants") were either the sole or joint underwriter for each of the Securitizations at issue herein. In that capacity, the Underwriter Defendants were responsible for underwriting the sale of the Certificates and managing their offering to investors, including Plaintiffs. The Underwriter Defendants sold each of the Certificates to Plaintiffs. See Table 1, *supra*. The Underwriters Defendant collected fees and made profits for its role in the Securitizations.

77.     The Underwriter Defendants' participation in the structuring and marketing of the Securitizations was an essential component of the sale of the Certificates to Plaintiffs, and contributed directly to the other Defendants' wrongdoing and to Plaintiffs' losses.  The Underwriter Defendants received substantial fees in connection with the Securitizations and sought to increase the volume of Securitizations in order to generate more underwriting fees and to gain a larger share of the RMBS securitization market.  By flagrantly disregarding failures to adhere to underwriting standards and allowing the Issuer Defendants to buy and "waive in" non-conforming, defective loans, the Underwriter Defendants were able to generate more fees at Plaintiffs' and other investors' ultimate expense.

78.     The Underwriter Defendants assisted in the preparation of the Offering Documents and were required to perform due diligence in connection therewith, and were aware of the due diligence results for each of the Securitizations prior to the time they sent the Offering Documents to Plaintiffs.  As such, the Underwriter Defendants were aware of or actively participated in the "waiving in" of loans that they knew were not originated in accordance with stated loan underwriting guidelines into the purportedly underlying loan pools.  High level management of the Underwriter Defendants were often the same people that were running the Issuer Defendants, further contributing to the free flow of information to the Underwriter Defendants.

79.     The Underwriter Defendants were not only active in structuring the Securitizations and drafting the Offering Documents, but also provided much of the information contained therein.  As such, they were aware that certain information regarding loan conformity to origination guidelines and the transfer of notes and mortgages to the Trusts was materially false and are directly responsible for the misrepresentations in the Offering Documents relating thereto.  Despite their participation in drafting Offering Documents that they knew contained misrepresentations, the Underwriter Defendants nevertheless sold the Certificates

in order to generate significant fees for themselves, all at the expense and to the detriment of the Plaintiffs.  The Underwriter Defendants provided the Offering Documents, which they knew, or should have known, contained material misrepresentations, to Plaintiffs for the purpose of soliciting Plaintiffs' investments.  The Plaintiffs relied upon the Offering Documents when purchasing the Certificates.

## IV.   THE DEFENDANTS' FRAUDULENT, FALSE AND MISLEADING STATEMENTS AND OMISSIONS REGARDING LOAN QUALITY

### A.   Defendants Made False and Misleading Statements Regarding Loan-to-Value Ratios

#### 1.   Statements Regarding Loan-to-Value Ratios

80.   The Offering Documents for the Securitizations reported information regarding the credit quality of the pooled mortgage loans.  One particularly important piece of data is the CLTV ratio.  The CLTV ratio is a material metric indicative of the quality of the pooled mortgage loans which is provided in the Prospectus Supplements for the Securitizations.  Generally, a CLTV ratio is the ratio of the principal balance of the combined liens on a mortgaged property to the appraised value of the mortgaged property.[4]  The CLTV ratio in the Offering Documents is provided on a weighted average basis, meaning that the Defendants weighted the CLTV ratio of each loan in the pool according to the size of the loan in relation to the aggregate principal balance of the entire loan pool.[5]

81.   CLTV ratios are material to prospective RMBS investors because they are among the strongest predictors of default risk for the loans underpinning the Securitizations.  Lower CLTV ratios mean that the borrowers have more of their

---

[4]  CLTV is a variation of the LTV ratio, which measures only the ratio of the securitized loan to the value of the property.  By including any additional liens in the calculation, CLTV is generally a more comprehensive indicator of credit risk than LTV alone.

[5]  Unless otherwise indicated, all figures presented in this Complaint concerning CLTV ratios and owner-occupancy rates are on a weighted average basis according to the principal balance of the underlying loans at issue, which is how they were represented in the Offering Documents.

1 own equity in the properties, which decreases the likelihood that they will default

2 or simply stop paying the mortgages if the properties decline in value.

3 Furthermore, in cases of a default, a higher amount of equity can lessen the

4 severity of a loss by potentially permitting a higher recovery from a foreclosure.

5 Therefore, the loss severity, *i.e.*, the magnitude of losses, that a trust suffers

6 resulting from a default by a borrower is generally lower if the CLTV ratio is

7 lower.

8      82.     For example, if a loan has a CLTV of 100%, the trust must bear the

9 entire cost of the foreclosure process, including legal fees, real estate fees, taxes,

10 foregone interest, late charges, plus any loss taken on the sale of a property which

11 suffered from a diminution in value.  A loan with a CLTV of 80%, however,

12 provides a 20% cushion to cover such losses.  Where the trust bears such costs,

13 these costs reduce the amount of funds that would otherwise be available to make

14 regular payments to investors in the securitization.

15      83.     With regard to default risk, a CLTV ratio over 100% means that the

16 outstanding amount of the mortgage loan(s) is higher than the value of the

17 property, and thus the holder of the note is likely to suffer a loss in the event of

18 default.  Conversely, a lower CLTV ratio implies that the borrower has equity in

19 the property, in which case the borrower has more incentive to keep the loan

20 current so as not to default and lose the equity in the property during foreclosure.

21 Therefore, as compared to a borrower whose mortgage has a CLTV ratio of 100%

22 or more and thus has no equity in the property, a borrower who has a mortgage

23 with a CLTV ratio of 80% has 20% of his or her own equity invested in the house,

24 and is much less likely to default and risk foreclosure because he or she may stand

25 to lose the 20% remaining equity value in the property.  In addition, should the

26 mortgage default then the loss severity on a loan with an 80% CLTV would be

27 20% lower than for a loan with a 100% CLTV, all other things being equal.  In a

28 study of the relationship between CLTV ratios and default risk, Standard & Poor's

determined that subprime default risk increased by approximately 17% when the CLTV was misrepresented by 15 percentage points.  *See* Standard & Poor's, RMBS:  Methodology and Assumptions For Rating U.S. RMBS Prime, Alternative-A, And Subprime Loans (Sept. 10, 2009) ("S&P Report").

84.   The Offering Documents misrepresented the CLTV ratios for the mortgages purportedly in the pools underlying the Securitizations because they used inflated appraisal values for the mortgaged properties.

85.   Accurate appraisals are crucial to the accuracy of CLTV ratios, since the value of the property is the denominator of the CLTV ratio.  An inflated appraisal, therefore, generally results in a CLTV ratio that understates the credit risk of the loan.

86.   Plaintiffs' loan level investigation and analyses have revealed that the appraisal value of a large number of loans was materially inflated in each of the Securitizations, causing the CLTV ratios to be understated.  As described below, many of the originators deliberately inflated their appraisals in order to achieve the target CLTV ratios required by Defendants for the Loan Groups in the Securitizations, and Defendants were aware of these inflated appraisals based on their own due diligence and due diligence done for them by third-party vendors engaged for that purpose.

### 2.   Combined Loan-to-Value Ratio Data Was Materially False

87.   Plaintiffs directed a review of loan-level data for the purportedly pooled mortgages in each of the Trusts at issue to determine whether Defendants' representations concerning CLTV ratios were correct and accurate.  They were not.  Defendants understated the CLTV, thus understating both the probability of default and the loss severity upon default of the loans purportedly underlying the Securitizations.

88.    As described below, the originators deliberately inflated their appraisals for the properties in order to achieve the target CLTV ratios that Defendants sought.  Defendants were aware of the inflated appraisals and did not believe them to be correct at the time Defendants issued the Certificates from the Securitizations based on Defendants' own due diligence and because Defendants knew that the data underlying the appraisals was false.

89.    Plaintiffs commissioned the use of an AVM to determine the value of the underlying properties at the time the pooled loans were originated.  AVMs rely on similar data as do appraisers, primarily county assessor records, tax rolls, and information about comparable property sales to determine property values.  AVMs are a routinely used and widely accepted method of determining property value.  Plaintiffs used an industry-standard AVM that is regularly used to determine property values by 18 of the top 20 mortgage lenders in the United States, as well as by brokers, government agencies, marketing firms, consumers, and insurance companies.

90.    Plaintiffs' investigation involved the application of AVMs to a large sampling of 6,470 loans from the relevant Loan Groups to determine the value of the underlying properties at the time the pooled loans were originated.

91.    Defendants represented the weighted average LTV/CLTV for the Trusts as being between 74.52% and 93.07% in the Offering Documents.  In fact, these representations understated the actual weighted average CLTV ratio at the time they were made by as much as 17.3 percentage points, as set forth in Table 6 below.  This substantial understatement of the CLTV ratios associated with the Loan Groups underlying the Certificates materially misrepresented the true credit risk of the Certificates that Plaintiffs purchased from those Securitizations.  Indeed, the likelihood of default was actually much higher than indicated by the CLTV ratio numbers disclosed in the Prospectus Supplements.  Therefore, any mortgage

loans that had misrepresented CLTV ratios will correspondingly have much higher loss severities upon default and liquidation.

92.     The results of Plaintiffs' loan-level investigation into the true CLTV ratios of the mortgages underlying the Certificates are reflected in Table 6 below:

**Table 6**

| Trust | Sample Size[6] | Reported Weighted Avg. LTV/CLTV (Pro. Supp.) | Actual Weighted Avg. LTV/CLTV of Loans Sampled Using AVM | Percentage Points by which Reported Weighted Avg. LTV/CLTV was Understated in Pro. Supp. Based on the Sample | Percentage of Loans Sampled where Offering Documents Understated LTV/CLTV by more than 10 Percentage Points | Reported Percentage of Loans in Securitization with LTV/CLTV over 100% in Pro. Supp. | Actual Percentage of Original Amount of Loans Sampled with LTV/CLTV over 100% Based on the AVM |
|---|---|---|---|---|---|---|---|
| ABFC 2006-HE1 A2C | 276 | 81.03% (Pro. Supp. at S-14, A-4) | 96.6% | 15.6 | 30.9% | 0% (Pro. Supp. at S-14, S-28, A-4) | 39.8% |
| ABFC 2006-OPT1 M1 | 276 | 82.37% (Pro. Supp. at A-4) | 93.9% | 11.5 | 40.0% | 0% (Pro. Supp. at S-12, A-4) | 42.1% |
| ABSHE 2004-HE6 A1[7] | 248 | 80.10% (Pro. Supp. at S-37) | 82.6% | 2.5 | 23.0% | 0% (Pro. Supp. at S-17, S-29, S-37) | 11.8% |
| CBASS 2006-CB6 A23 | 352 | 78.1% (Pro. Supp. at S-13, A-25) | 88.8% | 10.7 | 38.0% | .40% (Pro. Supp. at S-13, A-25) | 32.2% |
| CWL 2005-14 3A2* | 356 | 78.84% (Pro. Supp. at S-28) | 86.5% | 7.7 | 33.0% | 0% (Pro. Supp. at A-24) | 19.5% |

---

[6] The sampled loans are drawn from the Loan Groups associated with the particular tranche purchased by Plaintiffs.

[7] Only Loan-To-Value (LTV) data was provided in the Prospectus Supplement for ABSHE 2004-HE6 and the Trusts designated with an asterisk.

| Trust | Sample Size[6] | Reported Weighted Avg. LTV/CLTV (Pro. Supp.) | Actual Weighted Avg. LTV/CLTV of Loans Sampled Using AVM | Percentage Points by which Reported Weighted Avg. LTV/CLTV was Understated in Pro. Supp. Based on the Sample | Percentage of Loans Sampled where Offering Documents Understated LTV/CLTV by more than 10 Percentage Points | Reported Percentage of Loans in Securitization with LTV/CLTV over 100% in Pro. Supp. | Actual Percentage of Original Amount of Loans Sampled with LTV/CLTV over 100% Based on the AVM |
|---|---|---|---|---|---|---|---|
| CWL 2005-IM3 A3* | 349 | 79.6% (Pro. Supp. at 100 of 233) | 84.4% | 4.8 | 26.0% | 0% (Pro. Supp. at 100 of 233) | 10.5% |
| CWALT 2006-OC1 2A2* | 299 | 77.18% (Pro. Supp. at S-5, S49) | 85.2% | 8.0 | 28.0% | 0% (Pro. Supp. at S-49) | 10.8% |
| CWL 2006-IM1 A2* | 327 | 79.07% (Pro. Supp. at S-2) | 86.25% | 7.2 | 28.0% | 0% (Pro. Supp. at A-4) | 11.2% |
| CWL 2007-BC2 2A1* | 305 | 76.30% (Pro. Supp. at S-3, A-15) | 85.6% | 9.3 | 35.0% | 0% (Pro. Supp. at A-1) | 17.8% |
| CWL 2007-9 2A3* | 277 | 76.76% (Pro. Supp. at S-3, S-29) | 90.8% | 14.1 | 47.0% | 0% (Pro. Supp. at A-15) | 27.9% |
| CWL 2007-10 2A3* | 22 | 76.87% (Pro. Supp. at S-3, S-31) | 91.6% | 14.7 | 48.0% | 0% (Pro. Supp. at A-15) | 27.3% |
| CWALT 2007-OH2 A2A* | 310 | 74.52% (Pro. Supp. at S-2, A-4) | 91.7% | 17.2 | 48.0% | 0% (Pro. Supp. at A-4) | 23.3% |
| FFMER 2007-3 A2B | 263 | 93.07% (Pro. Supp. at AII-26) | 105.9% | 12.9 | 35.0% | 0% (Pro. Supp. at A-II-26) | 59.8% |

| Trust | Sample Size[6] | Reported Weighted Avg. LTV/CLTV (Pro. Supp.) | Actual Weighted Avg. LTV/CLTV of Loans Sampled Using AVM | Percentage Points by which Reported Weighted Avg. LTV/CLTV was Understated in Pro. Supp. Based on the Sample | Percentage of Loans Sampled where Offering Documents Understated LTV/CLTV by more than 10 Percentage Points | Reported Percentage of Loans in Securitization with LTV/CLTV over 100% in Pro. Supp. | Actual Percentage of Original Amount of Loans Sampled with LTV/CLTV over 100% Based on the AVM |
|---|---|---|---|---|---|---|---|
| FFML 2005-FF12 A2B* | 314 | 80.1% (Pro. Supp. at S-47) | 85.0% | 4.9 | 25.0% | 0% (Pro. Supp. at S-47) | 11.7% |
| IMM 2005-6 1A1 | 291 | 78.19% (Pro. Supp. at 7, 32, 41-41 of 284)[8] | 95.5% | 17.3 | 31.3% | .004% (Pro. Supp. at 7, 32, 41-42 of 284) | 39.0% |
| MLMI 2007-HE1 A2A | 288 | 89.94% (Pro. Supp. at A-II-28) | 103.7% | 13.8 | 41.0% | 0% (Pro. Supp. at A-II-2) | 50.4% |
| MSHEL 2007-1 A3 | 324 | 81.25% (Pro. Supp. at S-39, III-7) | 92.87% | 11.6 | 38.9% | 0% (Pro. Supp. at S-21, S-26 – S-27, III-7) | 33.0% |
| OOMLT 2007-6 2A2 | 221 | 81.24% (Pro. Supp. at 55 of 235) | 98.46% | 17.2 | 55.7% | 0% (Pro. Supp. at 23, 55 of 235) | 44.6% |

---

[8] "Combined loan-to-value ratios with respect to the Group 1 Loans secured by second liens."  IMM 2005-6 Pro. Supp. at 42 of 284.

| Trust | Sample Size[6] | Reported Weighted Avg. LTV/CLTV (Pro. Supp.) | Actual Weighted Avg. LTV/CLTV of Loans Sampled Using AVM | Percentage Points by which Reported Weighted Avg. LTV/CLTV was Understated in Pro. Supp. Based on the Sample | Percentage of Loans Sampled where Offering Documents Understated LTV/CLTV by more than 10 Percentage Points | Reported Percentage of Loans in Securitization with LTV/CLTV over 100% in Pro. Supp. | Actual Percentage of Original Amount of Loans Sampled with LTV/CLTV over 100% Based on the AVM |
|---|---|---|---|---|---|---|---|
| OOMLT 2006-2 M1 | 238 | 80.82% (Group I) (Pro. Supp. at 36 of 252)[9] and 81.30% (Group I) (Pro. Supp. at 48 of 252) | 92.39% | 11.6 and 11.1 | 40.8% | 0% (Pro. Supp. at 24 of 252) | 37.4% |
| SURF 2006-BC1* M1 | 260 | 81.58% (Pro. Supp. at S-13, A-II-4) | 82.06% | .5 | 22.0% | 0% (Pro. Supp. at S-13, S-23, A-II-4) | 16.7% |
| SURF 2006-BC4* M1 | 303 | 83.11% (Pro. Supp. at S-15, A-II-5) | 85.1% | 2.0 | 26.0% | 0% (Pro. Supp. at S-15, A-II-5) | 19.9% |

93.     This data shows that the appraised values reported in the Offering Documents for the properties supposedly comprising the Loan Groups were significantly higher than the actual property values.  The failure to accurately appraise these properties led to a material understatement of the CLTV ratios and a corresponding understatement of the investment risk.  The results demonstrate at

---

[9] "References to loan-to-value are references to combined original loan-to-value ratios with respect to second lien Mortgage Loans."  OOMLT 2006-2 Por. Supp. at 36, 48 of 252, fn. 3.

least three ways in which the Offering Documents significantly understated the CLTV ratios.

94.    First, the Offering Documents understated the CLTV ratios by misrepresenting the maximum acceptable CLTV ratio for loans included in each of the Securitizations.  For almost all of the Securitizations, the Offering Documents represented that none of the mortgages in the Securitizations had loans with a CLTV ratio more than 100%.[10]  *See* Table 6.  In reality, ***between 10.5% and 59.8% of the sampled loans for each Securitization had CLTV ratios over 100%.***  Every one of the Securitizations included a significant number of loans that were over 100% CLTV, despite representations in the Offering Documents to the contrary.  Such "under water" mortgages are far more likely to default and cause losses to the Trusts.

95.    Second, the Offering Documents understated the weighted average CLTV ratios for the entire pool of loans in each of the Trusts.  Each of these misrepresentations materially understated the degree of credit risk associated with the underlying Loan Pool.  The Offering Documents reported appraised values for the properties supposedly securing the loans pooled into the Trusts that were significantly higher than their actual values, as shown by the weighted average CLTV analysis.  For each Trust, the actual weighted average CLTV was up to 17.3 ***percentage points higher*** than reported in the Offering Documents, based on the samples.

96.    Third, the data also demonstrates the severity of the LTV/CLTV understatement in the Offering Documents.  ***Between 22% and 55.7% of the loans sampled were misrepresented by more than 10 percentage points*** in each of the

---

[10]   For the two Securitizations that disclosed loans with CLTVs over 100%, the number of such loans was miniscule.  *See* CBASS 2006-CB6 (Pro. Supp. at S-13, A-25) (0.40% of loans); IMM 2005-6 Pro. Supp. at 7, 32, 41-42 of 284 (0.004% of loans).

1  Securitizations.  These overstatements led to a material understatement of the

2  CLTV ratios, and a corresponding understatement of the investment risk.

3      97.    In sum, the representations in the Offering Documents about CLTV

4  ratios were demonstrably false with the effect of materially understating the credit

5  risk of the Certificates.  Plaintiffs relied on Defendants' representations in the

6  Offering Documents to accurately portray the CLTV characteristics of the Loan

7  Groups, because Plaintiffs did not have access to the information necessary to

8  independently verify those figures at the time Plaintiffs purchased the Certificates.

9  In addition, as described below, Defendants' knew the CLTV information was

10 false based on due diligence reports.

11 **B.    Defendants Made False and Misleading Statements Regarding Owner-Occupancy**

12

13      **1.    Statements Regarding the Owner-Occupancy Status of the Borrowers**

14     98.    Another material piece of information provided in the Offering

15 Documents for the Securitizations indicative of the quality of the pooled mortgage

16 loans was the "owner-occupancy status" of the mortgage borrowers.  Owner-

17 occupancy status refers to the residency of the borrower, that is, whether the

18 borrower is living in the respective mortgaged property or whether the property is a

19 second home, or a vacation or investment property.  A loan to a borrower who uses

20 the mortgaged property as a primary residence is generally referred to as an

21 "owner-occupied" loan.  This information is material to an investor's assessment

22 of the credit risk, because a property's occupancy status affects the credit risk of

23 the loan.

24     99.    As several studies have confirmed, borrowers who actually live in the

25 homes secured by mortgages are significantly less likely to default on their loan

26 obligations than borrowers with mortgages on second homes, vacation homes or

27 investment properties.  In fact, a study conducted by Equifax Inc. concluded that

28 non-owner-occupied loans were nearly *twice* as likely to be in default 12 months

1   after origination as owner-occupied loans.  *See* Equifax Capital Markets Media

2   Primer, at 1 (Mar. 25, 2010), *available at* www.equifax.com/PR/pdfs/

3   012910CMDataPrimer.pdf.  A separate study conducted by Standard & Poor's

4   concluded that the impact of occupancy of the property alone shows an increased

5   risk of default of 1.3 times for second homes and 1.9 times for investor properties.

6   *See* S&P Report.  More importantly, however, the ***joint*** effect of owner occupancy

7   and CLTV is greatly magnified, such that a property purchased for investment with

8   a 95% CLTV is 4.5 times more likely to default than an owner-occupied property

9   with an 80% CLTV.  *Id.*

10          100.   Overall, the higher the percentage of loans that are not owner-

11   occupied in a Securitization, the greater the risk of loss to investors.  As with

12   CLTV, even a small inaccuracy in the percentage of owner-occupied properties is

13   crucial to investors as those small differences significantly impact the overall risk

14   of the Securitization.  Inaccuracies in owner-occupancy rates also directly affect

15   the ratings given to the Certificates, and particularly when combined with

16   misstated CLTV ratios, the inaccuracies result in significantly higher-cumulative

17   loss estimates for the Loan Groups.

18          101.   For each of the Securitizations, the Offering Documents materially

19   overstated the percentage of loans that were owner-occupied, and thus materially

20   understated the Certificates' degree of risk.  The representations concerning owner-

21   occupancy rates made in the Offering Documents for the Securitizations are shown

22   in Table 7, *infra*.

23                  **2.      Owner-Occupancy Data Was Materially False**

24          102.   Plaintiffs conducted a review of loan-level data for a sample of the

25   pooled mortgages in these Securitizations to determine whether data on owner-

26   occupancy rates contained in the Offering Documents were accurate.  These data,

27   too, were false.

28

---

103.   Plaintiffs sampled more than 7,500 loans from the Loan Groups purportedly underlying the Securitizations.  The number of owner-occupied properties collateralizing the Securitizations was, in fact, significantly lower than represented.

104.   Plaintiffs' investigation into the occupancy status of the reviewed loans involved looking at the borrowers' contemporary credit history, *i.e.*, whether creditors were reporting the securitized property's address as the borrower's mailing address six months after the origination of the mortgage.

105.   Six months provides ample time for a borrower to notify creditors of his or her new address.  If the securitized property does not appear anywhere in the borrower's credit history in the six months after the securitized mortgage was originated, this is a strong indication that the property was not, in fact, the borrower's primary residence.

106.   Far fewer properties were owner-occupied than Defendants reported in the Offering Documents.  For the Securitizations, the actual owner-occupancy rate of the sampled loans for the Trusts was ***overstated by as much as 55.3%*** (and by no less than 7.6% for any Trust) as shown in the last column on Table 7:

**Table 7**

| Trust | Sample Size[11] | Represented Owner-Occupied Percentage (Pro. Supp.) | Percentage of Reported Owner-Occupied Loans Sampled Not on Borrower's Credit History After 6 Months | Percentage by which Owner-Occupancy was Overstated Based on the Sample |
|---|---|---|---|---|
| ABFC 2006-HE1 A2C | 349 | 92.79% (Pro. Supp. at A-7) | 20.6% | 25.9% |
| ABFC 2006-OPT1 M1 | 258 | 92.91% (Pro. Supp. at A-8) | 7.1% | 7.6% |
| ABSHE 2004-HE6 A1 | 404 | 92.98% (Pro. Supp. at S-36) | 14.6% | 17.1% |
| CBASS 2006-CB6 A23 | 366 | 92.50% (Pro. Supp. at A-23) | 7.7% | 8.3% |

[11]   The sampled loans are drawn from the Loan Groups associated with the particular tranche purchased by Plaintiffs.

| Trust | Sample Size[11] | Represented Owner-Occupied Percentage (Pro. Supp.) | Percentage of Reported Owner-Occupied Loans Sampled Not on Borrower's Credit History After 6 Months | Percentage by which Owner-Occupancy was Overstated Based on the Sample |
|---|---|---|---|---|
| CWL 2005-14 3A2 | 438 | 96.14% (Pro. Supp. at A-25) | 17.0% | 20.5% |
| CWL 2005-IM3 A3 | 93 | 85.15% (Pro. Supp. at 106 of 233) | 23.7% | 31.1% |
| CWALT 2006-OC1 2A2 | 347 | 90.58% (Pro. Supp. at S-51) | 15.0% | 13.58% |
| CWL 2006-IM1 A2 | 340 | 84.36% (Pro. Supp. at A-11) | 18.2% | 22.2% |
| CWL 2007-BC2 2A1 | 292 | 94.92% (Pro. Supp. at A-17) | 15.1% | 17.8% |
| CWL 2007-9 2A3 | 383 | 95.58% (Pro. Supp. at A-17) | 27.4% | 37.7% |
| CWL 2007-10 2A3 | 405 | 94.93% (Pro. Supp. at A-17) | 24.2% | 31.9% |
| CWALT 2007-OH2 A2A | 357 | 84.46% (Pro. Supp. at A-6) | 23.8% | 31.2% |
| FFMER 2007-3 A2B | 390 | 97.72% (Pro. Supp. at A-II-28) | 21.5% | 27.4% |
| FFML 2005-FF12 A2B | 397 | 99.06% (Pro. Supp. at S-48) | 20.2% | 25.3% |
| IMM 2005-6 1A1 | 322 | 84.77% (Pro. Supp. at 42 of 284) | 11.2% | 12.6% |
| MLMI 2007-HE1 A2A | 414 | 93.91% (Pro. Supp. at A-II-31) | 16.2% | 19.3% |
| MSHEL 2007-1 A3 | 408 | 93.69% (Pro. Supp. at III-14) | 17.4% | 21.1% |
| OOMLT 2007-6 2A2 | 118 | 93.85% (Pro. Supp. at 54 of 235) | 35.6% | 55.3% |
| OOMLT 2006-2 M1 | 360 | 88.78% (Group I) (Pro. Supp. at 35 of 252)[12]; 93.07% (Group II) (Pro. Supp. at 48 of 252) | 20.8% | 26.3% (Group I) 26.2% (Group II) |
| SURF 2006-BC1 M1 | 439 | 98.5% (Pro. Supp. at A-II-5) | 17.5% | 21.2% |
| SURF 2006-BC4 M1 | 409 | 96.18% (Pro. Supp. at A-II-6) | 21.5% | 28.8% |

[12]  The Owner Occupancy percentage in the Prospectus Supplement for OOMLT 2006-2 was provided by Loan Group, not as an aggregate figure.

107.   It is reasonable to infer that the Offering Documents significantly misstated the rate of owner-occupancy, a highly material credit risk metric, based on Plaintiffs' samples from each of the Securitizations.  Because Defendants had access to the loan files, they could have easily verified the owner-occupancy status of the properties.  And, as described below, Defendants knew the owner-occupancy information was false based on due diligence reports received from Clayton.

## V.   DEFENDANTS KNEW THAT THE REPRESENTATIONS IN THE OFFERING DOCUMENTS WERE FALSE

108.   Defendants were required to perform due diligence on every pool of mortgages that went into their securitizations in order to obtain the ratings they needed to market them to investors.  The purpose of this due diligence process was to determine whether the loans complied with the underwriting guidelines of the originators.  This process scrutinized many aspects of the originators' guidelines, including CLTV ratios and owner-occupancy rates.

### A.   Defendants Knowingly Placed Defective Loans in the Securitizations

109.   Defendants completed their own due diligence and also used Clayton or similar companies (such as The Bohan Group, Inc.) to perform due diligence on the pools of mortgages that purportedly went into their RMBS securitizations.  For example, during the period from at least 2006 through mid-2007, Defendants used Clayton to perform due diligence on the pools of mortgages that went into their RMBS securitizations.  During this period, Clayton reviewed loan files for more than 10,000 loans securitized by Bank of America, more than 2,400 loans securitized by Countrywide, and more than 55,000 loans securitized by Merrill Lynch.  Clayton Report at 2, 3, 7.

110.   Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (Jan. 2011) (the "FCIC Report") details that reviews conducted by firms such as Clayton were intended to

1    cover three areas:  "credit, compliance, valuation."  FCIC Report at 166.  The

2    review included answering such questions as whether the loans "[met] the

3    underwriting guidelines," "compl[ied] with federal and state laws, notably

4    predatory-lending laws and truth-in-lending requirements," and whether "the

5    reported property values [were] accurate."  *Id*.  The review also analyzed whether

6    loans that failed to comply with the underwriting guidelines possessed any

7    "compensating factors."  *Id*.

8        111.   In essence, the purpose of this due diligence process was to determine

9    whether the loans complied with the stated underwriting guidelines of the

10   originators.  Defendants' due diligence process scrutinized many aspects of the

11   originator's guidelines, including LTV/CLTV ratios and owner-occupancy rates.

12       112.   Clayton graded each loan it reviewed on a scale of 1 to 3.  A grade of

13   "1" meant that the loan complied with the underwriting guidelines of the

14   originator.  A grade of "2" meant that the loan did not comply with the originator's

15   underwriting guidelines, but had unspecified "compensating factors."  A grade of

16   "3" meant that the loan both failed to comply with the originator's underwriting

17   guidelines and failed to possess any compensating factors.

18       113.   During the period of 2006 through mid-2007, approximately 30.3% of

19   the loan files Clayton reviewed for BOA, approximately 26.5% of the loans filed

20   Clayton reviewed for Countrywide, and approximately 23.2% of the loan files

21   Clayton reviewed for Merrill Lynch were found not to comply with the

22   underwriting guidelines of the originators or have sufficient compensating factors.

23   Even these rates are likely understated, however, as Clayton was pressured by

24   issuers and underwriters such as the Defendants to keep rejection rates low and

25   other investigations have found much higher rates of non-compliance with

26   underwriting guidelines for Defendants' securitizations.  *See* ¶¶ 119, 215-216, 229

27   *infra*.

28

---

114.   Clayton provided detailed reports to the Defendants containing the grades of the reviewed loans prior to and during the preparation of the Offering Documents.  Given the similarity of the origination and underwriting processes in prior years, results for prior periods can be expected to be similar (and, based on the information now available, it is a reasonable inference that the results for Defendants' Securitizations were similar for prior years).  It would be reckless, or in the alternative, negligent, for Defendants to fail to assume that a similar percentage of the un-sampled loans were subject to similar deficiencies.

115.   Defendants therefore knew when they were preparing the Offering Documents for the Securitizations that, on average, between approximately 23% and 30% of the loans reviewed by Clayton failed to comply with the underwriting guidelines of the originators and were without any compensating factors.

116.   Nevertheless, ***BOA "waived in" 27% of the loans Clayton had reviewed and rejected as non-conforming with the underwriting guidelines and without compensating factors, Countrywide "waived in" 12% of such loans, and Merrill Lynch "waived in" 32% of such loans***.  The BOA, Countrywide and Merrill Lynch Defendants ultimately included those loans in the RMBS sold to investors.  Clayton Report at 2, 3, 7.  That means Defendants knew -- whereas Plaintiffs did not -- that a significant percentage of the loans purportedly included in their RMBS were unacceptable by the originators' own standards.

117.   "Waiving in" loans that failed to meet such criteria as LTV, CLTV and owner-occupancy has obvious adverse effects on investors.  It adversely affected the Trusts' cash flow, and thereby the performance on the Certificates, as the criteria Defendants disregarded involve factors that indicate the likelihood that the borrowers will make their payments or whether they will likely default.  The fact that loans were included in the Trust pools that did not meet those criteria, despite representations in the Offering Documents to the contrary, meant that the value of the Certificates was impaired from the outset.  Given this, Defendants had

1   a duty to disclose that they had a practice of waiving in loans that were not made in

2   accordance with the originator's represented underwriting criteria, as set forth in

3   the Offering Documents.

4          118.   Yet, instead of returning substandard loans to the originators, issuers

5   such as Defendants negotiated discounts of their purchase prices of such loans

6   from the originators on the basis of the defects in the loans' credit quality --

7   discounts that issuers did not pass on to investors, but rather kept for themselves,

8   passing on only the risk.  FCIC Report at 166.  Thus, Defendants had a strong

9   financial motive for accepting substandard loans for inclusion in their

10  securitizations and then misleading investors as to their loan quality.

11         119.   A former Clayton due diligence underwriter (the "Clayton Witness")

12  gave deposition testimony in *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No.

13  09 Civ. 3106 (PAC) (S.D.N.Y.) and *Ambac Assurance Corp. v. EMC Mortgage*

14  *LLC*, Index No. 650421/2011 (N.Y. Sup. Ct. N.Y. Cnty.), on January 21, 2012.

15  According to a publicly filed partial transcript of the deposition, which also quotes

16  an affidavit submitted by the Clayton Witness, "Clayton supervisors would often

17  inform the due diligence underwriters that the purchasers wanted the underwriters

18  to approve loans that often did not satisfy the underwriting guidelines."  According

19  to the Clayton Witness, this practice was pervasive at Clayton, "[a]cross all

20  clients."  In referring to purchasers and clients, the Clayton Witness was referring

21  to investment banks that purchase loans from originators to be securitized.

22         120.   Moreover, even though Defendants were on notice that between

23  approximately 23% and 30% of the loans Clayton sampled did not comply with

24  underwriting guidelines or possess compensating factors, Defendants failed to

25  conduct any additional review of the loans not yet sampled.  In other words, even

26  though Defendants knew that the un-sampled set would contain approximately the

27  same proportion of bad loans (as such is the purpose of sampling), Defendants

28

1    ignored this obvious defect, and placed un-sampled loans into securitizations as

2    well.

3          121.   The Defendants represented in the Offering Documents that ***all*** the

4    loans in the mortgage pool either complied with the underwriting guidelines or had

5    compensating factors, even though they knew or should have known that this was

6    false.

7          122.   Moreover, since Defendants received detailed information regarding

8    LTV ratios, CLTV ratios and owner-occupancy rates from Clayton, Defendants

9    knew or should have known that the representations concerning these important

10   metrics were false.

11         123.   Based on information available now (but not available at the time of

12   purchase), Plaintiffs have conducted several investigations into the underwriting of

13   the loans that ultimately were included in the Securitizations that it purchased from

14   Defendants.  This investigation has revealed several material misstatements about

15   the loan characteristics.

16         124.   The actual loan files that Defendants had in their possession and

17   control when they conducted their own due diligence and securitized and sold the

18   Certificates would have revealed the same systematic underwriting flaws that

19   Plaintiffs have recently discovered.  At the time that they published the Offering

20   Documents, Defendants knew or were reckless in not knowing that the loans did

21   not conform to the specified underwriting guidelines of the originators, including

22   with respect to CLTV and owner-occupancy statistics.  Thus, Defendants knew or

23   should have known that their representations about those credit risk metrics were

24   false.

25   **B.     Bank of America Knew that the Representations in the Offering Documents were False**

26

27         125.   BOA N.A. is one of the nation's largest banks and a leading sponsor

28   of mortgage-backed securities.  BOA N.A. is also the direct parent corporation of

1    non-party depositor ABFC.  As stated in the Prospectus Supplement for the ABFC

2    2006-HE1 Securitization, "Bank of America and its affiliates have been active in

3    the securitization market since inception.  Bank of America has sponsored publicly

4    offered securitization transactions since 1977.  ABFC 2006-HE1 Prospectus dated

5    Oct. 3, 2006, at p. 33.  The volume of loans originated and aggregated by BOA

6    N.A. made it possible for BOA Corp. to consistently securitize tens of billions of

7    dollars worth of mortgage loans during the time period relevant here.  In 2005,

8    BOA Corp. securitized a total of $95.1 billion of mortgages.  *See* BOA Corp. 2006

9    Annual Report, at 119.  In 2006, BOA Corp. securitized a total of $65.5 billion of

10   mortgages.  *Id*.  In 2007, BOA Corp. securitized a total of $84.5 billion of

11   mortgages.  *See* BOA Corp. 2007 Annual Report, at 135.  In 2007, BOA was

12   ranked the 14th largest sponsor of non-agency mortgage-backed securities.  *See*

13   Financial Crisis Inquiry Commission, Preliminary Staff Report: Securitization and

14   the Mortgage Crisis, April 7, 2010, at 13.

15       126.   Accordingly, the BOA Defendants' involvement in the mortgage-

16   backed securitization industry was substantial.  The BOA Defendants had

17   enormous financial incentives to complete as many offerings as quickly as

18   possible.  For example, BOA Funding, as the depositor, was paid a percentage of

19   the total dollar amount of the offerings upon completion of the Securitizations, and

20   BOA Securities, as the underwriter, was paid a commission based on the amount it

21   received from the sale of the Certificates to the public.

22       127.   Bank of America also played a central role in the creation and sale of

23   mortgage securities by providing "warehouse lending" to mortgage lenders such as

24   New Century, which was one of the originators for the Securitizations.  FCIC

25   Report at 115 (stating the Bank of America provided $147 million in financing to

26   New Century); *see infra* ¶¶279-285.  Bank of America extended warehouse

27   lending lines of credit to third-party loan originators to fund mortgage loans -- and

28   thereby ensure that it had access to a steady stream of loans to securitize and sell to

investors.  Warehouse financing is an integral part of the RMBS securitization process as it allows originators to fund and then pool mortgage loans together for sale into an RMBS trust.  As a result of its longstanding relationships with some of the country's most prolific and problematic originators, and the numerous roles Bank of America played in its securitizations, Bank of America was uniquely positioned to know that the originators had abandoned their underwriting guidelines.

128.   In addition, in 2001 BOA sold EquiCredit, a division of BOA that, at the time, was primarily responsible for making subprime loans.  In order to guarantee that it could obtain sufficient mortgages to pool into its residential mortgage-backed securities securitizations, BOA began to directly fund originating banks, including Countrywide.  According to *Inside Mortgage Finance*, BOA was the leading participant in the correspondent mortgage channel, with nearly 26 percent market share by 2009.  *See* Press Release, BOA Corp., Bank of America Exits First Mortgage Wholesale Channel, (Oct. 5, 2010).

129.   Through its warehouse lending activities with originators such as New Century, Bank of America gained direct access to the underlying loan files and detailed information for loans that it did not originate, and thus was able to gain an inside look into the true quality of the loans it securitized.  As one industry publication explained, warehouse lenders like Bank of America have "detailed knowledge of the lender's operations."  Kevin Connor, *Wall Street and the Making of the Subprime Disaster*, at 11 (Nov. 2007).  Further, in granting warehouse lending facilities to originators, Bank of America would have done extensive credit and operational analyses of the mortgage originators themselves.  Therefore, Bank of America had valuable information about the mortgage loans and the operations of the originators that Plaintiffs did not possess and Bank of America knew, or was negligent in not knowing, of the poor quality of the mortgages and the originators' non-compliance with underwriting guidelines.

130.   In addition to the fees it earned by serving as a sponsor and depositor in offerings, Bank of America earned fees from the originators by providing warehouse loans.  However, because of its financial arrangements with warehouse lenders, Bank of America was essentially committed to buying the loans that secured its warehouse lines regardless of their quality and the results of Bank of America's due diligence.  Indeed, Bank of America needed to purchase the loans with little or no objection to keep the lenders supplied with capital to pay fees and interest owed on the lines of credit.  It was also important to Bank of America that it protect its business relationships with warehouse lenders in order to ensure a steady flow of loans for securitization.  Therefore, Bank of America was incentivized to allow defective mortgages to remain in the securitizations because: (i) mortgage originators would not maintain a relationship with a bank that consistently kicked out large numbers of loans; and (ii) the securitization became smaller as loans were kicked out, thus decreasing the underwriting fees and other fees.

131.   In May 2011, the New York Attorney General opened an investigation into the mortgage securitization practices of Bank of America.  *The New York Times* reported on May 16, 2011, that the Attorney General had subpoenaed information "covering many aspects" of Bank of America's "pooling operations" in connection with the "bundling" of home loans into securities.  Upon information and belief, that investigation is ongoing.  Bank of America also has announced settlements of claims under the federal and state securities in relation to the offering and sale of RMBS, including a recent settlement with the National Credit Union Administration for $165 million that included claims against the Countrywide and Merrill Lynch Defendants as well.  Further, as detailed in the FCIC Report, in 2007 the Office of the Comptroller of the Currency ("OCC"), an office within the United States Department of the Treasury, conducted a review of the mortgage loans included in Bank of America-issued securitizations and found

that 16 of the 50 mortgage loans reviewed contained suspicious information indicative of fraud.  FCIC Report p. 162.  Bank of America, however, failed to file the required reports with the OCC for those suspicious mortgage loans.  *Id*. Finally, the FCIC Report also noted that Fannie Mae and Freddie Mac "put back" $6.9 billion and $476 million of loans, respectively, in securitizations issued by Bank of America because those loans did not conform to the stated underwriting guidelines.  *Id*. p. 225.

### C.  Merrill Lynch Knew that the Representations in the Offering Documents were False

132.  Merrill Lynch knew from Clayton that a substantial number of loans did not comply with the underwriting guidelines but nevertheless, in pursuit of market share and fees received from the securitizations, waived in 32% of the loans rejected by Clayton into the loan pools for securitization.  In addition to using third-party vendors to perform due diligence, the Merrill Lynch Defendants performed their own due diligence on the pools of mortgages that purportedly went into their RMBS securitizations.  For example, in his September 16, 2010 interview with the FCIC, former Merrill Lynch CEO Stanley O'Neal stated that Merrill Lynch conducted "spot-checking" of the mortgages that it purchased from third parties to ensure that they complied with the relevant underwriting guidelines. *See* Audio File of FCIC Interview of Stanley O'Neal, Sept. 16, 2010, *available at* http://fcic.law.stanford.edu/resource/interviews ("O'Neal Interview"), at 1:29:12-46, 1:29:59-1:30:15.  Likewise, Jeff Kronthal, the former head of Merrill Lynch's structured-products division, told the FCIC in his September 14, 2010 interview that Merrill Lynch performed due diligence on the mortgages it purchased from a mortgage originator, Ownit Mortgage Solutions, Inc. ("Ownit").  *See* Audio File of FCIC Interview of Jeff Kronthal, Sept. 14, 2010, *available at* http://fcic.law.stanford.edu/resource/interviews ("Kronthal Interview") at 1:51:08-

1 | 1:51:53.  Ownit was an originator for the CBASS 2006-CB6 Securitization at issue

2 | here.  *See* ¶¶ 290-294 *infra*.

3 |     133.   Moreover, in addition to Clayton, Merrill Lynch used another third-

4 | party due diligence firm, The Bohan Group, Inc. ("Bohan"), to analyze the

5 | underlying mortgage loans for its securitizations.  According to one former Bohan

6 | loan reviewer, who analyzed mortgage loans that Merrill Lynch and other issuers

7 | bought for RMBS securitizations, the "pressure was so intense to approve as many

8 | loans as quickly as possible" that a supervisor would stand on a desk screaming at

9 | the loan reviewers.  Paul Muolo & Matthew Padilla, *Chain of Blame: How Wall*

10 | *Street Caused the Mortgage and Credit Crisis*, at 197 (2008) (hereinafter, "*Chain*

11 | *of Blame*").  The same loan reviewer, referring to the fraudulent approval and

12 | securitization of non-compliant loans, singled out Merrill Lynch as having

13 | "perpetuated the whole thing" and stated that if she identified a loan as non-

14 | conforming with the applicable underwriting guidelines, "a Merrill supervisor

15 | would find a way to get the loan approved."  *Id*.  Merrill Lynch, therefore, knew

16 | that a significant portion of the mortgage loans it was securitizing was non-

17 | conforming, yet nevertheless routinely waived in these loans rejected by its third

18 | party due diligence firms.  Merrill Lynch failed to disclose such fraudulent

19 | practices to its RMBS investors, including Plaintiffs.

20 |     134.   Furthermore, Merrill Lynch must have and did know of the true credit

21 | quality of the loans and the rampant non-compliance with the underwriting

22 | guidelines in the mortgage pools underlying its securitizations because of its close

23 | relationships with mortgage originators, including through its own origination

24 | program, Specialty Underwriting and Residential Finance ("SURF").  SURF was

25 | established by Defendant MLML to originate and purchase mortgage loans

26 | pursuant to specific underwriting guidelines.  As stated in the SURF 2006-BC 1

27 | Pro. Supp., "[a]ll of the Mortgage Loans were originated generally in accordance

28 | with SURF's Underwriting Guidelines."  SURF 2006-BC1 Pro. Supp. dated Feb.

17, 2006 at S-31.  All of the loans in the SURF 2006-BC1 and SURF 2006-BC4 Securitizations were allegedly originated pursuant to SURF's underwriting guidelines.

135.   Initially, when the RMBS securitization business began to grow in the early 2000s, Merrill Lynch was not a dominant market player.  At the time, Merrill Lynch was at the bottom of the "league tables," which ranked top issuers of asset-backed securities (including RMBS) by volume, behind other investment banks like Bear Stearns and Lehman Brothers.  *See Chain of Blame*, at 186.

136.   Beginning in 2004, led by its CEO at the time, Stanley O'Neal, Merrill Lynch embarked on an aggressive strategy to ascend to the top of the league tables for asset-backed securities, in particular RMBS.  *See id.* at 189. O'Neal hired new trading personnel to enable Merrill Lynch to significantly expand the volume of subprime mortgage loans that it was buying from originators and securitizing to RMBS investors.  *Id.*

137.   However, as a late entry to the already-crowded RMBS securitization market, Merrill Lynch began paying more for mortgage loans than any other Wall Street firm.  *See id*. at 189-90.  In particular, to become more competitive, Merrill Lynch began offering "warehouse" financing to originators (lines of credit, in effect, providing money to the originators to fund the mortgage loans they were originating) at prices disadvantageous to Merrill Lynch, in order to entice originators to sell their loans to Merrill Lynch, and thereby increase its volume of subprime mortgages for RMBS securitizations:

> To entice Bill Dallas [CEO of subprime originator Ownit] and other subprime executives into selling their loans to Merrill, its salesmen offered them a deal:  If you agree to sell your loans to us, we'll offer warehouse financing for next to nothing.  Merrill's warehouse chief was Jim Cason, who had been with the firm for a couple of years.  With O'Neal's edict to grow the subprime business, Cason's unit, by 2005, became one of the largest warehouse lenders to nonbank residential lenders in the nation.  'The idea was to create a one-stop shopping place for subprime lenders,' said one warehouse executive familiar with Merrill's efforts.

'Merrill would make no money on the warehouse business, but it would do it to get the securitization business.' As George Davies, the head trader later admitted: 'The idea was to secure product [mortgages].'

*Id*. at 190 (final brackets in original); *see also* FCIC Report at 204 (stating that Merrill Lynch provided warehouse lines of credit to mortgage originators Ownit and Mortgage Lenders Network).

138.   Merrill Lynch's status as a warehouse lender to originators gave it a unique, inside look into the true credit quality of the mortgage loans that were originated using Merrill's financing.  *See* Kevin Connor, *Wall Street and the Making of the Subprime Disaster*, at 11 (2007).  As one industry publication explained, warehouse lenders like Merrill Lynch had a "detailed knowledge" of the originators' operations.  *Id.*  According to an unnamed insider source quoted in the article, "[warehouse lenders] have that day-to-day pipeline exposure to what the mortgage lender's doing."  *Id.*  Therefore, Merrill Lynch was particularly well-positioned to know the true loan characteristics of the underlying loans in its securitizations, which were obtained from the originators whose mortgage originations it was financing.

139.   Moreover, because of this warehouse financing arrangement, Merrill Lynch was essentially committed to purchasing the loans that secured its warehouse lines irrespective of what its due diligence revealed as to their poor credit quality and non-compliance with underwriting guidelines.  Merrill Lynch needed to buy these loans with minimal objections in order to keep the mortgage originators supplied with capital to pay fees and interest owed on the warehouse lines of credit.

140.   As with Bank of America, through its warehouse lending activities Merrill Lynch gained direct access to underlying loan files and would have done extensive credit and operational analyses of the mortgage originators.  Therefore, Merrill Lynch had valuable information about the mortgage loans and the

1  operations of the originators that the Plaintiffs did not possess and knew, or was

2  negligent in not knowing, of the poor quality of the mortgages and the originators'

3  non-compliance with underwriting guidelines.  Merrill Lynch did not, however,

4  disclose this information in the Offering Documents or to investors such as

5  Plaintiffs.

6       141.   In addition to the warehouse financing, Merrill Lynch's ascent to the

7  top of the RMBS market was facilitated by a vertical integration strategy to acquire

8  ownership in mortgage originators and thereby ensure an increased supply of

9  mortgage loans for securitization.  As one article reported, quoting a Merrill Lynch

10  insider, under CEO O'Neal's reign, "Merrill Lynch 'went hog wild'. . . buying up

11  right and left mortgage finance companies."  Elizabeth MacDonald, *Dumbest*

12  *Bubble Deals*, FoxBusiness, Jan. 27, 2009.

13       142.   First, in the fall of 2005, Merrill Lynch bought a $100 million or 20%

14  ownership stake in Ownit, a subprime mortgage originator, to whom it also

15  provided substantial amounts of warehouse financing.  *See* FCIC Report at 204;

16  Vikas Bajaj & Christine Haughney, *Tremors at the Door*, N.Y. Times, Jan. 26,

17  2007.  Moreover, Michael Blum, Merrill Lynch's head of global asset-backed

18  finance, "sat on the board of Ownit Mortgage," ensuring Merrill Lynch's visibility

19  and input into Ownit's origination operations.  Elizabeth MacDonald, *Dumbest*

20  *Bubble Deals*, FoxBusiness, Jan. 27, 2009.

21       143.   Ownit has since been identified in government investigations as one

22  of the worst subprime mortgage originators with respect to underwriting failures

23  during the period of the Securitizations at issue.  In November 2008, the OCC

24  issued a report identifying the "Worst Ten" mortgage originators in the "Worst

25  Ten" metropolitan areas, which it supplemented and updated several times in the

26  years following.  Press Release, OCC, Worst Ten in the Worst Ten (Nov. 13, 2008,

27  supplemented and updated Mar. 9, 2009, Mar. 22, 2010, and Mar. 31, 2010)

28  ("OCC Report").  The worst originators were defined as those with the largest

1    number of non-prime mortgage foreclosures for 2005-2007 originations (and then

2    subsequent periods).  Ownit was included on this "Worst Ten" list, as one of

3    "[o]nly 21 companies in various combinations [to] occupy the Worst Ten slots in

4    the Worst Ten metro areas" for 2005-2007 originations.  *Id.*; *see* ¶¶ 290-294 *infra*.

5         144.   Ownit filed for bankruptcy at the end of 2006, as mortgage defaults

6    began to sharply rise in 2006, and Merrill Lynch declined to provide further

7    warehouse financing.  *In re Ownit Mortgage Solutions, Inc.*, No. 06-bk-12579-VK

8    (Bankr. C.D. Cal. filed Dec. 28, 2006); Vikas Bajaj & Christine Haughney,

9    *Tremors at the Door*, N.Y. Times, Jan. 26, 2007.

10        145.   In September 2006, Merrill Lynch announced that it was acquiring

11   another mortgage originator, Defendant First Franklin for $1.3 billion.  FCIC

12   Report at 204.  The acquisition was completed on December 30, 2006, according

13   to Merrill Lynch's Form 10-K Annual Report for the period ending December

14   2006.  As Stanley O'Neal, Merrill Lynch's former CEO, told the FCIC in a

15   September 16, 2010 interview, Merrill Lynch acquired First Franklin "to control

16   our [own] source of origination," echoing the interviewer's comment that Merrill

17   made the acquisition to "vertically integrate" its mortgage securitization business.

18   O'Neal Interview at 1:32:20-1:33:04.  Merrill Lynch's 2006 Form 10-K similarly

19   stated, at 32-33:  "We expect First Franklin to accelerate our vertical integration in

20   mortgages, adding scale to our mortgage securitization and trading platform."

21        146.   Moreover, an October 21, 2007 Merrill Lynch presentation to the

22   company's board of directors, recently published by the FCIC, also revealed

23   Merrill Lynch's vertical integration model that was premised on its own control of

24   the source of loan origination, which it viewed as an essential component in

25   expanding its securitization business.  "Presentation To Merrill Lynch & Co. Board

26   of Directors, Leveraged Finance and Mortgage/CDO Review," Oct. 21, 2007 ("ML

27   Board Presentation"), at 44.  A slide in the presentation titled "Business Model and

28   Strategy Overview – ML Acquisition to Build a Vertically Integrated Mortgage

Platform Strategy," provided a flow chart depicting this model with "Origination," including First Franklin, as the first step. *Id.* The slide explained the rationale behind Merrill Lynch's movement away from its "historically [] third-party focused model," which relied on third-party mortgage originators. *Id.* It further listed "[d]irect 'access to assets'" and "[a]bility to tailor origination profile and pricing to specific risk appetite and capital market strategy" as some of the "[b]enefits of vertical integration." As this presentation acknowledged, controlling mortgage loan originators like First Franklin gave Merrill Lynch "[d]irect access to assets," meaning direct knowledge of the true credit quality of the mortgage loans it securitized, including their detailed loan level files, as well as the originator's underwriting practices. Thus, Merrill Lynch was intimately involved with, and therefore knew or was reckless in not knowing, about the true characteristics and underwriting failures of these mortgage loans that it repackaged to RMBS investors.

147.   Like Ownit, First Franklin has since been identified as one of the mortgage originators on the OCC's "Worst Ten in the Worst Ten" list. OCC Report. News reports and various lawsuits filed against First Franklin have also subsequently revealed its lax underwriting practices, which "relie[d] heavily on an army of independent brokers to find borrowers and submit loan applications, [while] other U.S. lenders have abandoned that channel, citing problems with underwriting and outright fraud." Tim McLaughlin, *Merrill Lynch's Painful Lesson in Subprime*, Reuters, Aug. 16, 2007. Additionally, a complaint filed by the Comptroller of the State of New York against Merrill Lynch highlighted First Franklin's weak underwriting standards, both before and after Merrill Lynch's acquisition, citing Wayne Bereman, an underwriter employee at First Franklin:

> According to Wayne Bereman, an underwriter at First Franklin both before and after Merrill acquired the company, the underwriting standards weakened and loan production quotas intensified after the Merrill acquisition. Further, under Merrill's ownership, First Franklin made an unprecedented number of "exceptions"

to provide loans to applicants who failed to meet even the weakened underwriting guidelines.

*DiNapoli v. Merrill Lynch & Co., Inc.*, No. 10 CV 5562, ECF No. 1 at ¶ 80 (S.D.N.Y. filed July 22, 2010).

148.   Moreover, Merrill Lynch used its ownership clout, as well as the warehouse line of credit, to pressure subprime originators like Ownit into relaxing their underwriting standards and originating more risky, low- and no-documentation loans in which the borrower's income is not verified to ensure a steady supply of mortgage loans for RMBS securitization.  For example, in an interview with the New York Times, William Dallas, Ownit's founder and CEO, who had also co-founded First Franklin in 1981, admitted to "loosening lending standards but says he did so reluctantly and under pressure from his investors, ***particularly Merrill Lynch***, which wanted more loans to package into lucrative securities."  Vikas Bajaj, *East Coast Money Lent Out West*, N.Y. Times, May 8, 2007 (emphasis added).  Specifically, he stated that he was instructed by Merrill Lynch and other Wall Street firms to originate more "stated income" loans, which are low-documentation loans wherein the borrower's income is not verified using pay stubs or other information and are therefore referred to in the industry as "liar loans" because they make it easier for borrowers and brokers to commit fraud.  *Id.* "The message, he said, was simple: You are leaving money on the table -- do more of them."  *Id.*  Although he reportedly "disagreed," Dallas ultimately "complied" with Merrill Lynch's demands.  *Id.*  As he explained, "If I can sell it at a profit, why would I not do it?"  *Id.*

149.   Merrill Lynch also encouraged mortgage originators like Ownit to originate more of these risky low- or no-documentation loans by paying more for them.  Another New York Times article reported Dallas as stating that firms like Merrill Lynch were "paying me to do a no-income-verification loan more than [they were] paying me to do the full documentation loans. What would you do?"

1   Vikas Bajaj & Christine Haughney, *Tremors at the Door*, N.Y. Times, Jan. 26,
2   2007.  In effect, Merrill Lynch used increased compensation to incentivize Ownit
3   to accept reduced documentation loan applications from unqualified borrowers and
4   originate such risky "liar loans" in contravention of its underwriting guidelines, all
5   in its drive to increase the volume of mortgage loans that it could repackage into its
6   RMBS.

7        150.   Accordingly, through their various affiliates and subsidiaries, the
8   Merrill Lynch Defendants participated in every step of the securitization process,
9   from the origination and servicing of the mortgage loans to the sponsoring and
10  structuring of the securitization, to the underwriting and marketing of the
11  Certificates.  This vertical integration allowed Merrill Lynch to control and
12  manipulate the loan level documentation, to knowingly choose poor quality, non-
13  conforming mortgage loans for securitization as a method of off-loading the loans
14  to investors as soon as possible, and to selectively make repurchase claims of
15  originators while simultaneously denying those of investors.  By virtue of their
16  control over each step in the securitization process, the Merrill Lynch Defendants
17  had knowledge of the true characteristics and credit quality of the mortgage loans.

18       151.   Former Merrill Lynch executives have since acknowledged that the
19  payment structure of Merrill Lynch's relationships with mortgage originators,
20  which was based solely on volume and disregarded credit quality, promoted
21  fraudulent origination practices.  In particular, former Merrill Lynch CEO John
22  Thain, in interview with the FCIC on September 17, 2010, admitted Merrill
23  Lynch's awareness of the problem:

24          When you have a system where you pay someone for
        originating mortgages simply on volume and nothing
25          happens to them if the credit quality is bad, and nothing
        happens to them if the borrower is fraudulent on his loan
26          application, and nothing happens to him if the appraisal's
        fraudulent, then that's probably not a very smart system.

27

28

1    Audio File of FCIC Interview of John Thain, Sept. 17, 2012, *available at*

2    http://fcic.law.stanford.edu/resource/interviews at 2:09:17 – 2:09:44.

3         152.   Other Merrill Lynch executives also have recently admitted the

4    pervasiveness of fraudulent practices in mortgage origination and their knowledge

5    of the problem.  During his September 14, 2010 interview with the FCIC, Jeff

6    Kronthal, former head of Merrill Lynch's structured products group, blamed the

7    credit crisis, in part, on "the level of fraud that was being committed . . . in the

8    mortgage origination process."  Kronthal Interview at 1:48:03-1:48:16.

9         153.   Accordingly, Merrill Lynch knew that subprime mortgage positions

10   were risky and dangerous; yet all the while Merrill Lynch continued to originate,

11   acquire and securitize defective and credit-impaired loans for inclusion in its

12   securitizations, which were sold to investors like Plaintiffs.  These facts

13   demonstrate that Merrill Lynch knowingly securitized, marketed, and sold

14   Certificates containing loans with poor credit characteristics that did not meet its

15   underwriting standards or those of other originators whose loans were purportedly

16   transferred to the securitizations and knowingly made false representations

17   regarding the Securitizations.

18        **D.    Countrywide Knew that the Representations in the Offering Documents were False**

19

20        154.   Defendant Countrywide Home Loans originated the vast majority of

21   the loans that purportedly were included in the Securitizations.  Given the overlap

22   of the officers, directors, and high-level employees among the Countrywide

23   Defendants, it is apparent that all the Countrywide Defendants knew the true nature

24   and quality of the loans that those Securitizations purportedly included.

25        155.   Defendant Countrywide Home Loans, which has been involved in the

26   securitization of home loans since 1969, was at all times relevant to this Complaint

27   a leading sponsor of mortgage-backed securities and loan originator.  The volume

28   of loans originated and aggregated by Countrywide Home Loans made it possible

1   for Countrywide Financial to "[take] the crown" as the biggest mortgage originator

2   from 2004 until 2007.  *See* FCIC Report at 105.  According to the SEC, by 2005,

3   Countrywide was the largest mortgage lender in the United States, originating over

4   $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408

5   billion in 2007.  *See* Complaint, *SEC v. Mozilo*, No. 09-03994, ECF No. 1 at ¶ 15

6   (C.D. Cal, filed June 4, 2009) (hereinafter the "SEC Complaint").  Countrywide

7   achieved a 16.8 percent market share by 2007.  *See* Goldstein & Fligstein, "The

8   Rise and Fall of the Nonconventional Mortgage Industry" at Table 1 (July 2010).

9         156.   Similarly, Defendant Countrywide Securities was, at all relevant

10  times, an investment bank and registered broker-dealer that was one of the leading

11  underwriters of mortgage and other asset-backed securities in the United States. In

12  2007, Inside Mortgage Finance ranked Countrywide as one of the top non-agency

13  mortgage-backed securities issuers, with 13.6 percent of the market share.

14  Goldstein & Fligstein, "The Rise and Fall of the Nonconventional Mortgage

15  Industry" at Table 1 (July 2010). Countrywide ranked number one in issuance of

16  securities backed by subprime mortgages for the years 2005 to 2007, generating

17  almost $86 billion in such issuances over those three years. "Mortgage

18  Repurchases Part II: Private Label RMBS Investors Take Aim – Quantifying the

19  Risks," Mortgage Finance at 8 (Aug. 17, 2010).

20        157.   During the time period in which the Certificates were issued –

21  approximately 2006 through 2007 – Countrywide's involvement in the mortgage-

22  backed securitization market was rapidly expanding. Countrywide Financial's

23  CEO, Angelo Mozilo, stated on a conference call with analysts in 2003 that his

24  goal for Countrywide Financial was to "dominate" the mortgage market and "to

25  get our overall market share to the ultimate 30% by 2006, 2007."  Q2 2003

26  Countrywide Financial Earnings Conference Call (July 22, 2003).  As described

27  below, in the drive to achieve this objective, Countrywide abandoned its

28  underwriting guidelines.

158.   The Countrywide Defendants' fraudulent representations were the means by which they pursued dominant market share.  Around May 2003, Countrywide Financial's President and COO, David Sambol, became a major force within Countrywide Financial and Countrywide Home Loans, taking complete charge of loan production in 2004.  Countrywide executives, and Mr. Sambol in particular, sent a clear message to loan origination and underwriting employees that overall volume was far more important than creditworthiness.  Indeed a post-crisis internal investigation at Countrywide determined that "[t]he focus of [loan] production was volume and margin, not credit risk."  *See SEC v. Mozilo*, No. 09-03994, ECF No. 391-1 (Declaration of Randall S. Luskey in Support of David Sambol's Motion In Limine No. 4 to Preclude Evidence of Countrywide Financial's "Lesson's Learned" Analysis ("Luskey Decl."), Ex. I) (the "Lessons Learned Report").

159.   In order to achieve such unprecedented growth, according to a former senior regional vice president of Countrywide Financial, Countrywide "approached making loans like making widgets, focusing on cost to produce and not risk or compliance."  Chris Palmeri, *One Insider's View of Countrywide*, Businessweek, Jan. 17, 2008.

160.   Indeed, in an interview with the FCIC, Mr. Mozilo stated that a "gold rush" mentality overtook the housing market during the relevant time frame, and that he was swept up in it.  FCIC Staff Interview with Angelo Mozilo, Sept. 24, 2010.  Confirming that "saleability" was the sole criteria for approving a loan, Mr. Sambol stated in his interview with the FCIC that Countrywide "was selling virtually all of its production to Wall Street in the form of mortgage-backed securities or in the form of mortgage whole loans" and that Countrywide's essential business strategy was "originating that which was saleable into the secondary market."  FCIC Staff Interview with David Sambol, Sept. 27, 2010.   In

order to generate more "saleable" loans, Defendants had to manipulate the credit metrics in order to make the loan pools appear more attractive to investors.

### 1. Countrywide's Own Documents Reveal It Knew the Falsity of Its Representations

161.   The Countrywide Defendants' knowledge of the falsity of their representations is established by evidence from Countrywide's own documents and employees.  For example, in November 2007, by which time Countrywide was learning of the poor performance of its loans, Countrywide Financial prepared a "lessons learned" analysis.  *See* Lessons Learned Report, *supra*.  The 2007 Lessons Learned Report analysis showed that Countrywide knew at the time that what it was doing was wrong, but proceeded anyway:

- "We did not fully heed the warnings of our credit models.  Delinquencies were rising, and models predicted worse to come." Ex. I at 68 to Luskey Decl.

- "Early indicators of credit risk exposure existed.  Internal control systems highlighted many of the risks that eventually transpired." *Id.* at 69.

- "Going forward, we need to rely on our experience and instinct when business practices don't make sense.  In particular, stated income and high LTV was highly counter-intuitive." *Id.* at 72.

162.   These concerns mirrored those that Countrywide Financial's Credit Risk Committee raised long before Countrywide's problems became public, demonstrating that Countrywide's admissions were not mere hindsight.  In a February 13, 2007 Countrywide Financial Board of Directors Credit Risk Committee presentation highlighting "Areas of Concern," alternatively known as a "Wall of Worries," one of the Credit Risk Committee's "Areas of Concern" was Countrywide's "loan quality," including "increased fraud," "exception underwriting," "guideline drift," "[a]ttribute deterioration," and "[a]ppraisal quality." *SEC v. Mozilo*, No. 09-03994, ECF No. 253-10 at 23 (C.D. Cal., filed Aug. 16, 2010) (Declaration of John M. McCoy III in Support of SEC's Opposition to Defendants' Motions For Summary Judgment or Adjudication ("McCoy Decl."), Part 1).

163.   John McMurray (Countrywide Financial's then-Chief Risk Officer) gave repeated, explicit, and alarming warnings to Messrs. Sambol, Mozilo, and others that the company's "matching strategy" of matching any type of loan product offered by its competitors and its use of exceptions resulted in riskier loans with high default rates.  Countrywide ignored the risk management department's warnings about the consequences of abandoning underwriting standards and continued with its efforts to increase market share and loan volume.

164.   As early as 2005, Mr. McMurray warned Mr. Sambol that loans which were originated as exceptions to Countrywide's stated origination guidelines would likely experience higher default rates. On May 22, 2005, he wrote that "exceptions are generally done at terms even more aggressive than our guidelines." *Id.* ECF No. 275-13 (Declaration of Lynn M. Dean in Support of Plaintiff Securities and Exchange Commission's Opposition to Defendants' Motion for Summary Judgment or Adjudication ("Dean Decl."), Part 4).   In a May 22, 2005 e-mail, McMurray warned Sambol that the company would face liability for its faulty underwriting practices and misrepresentations to investors:  "We've sold much of the credit risk associated with high risk transactions away to third parties. Nevertheless, we will see higher rates of default on the riskier transactions and third parties coming back to us seeking a repurchase or indemnification based on an alleged R&W breach as the rationale." *Id.*

165.   Yet when Mr. McMurray attempted to enforce a set of underwriting guidelines, his efforts were quashed, and his repeated warnings were ignored by Countrywide's senior executives. On November 16, 2006, Mr. McMurray wrote to Mr. Sambol regarding the "fundamental deficiencies" within Countrywide with regard to risk:

> First, we need to agree on a risk vision and guiding principles that the entire enterprise will follow.  I previously created a set of guiding principles, but there hasn't been acceptance from some of the key business units. The most widely held belief is that our guiding

principle is simply doing what anyone else in the market is doing; if it's in the market, we have to do it.

Second, we should require everyone to follow established risk guidance and policies[;] a product cannot be rolled out or transactions closed without required approvals. There are several recent examples where products or transactions proceeded without the required risk approvals or in contradiction of established policy.

*Id.* ECF No. 279-3 (Ex. 94 to Dean Decl.).

166. On September 7, 2007, over a year after circulating his proposed policy, Mr. McMurray concluded in an e-mail: "I was never supported on this and Secondary [Marketing], [the] Production [Division], and [Countrywide Capital Markets] basically continued to operate as though they never received this policy." *Id.* ECF No. 298-5 (Ex. 187 to Dean Decl.).

167. Mr. McMurray identified during his SEC testimony his own notes from November 3, 2006, wherein he indicated that he had discussed with Mr. Sambol that he was concerned that he would be personally blamed for products that he "never advocated and often recommended against." *Id.* ECF No. 273 at 16-17. His testimony also indicates he raised "concerns about inadequate controls, infrastructure, etc." *Id.*

168. Frank Aguilera, a Countrywide Financial Managing Director who managed the risk management department, testified that he did not think investors were aware of Countrywide's internal "matching" strategy. *Id.* ECF No. 257-7 at 21 (Ex. 236 to McCoy Decl.). He stated that the use of this strategy to originate riskier subprime loans was "not a tolerable process" and that he had raised his concerns formally with at least two other managers at Countrywide. *Id.* at 13-14.

169. Christian Ingerslev, Countrywide Home Loan's Executive Vice President of Credit Risk Management, also warned Mr. Sambol and others about the consequences of Countrywide's failure to adhere to underwriting guidelines. In his testimony, Mr. Ingerslev confirmed that internal documentation from

November 2006 showed that products and transactions were going forward "without the required risk approvals or in contradiction of established policy." *Id.* ECF No. 226 at 25 (Testimony of Christian Ingerslev).  Mr. Ingerslev said it was part of the culture to have pressure to move things along and say yes to things, and he felt that pressure.  *Id.*  He also testified that he thought the company's guidelines had gone "too far" given the "additional layers of risk" in the product mix and changing interest rates.  *Id.* at 8.

170.   Mr. Ingerslev also testified there was no "consequence or penalty" for originating loans that had not been approved by Mr. McMurray.  *Id.* at 151-53.  Instead, the sales team ruled at Countrywide.  In a March 7, 2005 e-mail, Mr. Ingerslev complained:

> [S]ounds like they got on the line with the traders, and long story short, they now think they can sell them. . . . [I]t's frustrating to try and hold the line and then just be overridden with whining and escalations. . . .  [J]ust reinforces that sales can have anything they want if they yell loud enough to [D]rew [Gissinger, President of Countrywide Home Loans].

*Id.* ECF No. 305-10 (Declaration of Spencer E. Bendell in Opposition to Motion for Summary Judgment ("Bendell Decl.")).

171.   As stated above, the top Countrywide executive, Mr. Mozilo himself, admitted that he saw a "serious lack of compliance within our origination system." *Id.* ECF No. 227-5 (Ex. 16 to Dean Decl.).

### 2.   Countrywide Purposefully Abused Its Documentation Programs and Falsified Loan Applications

172.   Countrywide used low-documentation loan programs as a tool to get around Countrywide's theoretical underwriting standards.  When a loan officer knew an application would not be approved on the basis of the applicant's actual financial condition, the officer often steered applicants into low-documentation products.  Once in those programs, Countrywide coached borrowers on how to

falsify the application to ensure it would be approved, and in some instances would even fill out the required misrepresentations without the borrower's knowledge.

173.   According to Mark Zachary, a former Regional Vice President of Countrywide Home Loans, a high-ranking executive at a Countrywide originating affiliate sanctioned the falsification of information.  In an October 25, 2006 e-mail, Mr. Zachary posed to the executive a situation in which a loan officer confessed that a potential borrower did not have a job in the local area, when that is a requirement of the mortgage for which the borrower was applying.  Even more drastically, Mr. Zachary wondered what would happen if the loan officer mentioned that the borrower was applying for a stated-income loan because he was unemployed.  Mr. Zachary asked for confirmation that in those circumstances, when there was evidence that the borrower and/or loan officer were falsifying the borrower's information, the company would reject the loan.  Shockingly, the senior executive wrote back that "I wouldn't deny it [the loan] because I didn't hear anything. I would definitely tell the [loan officer] to shut up or shoot him!"  Second Amended Complaint, *Zachary v. Countrywide Fin. Corp.*, No. 08 Civ. 00214, ECF No. 15 at 5-6 (S.D. Tex., filed Apr. 9, 2008).

174.   According to Mr. Zachary, he refused to unconditionally approve borrowers that did not meet Countrywide's stated guidelines, at which point he was taken out of the approval process and the loans were approved anyway, by his supervisor.  *Id.* at 8 ¶ 20.

175.   A former Countrywide loan officer described in the California Attorney General's complaint against Countrywide reiterated the fact that borrowers were coached on how to lie.  He explained that a loan officer might say, "with your credit score of X, for this payment, and to make X payment, X is the income you need to make."  Complaint, *California v. Countrywide Fin. Corp. et al.*, No. LC081846, at 21 ¶ 88 (Cal. Super. Ct. N.W. Dist., filed June 24, 2008).  And NBC News reported that it spoke to six other former Countrywide employees,

1   who worked in different parts of the country, who described the same "anything

2   goes" corrupt culture and practices.  Some of those employees even said that

3   borrowers' W-2 forms and other documents were falsified to allow for loan

4   approval.  One employee stated that "I've seen supervisors stand over employees'

5   shoulders and watch them . . . change incomes and things like that to make the loan

6   work."  Lisa Myers, *Countrywide Whistleblower Reports 'Liar Loans'*, NBC

7   News, July 1, 2008.

8          176.   Borrowers have confirmed that Countrywide falsified loan

9   applications and encouraged them to falsify their loan applications.  Julie

10  Santoboni, who took out a Countrywide mortgage on her family's home in

11  Washington, D.C., was interviewed on National Public Radio.  Ms. Santoboni

12  stated a Countrywide loan officer pressured her to lie about her income to obtain a

13  more attractive loan, and that he wanted her to write a letter stating she made

14  $60,000 during each of the past two years and get her accountant to sign it, even

15  though that would have been fraudulent, since she had no income.  *See* Chris

16  Arnold, *Woman: Countrywide Proposed Fibbing to Get Loan*, NPR, May 6, 2008.

17  Another Countrywide borrower, Bruce Rose, described obtaining a mortgage loan

18  from Countrywide that stated his monthly income as $12,166, as he realized only

19  later, even though his income at the time was only around $16,000 a year.  *See*

20  Nick Carey, *Option ARMs, Next Chapter in Housing Crisis*, Reuters, Feb. 1, 2008.

21  Yet another borrower told NBC News that her Countrywide loan officer told her to

22  claim she made more than twice her actual income in order to gain approval for her

23  loan.  *See* Lisa Myers, *Countrywide Whistleblower Reports 'Liar Loans'*, NBC

24  News, July 1, 2008.

25          177.   In a June 2006 e-mail chain that included both Mr. McMurray and Mr.

26  Sambol, Countrywide circulated the results of an audit it had conducted.  Among

27  the findings were that "approximately 40% of the Bank's reduced documentation

28  loans . . . could potentially have income overstated by more than 10% and a

1  significant percent of those loans would have income overstated by 50% or more."

2  *SEC v. Mozilo*, No. 09-03994, ECF No. 283-1 (Ex. 117 to Dean Decl.).  Mr.

3  McMurray stated that was "obviously the case" that "perhaps many" of these

4  overstatements were the result of misrepresentations.  *Id.*  Another Countrywide

5  Financial Risk Officer, Clifford Rossi, agreed, testifying to the SEC that "the vast

6  majority" of the overstated income amounts was "likely" due to

7  misrepresentations.  *Id.* ECF No. 278 at 8-9.

8  ### 3. Countrywide "Cherry Picked" the Best Loans While Selling Riskier Loans to Investors

9
10  178.   Additionally, Countrywide knowingly offloaded its high-risk assets

onto investors by selectively "cherry picking" high quality loans to keep on its own
11
balance sheet, while securitizing the riskier loans and selling them on the
12
secondary market.
13
14  179.   On August 2, 2005, Mr. Sambol openly acknowledged and questioned

the company's policy of "cherry picking" the best loans for itself while leaving the
15
higher-risk leftovers for securitization:
16
17              While it makes sense for us to be selective as to the loans
                which the Bank retains, we need to analyze the
18              securitization implications on what remains if the bank is
                only cherry-picking and what remains to be
19              securitized/sold is overly concentrated with higher risk
                loans.  This concern and issue gets magnified as we put a
20              bigger percentage of our pay option production into the
                Bank because the remaining production then increasingly
21              looks like an adversely selected pool.

*Id.* ECF No. 305-2 (Ex. 297 to Bendell Decl.).
22
23  180.   Mr. Mozilo responded the same day, expressing his preference to

continue the practice:
24
25              I absolutely understand your position however there is a
                price we will pay no matter what we do.  The difference
26              being that by placing less attractive loans in the
                secondary market we know exactly the economic price
27              we will pay when the sales settle.  By placing, even at
                50%, into the Bank we have no idea what economic and
28              reputational losses we will suffer not to say anything
                about restrictions placed upon us by the regulators.

---

*Id.*

181.   Mr. McMurray testified that he also raised concerns about Countrywide's policy of picking the best loans to keep on its balance sheet:

> [T]here's another element that we need to bring in here that's important with respect to securities performance. Countrywide's bank tended to - on - on some of the key products, tended to select the best loans out of the ones that were originated. By best - I'm talking about from a credit risk standpoint, so let me clarify that.  So as - as those loans are drawn out of the population, what's left to put into the securities were not - are not as good as what you started out with, and then that can have an adverse effect on securities performance.

*Id.* ECF No. 261-11 (Ex. 266-1 to McCoy Decl.).

182.   That Countrywide was "cherry picking" the loans it would keep for itself was also confirmed by the testimony of Clifford Rossi, a Countrywide Risk Officer, who testified that the general strategy of the bank "was to originate and to cherry pick the better quality assets." *Id.* ECF No. 278 at 1.

### 4.   The Countrywide Defendants Knew of the Falsity of Their Representations Regarding Loan Quality Because They Originated So Many Loans Themselves

183.   The Countrywide Defendants knew of the falsity of the Offering Documents' representations regarding the quality of the underlying loans because Countrywide entities originated so many of them, including all of the loans for CWL 2005-14, CWL 2007-9 and CWL 2007-10 Securitizations.  The Originator Defendant's utter abandonment of its own underwriting guidelines is a matter of public record.

### 5.   Government Investigations Have Confirmed That Countrywide Routinely Failed to Adhere to Its Underwriting Guidelines

184.   Numerous government reports and investigations have described rampant underwriting failures at Countrywide throughout the period of the Securitizations.  Those reports and investigations have led to disclosures of admissions and acknowledgments made by top Countrywide executives of the

1   abandonment of adherence to underwriting guidelines. Courts, including the

2   federal court that presided over a civil action brought by the SEC against

3   Countrywide's former executives, have found that allegations of Countrywide's

4   failure to comply with underwriting guidelines, and lack of diligence regarding the

5   accuracy of representations made in registration statements relating to offerings of

6   securitizations of mortgage loans, are facially valid and raise genuine issues of

7   material fact.

8                    **(a)        Investigations and Actions of Federal Authorities**

9          185.   In November 2008, the OCC issued its Report identifying

10  Countrywide as one of the "Worst Ten" mortgage originators in the "Worst Ten"

11  metropolitan areas.  The worst originators were defined as those with the largest

12  number of non-prime mortgage foreclosures for 2005-2007 originations.

13  Countrywide Home Loans, which was the sole or primary originator of loans in the

14  majority of the Securitizations, was on that list. *See* OCC Report at 1.

15         186.   In January 2011, the FCIC issued its final report, which detailed,

16  among other things, the collapse of mortgage underwriting standards and

17  subsequent collapse of the mortgage market and wider economy.  Created to

18  "examine the causes of the current financial and economic crisis in the United

19  States," the FCIC "reviewed millions of pages of documents, interviewed more

20  than 700 witnesses, and held 19 days of public hearings in New York, Washington,

21  D.C., and communities across the country."  FCIC Report at xi.  The FCIC Report

22  specifically identified Countrywide in its summary discussions of the Report's

23  conclusions about the systemic breakdown in accountability and ethics.

24              Lenders made loans that they knew borrowers could not
                afford and that could cause massive losses to investors in
25              mortgage securities.  As early as September 2004,
                Countrywide executives recognized that many of the
26              loans they were originating could result in "catastrophic
                consequences."  Less than a year later, they noted that
27              certain high-risk loans they were making could result not
                only in foreclosures but also in "financial and
28              reputational catastrophe" for the firm.  But they did not
                stop.

1   *Id.* at xxii.

2        187.   On June 4, 2009, the SEC filed a complaint in the U.S. District Court

3   for the Central District of California against Mozilo, Sambol, and Sieracki for their

4   fraudulent disclosures relating to Countrywide's purported adherence to

5   conservative loan origination and underwriting guidelines, as well as insider

6   trading by Mozilo.  *See* SEC Complaint.  On September 16, 2010, the District

7   Court rejected the defendants' motion for summary judgment, finding that the SEC

8   had raised genuine issues of fact as to, among other things, whether the defendants

9   had misrepresented the quality of its underwriting processes.  In its decision, the

10  court stated:

11          The SEC has presented evidence that these statements
            regarding the quality of Countrywide's underwriting
12          guidelines and loan production were misleading in light
            of Defendants' failure to disclose, inter alia, that:
13
            (1) As a consequence of Countrywide's "matching
14          strategy," Countrywide's underwriting "guidelines"
            would end up as a composite of the most aggressive
15          guidelines in the market . . . and (2) Countrywide
            routinely ignored its official underwriting guidelines, and
16          in practice, Countrywide's only criterion for approving a
            loan was whether the loan could be sold into the
17          secondary market.

18          For example, Countrywide's Chief Risk Officer, John
            McMurray, explained in his deposition that Countrywide
19          mixed and matched guidelines from various lenders in
            the industry, which resulted in Countrywide's guidelines
20          being a composite of the most aggressive guidelines in
            the industry . . . .
21
            SEC has also presented evidence that Countrywide
22          routinely ignored its official underwriting guidelines to
            such an extent that Countrywide would underwrite any
23          loan it could sell into the secondary mortgage market.
            According to the evidence presented by the SEC,
24          Countrywide typically made four attempts to approve a
            loan. . . . As a result of this process, a significant portion
25          (typically in excess of 20%) of Countrywide's loans were
            issued as exceptions to its official underwriting
26          guidelines. . . .

27          In light of this evidence, a reasonable jury could
            conclude that Countrywide all but abandoned managing
28          credit risk through its underwriting guidelines, that
            Countrywide would originate any loan it could sell, and

1               therefore that the statements regarding the quality of
Countrywide's underwriting and loan production were
2               misleading.

3   *SEC v. Mozilo*, No. 09-03994, 2010 WL 3656068, at \*10 (C.D. Cal. Sept. 16,

4   2010) (hereinafter "SEC Order").  After this decision was rendered, Messrs.

5   Mozilo, Sambol, and Sieracki settled with SEC, agreeing to pay substantial fines.

6   *See* Press Release, SEC, Former Countrywide CEO Angelo Mozilo to Pay SEC's

7   Largest Ever Financial Penalty Against a Public Company's Senior Executive

8   (Oct. 15, 2010).

9       188.   The "matching strategy" described in the Court's decision in the SEC

10   action, by which Countrywide mixed and matched the least demanding guideline

11   requirements of other lenders, led Countrywide to deliberately abandon its

12   guidelines and instead to apply the most lax underwriting guidelines in the market.

13   The SEC's allegations, based on information that came to light during discovery,

14   were deemed to create a genuine issue of material fact that Countrywide, in its

15   drive to increase market share, created an underwriting process in which repeated

16   attempts were made to approve loans in circumvention of Countrywide's

17   established and stated guidelines.  SEC Order at \*2.

18       189.   First, loans were processed by an automated system that would either

19   approve the loan or refer it to manual underwriting.  The manual underwriter

20   would then seek to determine if the loan could be approved under his or her

21   exception authority.  If the loan exceeded the underwriter's exception authority, it

22   was then referred to the Structured Lending Desk, where underwriters with broader

23   exception authority attempted to get the loan approved.  Finally, if all prior

24   attempts to find an "exception" failed, it would be referred to the Secondary

25   Markets Structured Lending Desk, where the sole criterion for approving was

26   whether it could be sold, not whether it complied with applicable guidelines.  *Id.* at

27   \*10.  These steps were what the court in the SEC action found to be Countrywide's

28   "four attempts" at approving a loan, a methodology that led to in excess of 20

percent of mortgage loans typically being approved as exceptions to
Countrywide's guidelines. *Id.* At one point, nearly a quarter of Countrywide's
subprime first-lien loans – 23 percent – were generated as "exceptions." *Id.* at *17.
Even that "exception" rate was understated, however, because the exceptions were
only issued after Countrywide employees had coached borrowers and falsified
documentation in an effort to satisfy the underwriting standards. *See* ¶¶ 172-176
*supra*.

190.   To apply its "matching strategy" effectively, Countrywide expanded
the number of employees who were authorized to grant exceptions. A wide range
of employees were given authority to grant exceptions and to change the terms of a
loan, including underwriters, their superiors, branch managers, and regional vice
presidents. If Countrywide's automated system recommended denying a loan, for
example, an underwriter could override that denial by obtaining permission from
his or her supervisor. SEC Complaint at 11-12.

191.   The SEC action revealed that it was openly known at Countrywide
that loans were being approved for securitization based solely on Countrywide's
ability to sell the loan in the market, rather than on compliance with underwriting
criteria. Countrywide's high-volume computer system, called the "Exception
Processing System," was known to approve virtually every borrower and loan
profile, albeit with a pricing add-on by which Countrywide charged the borrowers
extra points and fees. The Exception Processing System was known within
Countrywide as the "Price Any Loan" system. Through the Exception Processing
System, Countrywide was able not only to generate enormous profits from these
higher fees, but also routinely approve loans that did not satisfy even its weakened
theoretical underwriting criteria.

**(b)    Admissions in Countrywide's Internal Reporting and E-mails**

192.   The SEC action also led to the disclosure of internal Countrywide reports and e-mails among Countrywide employees that provide contemporaneous documentation of Countrywide's routine failure to comply with its underwriting guidelines and abandonment of case-by-case determinations of the borrower's ability to repay the loan.

193.   One such document was Countrywide Financial's 2007 Lessons Learned Report (*see* ¶ 102, *supra*).  There, Countrywide admitted, among other things, that applying its "matching strategy" came at the price of compliance with risk assessment procedures, including application of Countrywide's underwriting guidelines. The Lessons Learned Report noted:

- "With riskier products, you need to be exquisite in off-loading the risk.  This puts significant pressure on risk management. Our systems never caught up with the risks, or with the pace of change."  Ex. D at 16 to Luskey Decl.

- "Risk indicators and internal control systems may not have gotten enough attention in the institutional risk and Board committees." *Id.* at 13.

- "Not enough people had an incentive to manage risk." *Id.* at 14.

- "Decentralized and local decision making were another characteristic of our model. . . . The downside was fewer risk controls and less focus on risk, as the local decision makers were not directly measured on risk." *Id.*

- "Our wide guidelines were not supported by the proper infrastructure (credit, risk management)."  *Id.* at 16.

- "[W]e did not put meaningful boundaries around the [broad product] strategy, even when our instincts might have suggested that we do so, and we allowed the model to outrun its critical support infrastructure in investment and credit risk management. . . . Our risk management systems were not able to provide enough counterbalance . . . ."  Ex. E at 28 to Luskey Decl.

- "The focus of production was volume and margin, not credit risk. There was also massive emphasis on share." Ex. I at 71 to Luskey Decl.

Lessons Learned Report, *SEC v. Mozilo*, No. 09-03994, ECF No. 391-1.

194.   E-mails from Countrywide Financial CEO Mozilo himself admitted Countrywide's lack of compliance with its own underwriting guidelines.  *See id.* ECF No. 230-2 at 1 (Ex. 28 to Dean Decl.).  In early 2006, HSBC had begun to contractually force Countrywide to buy back loans that did not comply with underwriting guidelines.  In an April 13, 2006 e-mail, Mr. Mozilo wrote to Mr. Sieracki and others that he was concerned that his company had originated the HSBC loans "with serious disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation." *Id.* ECF No. 227-5 at 2 (Ex. 16 to Dean Decl.: Part 3).

195.   According to the SEC, in mid-2006 attendees at an internal Countrywide credit meeting were informed that one-third of the loans referred out of Countrywide's automated underwriting system violated "major" underwriting guidelines, 23 percent of the subprime first-lien loans were generated as "exceptions," and that "exception" loans were performing 2.8 times worse than loans written within guidelines.  As the court presiding over the SEC action noted, the circumstance that the loans approved by exceptions were performing so much worse than other similar loans is itself strong evidence that the "exceptions" were not being granted based on any purported countervailing circumstances in the borrowers' credit profile.  SEC Order at *12.

196.   Nearly a year later, on May 29, 2007, Messrs. Sambol and Sieracki attended a Credit Risk Committee Meeting, in which they learned that "loans continue[d] to be originated outside guidelines," primarily via the Secondary Structured Lending Desk without "formal guidance or governance surrounding" the approvals. *Id.* at *17.

197.   The SEC Complaint also described a December 13, 2007 internal memo from Countrywide Financial's enterprise risk assessment officer to Mr. Mozilo, in which the officer reported that Countrywide had re-reviewed mortgages originated by Countrywide in 2006 and 2007 "to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures."  The memo concluded that "borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans."  SEC Complaint at 23-24.

198.   Ultimately, Countrywide's exception policy was designed to ensure that all loans were approved. For example, in an April 14, 2005 e-mail chain, various managing directors were discussing what FICO scores Countrywide would accept.  One managing director wrote that the "spirit" of the exception policy was to "provide flexibility and authority to attempt to approve all loans submitted under an approved program/guideline which are later determined to be outside." He continued: "I would argue that the [exception] policy would also contemplate more general exceptions such as . . . to keep pace with fast changing markets prior to submitting a formal product change." *SEC v. Mozilo*, No. 09-03994, ECF No. 253-14 (Declaration of John M. McCoy III in Support of SEC's Opposition to Defendants' Motions for Summary Judgment or Adjudication ("McCoy Decl."), Part 1, Ex. 213).

199.   Another internal Countrywide document described the objectives of Countrywide's Exception Processing System to include "[a]pprov[ing] virtually every borrower and loan profile," with "pricing add on" (i.e., additional fees to be charged by Countrywide).  The objectives also included providing "[p]rocess and price exceptions on standard products for high risk borrowers."  Ex. C to Sentencing Memorandum by Kourosh Partow, *United States v. Partow*, No. 06-cr-00104, ECF No. 39-3 (D. Alaska, filed Aug. 16, 2007).  In his testimony in the SEC proceeding, Mr. Sambol identified a February 13, 2005 e-mail in which he

stated that the "purpose of the [Structured Loan Desk] and our pricing philosophy" should be expanded.   Mr. Sambol wrote, "[W]e should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."  *SEC v. Mozilo*, No. 09-03994, ECF No. 267-4 at 50 (Ex. 276 to McCoy Decl.).

### (c)   Additional Deposition Testimony of Countrywide's Top Executives

200.   The SEC also annexed to court filings the deposition testimony given by Countrywide's former executives in the civil action.  In the testimony, Countrywide's top executives conceded that Countrywide stopped ensuring compliance with underwriting guidelines as a consequence of attempting to out-do its competitors in increasing its volume of mortgage-backed securitizations.

201.   For instance, in his testimony, John McMurray, Countrywide Financial's Chief Risk Officer, admitted that the "matching strategy" was "a corporate principle and practice that had a profound effect on credit policy."  *Id.* ECF No. 290 at 80 (Investigative Testimony Relied Upon in Plaintiff SEC's Opposition to Defendants' Motion for Summary Judgment: Witness John McMurray ("McMurray Investigative Testimony")).  He testified that it was indeed not possible to understand Countrywide's underwriting policies without knowing of and understanding the matching strategy, and that the strategy was rolled out by use of "the exception desks."  *Id.* at 81-83.  He also testified that exceptions were being made without determinations that sufficient compensating factors existed. *Id.* at 101-02.

202.   Mr. McMurray conceded that the use of exceptions, even as a general matter, was associated with higher risk of poor loan performance:  "[a]lmost by definition, you are dealing with a riskier transaction" when the loan is approved by an exception, and in fact there were areas in which his group found a "big disparity" in performance between "exception" loans and others.  *Id.* at 25, 87.

203.   Mr. McMurray also testified that there were "composite" negative effects of Countrywide's "matching strategy."  *Id.* ECF No. 261-12 at 133 (Ex. 266 to McCoy Decl.).  He explained that when Countrywide matched the guidelines of different lenders on separate products, the match "would be more aggressive than either one of those competitor reference points viewed in isolation."  *Id.* at 133-34. Mr. McMurray was concerned that Countrywide's competitors imposed additional requirements for their loan products not factored into Countrywide's system, such as credit history requirements.  These standards might enable competitors to use their products safely, whereas Countrywide could be "ceding our credit policy to the most aggressive players in the market."  *Id.* at 151-52.

204.   The testimony of Frank Aguilera, a Countrywide Financial Managing Director responsible for risk management, established that Countrywide even created a large database of products offered by competitors so Countrywide personnel could check the database when a new product was proposed, to see if a competitor had already approved the product.  *Id.* ECF No. 219 at 5-7 (Investigative Testimony Relied Upon in Plaintiff SEC's Opposition to Defendants' Motions for Summary Judgment: Witness Frank Aguilera).  Mr. Aguilera also confirmed that the "matching strategy" was implemented through Countrywide's "exception" processes.  *Id.* at 10.  Indeed, Mr. Aguilera testified that "90 percent" of his time as the person responsible for Countrywide's "technical manuals" was spent on "expansions" of the guidelines. *Id.* ECF No. 257-7 at 40:7 (Ex. 236 to McCoy Decl.).

205.   Mr. Aguilera also authored an e-mail regarding the "particularly alarming" results of an internal review on June 12, 2006.  He reported to others in Countrywide that over 23 percent of the subprime loans at the time were generated as exceptions, even taking into account "all guidelines, published and not published, approved and not yet approved."  *Id.* ECF No. 255-3 (Ex. 217 to McCoy

Decl.).  Mr. Aguilera wrote at the time that "[t]he results speak towards our inability to adequately impose and monitor controls on production operations."  *Id.*

206.   In February 2007, Mr. Aguilera disputed a belief expressed in a prior meeting that there were adequate controls with regard to exceptions, and stressed that the guidelines were meaningless when so many exceptions were being granted:  "Our review of January data suggests that these controls need to be reviewed.  Any guideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."  *Id.* ECF No. 275-15 (Ex. 86 to Dean Decl.).  As an example, Mr. Aguilera provided data on loans that were approved as "exceptions" despite having high loan-to-value ratios. He found "significant levels of exceptions" under "all high risk programs."  *Id.*

207.   In his testimony, Countrywide Financial CEO Mozilo admitted that Countrywide's practice of matching competitors heightened the risk that the loans would perform poorly.  He stated:  "if the only reason why you offered a product, without any other thought, any other study, any other actuarial work being done is because someone else was doing it, that's a dangerous game to play."  *Id.* ECF No. 235 at 27.

### (d)   Actions Brought by State Enforcement Authorities

208.   Countrywide's systematic failure to adhere to its underwriting guidelines, resulting in the material misstatements in the Registration Statements, has also been revealed in a substantial number of investigations and suits brought by various state enforcement authorities.  Like the SEC, a number of state attorneys general have investigated Countrywide's lending practices and commenced enforcement actions in which they have alleged that Countrywide abandoned its underwriting guidelines, which were intended to ensure borrowers' ability to repay their loans.

209.   In *California v. Countrywide Financial Corp.,* the Attorney General for the State of California filed a civil action on behalf of Countrywide borrowers

in California against Countrywide Financial (and certain affiliates) and its senior executives, asserting statutory claims for false advertising and unfair competition based on a plan to increase the volume of mortgage loans for securitization without regard to borrower creditworthiness. *California v. Countrywide Financial Corp.*, No. LC081846 (Cal Super. Ct., L.A. Cnty., filed June 24, 2008).

210.    In *Illinois v. Countrywide Financial Corp.*, the Attorney General for the State of Illinois filed a civil suit on behalf of Illinois borrowers against Countrywide Financial and Mozilo, asserting state consumer protection and unfair competition statutory claims, alleging that beginning in or around 2004, Countrywide engaged in unfair and deceptive practices, including loosening underwriting standards, structuring unfair loan products with risky features, and engaging in misleading marketing and sales practices. *Illinois v. Countrywide Financial Corp.*, No. 08CH22994 (Ill. Cir. Ct. Ch. Div., Cook Cnty., filed June 25, 2008).

211.    In *Connecticut v. Countrywide Financial Corp.*, the Connecticut Insurance Commissioner commenced a civil action asserting that Countrywide Financial, Countrywide Home Loans and others violated state unfair and deceptive practices law by deceiving consumers into obtaining mortgage loans for which they were not suited and could not afford. *Connecticut v. Countrywide Financial Corp.*, No. 1207 (Conn. Super. Ct., Hartford, filed July 28, 2008).

212.    In *Florida v. Countrywide Financial Corp.*, the Florida Attorney General commenced a civil action against Countrywide Financial, Countrywide Home Loans, and Mozilo, asserting state unfair practices statutory claims, and alleging that since January 2004, Countrywide promoted a scheme to originate subprime mortgage loans to unqualified borrowers, and relatedly engaged in securities law violations. The Attorney General alleged that Countrywide violated state statutory lender laws by falsely representing that Countrywide originated each mortgage loan in accordance with its underwriting guidelines and that each

1    borrower had the ability to repay the mortgage loan. *Florida v. Countrywide*

2    *Financial Corp.* , No. 08-30105 (Fla. Cir. Ct. 17th Judicial Circuit, filed June 30,

3    2008).

4        213.   In *Indiana v. Countrywide Financial Corp.*, the State of Indiana filed

5    a civil action asserting that Countrywide Financial and Countrywide Home Loans

6    violated the state's unfair and deceptive practices law from 2005 through 2008 by

7    deceiving consumers into obtaining mortgage loans for which they were not suited

8    and could not afford. *Indiana v. Countrywide Financial Corp.,* No. 76C01-0808-

9    PL-0652 (Ind. Cir. Ct., Steuben Cnty., filed Aug. 22, 2008).

10       214.   On October 6, 2008, these states, plus 23 others, all joined in a

11   settlement with Bank of America, pursuant to which Bank of America (as the

12   successor-in-interest to the Countrywide Defendants) agreed to pay $150 million

13   for state foreclosure relief programs and loan modifications for borrowers totaling

14   $8.4 billion. *See* Gretchen Morgenson, *Countrywide to Set Aside $8.4 Billion in*

15   *Loan Aid*, N.Y. Times, Oct. 5, 2008.

16                  **6.    Countrywide Recently Admitted to Knowing About and**
                            **Ignoring Widespread Underwriting Misrepresentations**
17                          **During the Period the Securitizations were Issued**

18       215.   During ongoing litigation in which one of Countrywide's bond

19   insurers, MBIA Insurance Corporation ("MBIA"), which is similarly suing

20   Countrywide for having misrepresented the quality of the loans that it was

21   securitizing, Defendants Countrywide Home Loans, Countrywide Securities,

22   Countrywide Financial and BOA Corp. have repeatedly admitted that they were

23   aware that a substantial portion of the loans they were securitizing from 2004 to

24   2007 did not conform to their own underwriting guidelines, contrary to the

25   representations in the prospectus.  Specifically, these Defendants have admitted

26   that:

27                  For each of the Securitizations, ***Countrywide's third-***
                    ***party due diligence raised questions about the extent to***
28                  ***which the loans complied with Countrywide's***
                    ***contractual representations and warranties*** ("R&Ws").

> The third-party due diligence results should have triggered further inquiry by MBIA, but no such inquiry was made. ***Indeed, MBIA knew that, based on these results, Countrywide removed some of the 200 loans reviewed by the due diligence firms from each pool and, thus, that in all likelihood some number of the remaining loans also would be noncompliant with R&Ws.***

*MBIA Insurance Corp. v. Countrywide Home Loans, et al.*, No. 602825/08, Dkt. No. 2070, Mem. of Law in Support of Countrywide's Mot. for Summary Judgment at 3, (Sup. Ct. New York Cnty., entered on Oct. 5, 2012).

216.   Significantly, while Countrywide and MBIA had access to the due diligence performed on the loans, ***investors did not***.  Nor did Countrywide make any reference or disclosure in its offering documents that there were, in its own words, "clear indications from the results of Countrywide's third-party due diligence that some number of loans in the pools would not comply with the contractual R&Ws." *Id.* at 11.  Indeed, according to Countrywide, "the third-party due diligence firms raised questions about, on average, ***more than one out of every four loans*** they reviewed."  *Id.* at 13-14 (emph. added).  Countrywide further admitted that its practice of failing to conduct a thorough due diligence of the loans meant that the problems identified in the sample were only the tip of the iceberg. The Countrywide Defendants have admitted that because of their practice of only sampling a small number of the loans, "***in all probability, a significant number of loans remaining in the pools also would fail to comply with applicable R&Ws.***" *Id.* at 29 (emph. added).

217.   Thus, Countrywide has candidly laid out the shocking disparity between what deal insiders, such as Countrywide and MBIA, knew about the true quality and characteristics of the loans, compared with the far rosier picture of the loan pools that Countrywide actually represented in their offering documents.

**VI.    DEFENDANTS' FALSE AND MISLEADING REPRESENTATIONS THAT THE LOANS IN THE LOAN POOLS COMPLIED WITH THE UNDERWRITING GUIDELINES OF THE ORIGINATORS**

> **A.    Representations in the Offering Documents Concerning the Originators' Adherence to Underwriting Guidelines**

218.    In addition to relying on specific representations about loan and credit criteria in the Offering Documents, Plaintiffs relied on Defendants' representations that the originators of the mortgage loans purportedly pooled in the Trusts adhered to their own underwriting guidelines regarding such matters as owner-occupancy and CLTV, as well as representations that loans would fall outside the originators' guidelines *only in the event of sufficient compensating factors*.

219.    Underwriting guidelines are the backbone of any mortgage-backed security.  They define lending practices that are meant to assess a borrower's ability to repay the mortgage obligation.  They are the link between the lender's first-hand interaction with the borrower and the investor that ultimately assumes the risk of the borrower's default.

220.    Countless investigations and reports have now established that the failure to adhere to underwriting guidelines was one of the primary causes of the financial crisis.  *See, e.g.*, FCIC Report, Conclusions at xxiii ("We conclude collapsing mortgage-lending standards and the mortgage securitization pipeline lit and spread the flame of contagion and crisis.").  The originators of the loans that were supposedly pooled into the Trusts are among those that later became notorious for their lack of adherence to underwriting guidelines.

221.    The Prospectus Supplements for the Securitizations stated that the loans conformed to the underwriting guidelines of the respective originator, unless the loans possessed additional compensating factors.  In particular, the Prospectus Supplement for FFML 2005-FF12 stated that "[a]ll of the Mortgage Loans were originated or acquired by the Originator and subsequently purchased by the Seller. All of the Mortgage Loans were underwritten in accordance with the underwriting

1    guidelines of the Originator."  FFML 2005-FF12 Pro. Supp. dated December 22,

2    2005 at S-25.  The Prospectus Supplements for the remaining Securitizations

3    contained the same or substantially similar statements.  *See* Appendix A.

4         222.   Defendants represented that although exceptions to the underwriting

5    guidelines were permissible "[o]n a case by case basis, the originator may

6    determine that, based upon compensating factors, a prospective borrower not

7    strictly qualifying under its applicable underwriting risk category guidelines

8    warrants an underwriting exception."  CWL 2006-IM1 Pro. Supp. dated January

9    27, 2006 at S-12.  The Prospectus Supplements for the remaining Securitizations

10   contained substantially similar statements.  *See* Appendix A.

11        223.   In other words, the Offering Documents unambiguously represented

12   that if no compensating factors were present, the loan had to comply with the

13   underwriting guidelines, or it could not be included in the Securitization.  With

14   respect to each of the Securitizations, Plaintiffs' analysis of appraisal values and

15   owner-occupancy data demonstrates that a substantial percentage of the loans in

16   the Loan Groups did not comply with the underwriting guidelines.  *See supra*

17   Sections IV.A, IV.B.

18        224.   As part of the marketing of the Certificates, Defendants touted the due

19   diligence that the underlying loans would be subjected to prior to being securitized

20   into the Trusts.  Plaintiffs relied on these representations in the Offering

21   Documents regarding the quality control procedures employed by Defendants to

22   ensure compliance with the stated underwriting guidelines.  For instance, the

23   MLMI 2007-HE1 Prospectus Supplement stated:

24            Prior to acquiring any residential mortgage loans, MLML
             conducts a review of the related mortgage loan seller that
25            is based upon the credit quality of the selling institution.
             MLML's review process may include reviewing select
26            financial information for credit and risk assessment and
             conducting an underwriting guideline review, senior level
27            management discussion and/or background checks. The
             scope of the mortgage loan due diligence varies based on
28            the credit quality of the mortgage loans.

MLMI 2007-HE1 Pro. Supp. dated March 7, 2007 at S-47.  Many of the remaining Securitizations contained the same or substantially similar representations.  *See* Appendix A.

225.   The disclosures in the Offering Documents concerning adherence to underwriting standards or compensating factors were false.  Defendants knew they were false from their own actions and due diligence (*see supra* Section V.), which demonstrated that originators systematically disregarded their underwriting guidelines (information that only later became generally available to the public).  Defendants nevertheless represented to investors, such as Plaintiffs, that the underwriting guidelines were being followed.

**B.    The Originators' Abandonment of Their Underwriting Guidelines**

226.   The rampant abandonment of underwriting guidelines by the originators of loans securitized into the Trusts is now well-documented.  The deterioration of underwriting quality at each of the originators at or about the time of the Securitizations has been confirmed in detailed government investigative reports, news reports and Court opinions.

227.   Moreover, the Clayton reports that Defendants' received in connection with their RMBS securitizations establish both that there were widespread underwriting breaches (without compensating factors) in the loan pools that Defendants were securitizing during the relevant time period, and that Defendants were well aware of that fact at the same time they were representing to investors such as Plaintiffs that all of the loans did conform to the stated underwriting guidelines.

228.   Plaintiffs' investigation of the CLTV ratios and owner-occupancy rates that Defendants represented in the Offering Documents for the Securitizations at issue here further shows that the underwriting guidelines were not being adhered to in these specific Trusts.  Both CLTV and owner-occupancy are crucial

1    components of the overall underwriting guidelines.  For example, Countrywide

2    Home Loans' own underwriting guidelines required that even for borrowers with

3    good credit who submitted full documentation on an owner-occupied mortgage, the

4    maximum CLTV could never be more than 100%.  *See, e.g.,* CWABS 2006-IM1

5    Pro. Supp. dated Jan. 27, 2006, at S-28.  For non-owner occupied loans, the

6    maximum CLTV was 95%.  *Id.*  Yet, Plaintiffs' investigation has revealed that

7    every one of the Securitizations here included ***double-digit*** percentages of loans

8    with CLTV ratios over 100%, and between 22% and 55.7% of the loans in the

9    Securitizations misstated CLTV ratios by more than 10 percentage points.  *See*

10   Table 6, *supra*.  As a result, every one of the Securitizations contained material

11   numbers of loans that breached the stated underwriting guidelines and

12   misrepresented the CLTV ratios for the Loan Groups.

13        229.   Moreover, CLTV and owner-occupancy are only two of many criteria

14   that must be met in order to satisfy the underwriting guidelines.  In addition to the

15   Clayton data showing widespread underwriting guideline departure in Defendants'

16   RMBS, as discussed above, a forensic loan file review conducted by MBIA,

17   which, unlike Plaintiffs, had access to certain loan files, produced some

18   astonishing findings.  *See* Amended Complaint, *MBIA Ins. Corp. v. Countrywide*,

19   No. 602825/08, Docket Entry No. 9 at ¶ 24 (Sup. Ct. N.Y. Cnty. filed Aug. 24,

20   2009) (stating that MBIA's analysis found an "extraordinarily high incidence of

21   material deviations from the underwriting guidelines Countrywide represented it

22   would follow.").  MBIA found that 91 percent of the defaulted or delinquent loans

23   in the loan pools for the Countrywide securitizations contained material deviations

24   from Countrywide's stated underwriting guidelines.  *Id*.  The misrepresentations

25   that MBIA found included violations related to owner-occupancy, the borrower's

26   incomes and the borrowers' outstanding debt levels, and the borrowers' incomes.

27   *Id*.  These misrepresentations are crucial to determining the borrower's ability to

28

1   repay the debt and therefore the riskiness of the certificates backed by those

2   mortgage loans.

3        230.   In November 2008, the OCC, the primary regulator of mortgage

4   originators, issued the OCC Report identifying the "Worst Ten" mortgage

5   originators in the "Worst Ten" metropolitan areas, which it supplemented and

6   updated several times in the years following.  The OCC defined the worst

7   originators and worst areas as those with the highest rates of non-prime mortgage

8   foreclosures for loans originated during 2005-2007 at the end of each reporting

9   period.

10        231.   Many of the originators for the Securitizations at issue in this case,

11   including Aegis Mortgage Corporation, American Home Mortgage Corp.,

12   Ameriquest Mortgage Company, Argent Mortgage Company, Countrywide Home

13   Loans, Inc., Decision One Mortgage Company LLC, First Franklin Financial

14   Corporation, Fremont Investment & Loan, New Century Mortgage Corporation,

15   Option One Mortgage Corporation, Ownit Mortgage Solutions, Inc., People's

16   Choice Financial Corporation, and WMC Mortgage Corp., were listed on the OCC

17   Report as the "Worst Ten in the Worst Ten," evidencing that the loans they

18   originated between 2005 and 2007 had some of the worst foreclosure rates in the

19   country as of both 2008 and 2009.  *See* OCC Report.  Remarkably, 13 of the 21

20   "Worst" originators originated loans for the Securitizations at issue in this case.  *Id*.

21   Each was also featured prominently on the "Worst Ten" lists for the ten worst

22   individual metropolitan areas.

23        232.   As described below, the Trusts at issue here contained loans

24   originated by some of the worst lenders in the country, each of which have recently

25   been shown to have essentially abandoned their own underwriting guidelines.

26              **1.      Accredited Home Lenders, Inc.**

27        233.   Accredited Home Lenders, Inc. ("Accredited") originated loans for

28   the ABFC 2006-HE1 and MSHEL 2007-1 Securitizations.  Allegations that

1    Accredited's stated adherence to its stated underwriting practices were false have

2    been upheld.  *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d

3    1142, 1154 (S.D. Cal. 2008) (upholding allegations of pervasive, widespread

4    exceptions to the Company's underwriting policies and substantial pressures to

5    approve such loans at the end of reporting periods in an effort to meet financial

6    projections).

7              **2.**      **Aegis Mortgage Corporation**

8         234.   Aegis Mortgage Corporation ("Aegis") originated loans for the MLMI

9    2007-HE1 Securitization.  Aegis was one of only 21 companies to occupy the

10   "Worst Ten" slots in the worst ten metro areas for 2005-2007 originations.  *See*

11   OCC Report.

12        235.   According to a complaint filed by one of the founders of Aegis, Aegis

13   was founded in 1993 with a $500,000 investment and grew, through cash infusions

14   from outside investors and acquisitions of other mortgage production operations,

15   including UC Lending and New America, from 150 employees in nine locations in

16   1999 to 3,800 employees in over 100 locations in 2005.  *Thompson v. Aegis*

17   *Mortgage Corp.*, No. 07-33593 (Tex. Dist. Ct., Harris Cnty. filed Sept. 11, 2007)

18   ("Thompson Compl.").  By 2006, Aegis was ranked as the 13th-largest subprime

19   lender in the country, generating close to $20 billion in annual originations.  In

20   eight years, the company's subprime originations grew by an incredible 1,750%.

21   Thompson Compl. at 6-9.

22        236.   At the height of the mortgage origination boom, Aegis employed

23   about 3,500 people, mostly in the Houston area.  But Aegis lost it all in just nine

24   months when the market for mortgage loans tanked.  Katie Benner, *The darker side*

25   *of buyout firms*, CNN Money, Aug. 20, 2007, available at http://money.cnn.com/

26   2007/08/17/magazines/fortune/benner_aegis.fortune/index.htm.

27        237.   According to the Thompson Complaint, high-fee, high-risk mortgages

28   fueled Aegis's astronomical growth.  Thompson Compl. at 10.  As the need for

these mortgages increased, loan underwriting standards were loosened to the point of near abandonment by 2006.  A large portion of the loans Aegis originated during this time were purchased from unlicensed mortgage brokers.  Because investment banks like Bear Stearns purchased Aegis' loans, underwriting standards were disregarded and quantity became more important than quality.  Aegis' divisional head of underwriting, Helen Spavile, bullied the understaffed East Coast underwriting department in Jacksonville, Florida, to approve whatever loans were sent there for approval, resulting in the guidelines being ignored and the loans approved.  Thompson Compl. at 10; *see also* Complaint in *In re Lehman Brothers Sec. & ERISA Litig.*, No. 09-md-2017 (S.D.N.Y. filed Feb. 23, 2009), at ¶ 149.

238.   Aegis filed for bankruptcy in late 2007.  *See* OCC Report; *In re Aegis Mortg. Corp.*, No. 07–11119 (Bankr. D. Del. filed Aug. 13, 2007).  Aegis's growth coupled with bullying by a head of underwriting caused loans to be approved that otherwise would not have been approved.

### 3.    American Home Mortgage Corp.

239.   American Home Mortgage Corp. ("American Home") originated loans for the CWALT 2006-OC1 Securitization.  American Home's ultimate parent was American Home Mortgage Investment Corp., which invested in mortgage-backed securities including securitizations involving residential mortgage loans originated and serviced by its subsidiaries.  Internal documents and accounts of former employees demonstrate American Home's disregard for underwriting guidelines.

240.   An internal October 2005 American Home "Credit Update" presentation enumerated credit factors loosening the company's underwriting standards:

- [N]ot requiring verification of income sources on stated income loans;
- [R]educing the time that need have passed since the borrower was in bankruptcy or credit counseling;

- [R]educing the required documentation for self-employed borrowers; and

- [B]roadening the acceptable use of second and third loans to cover the full property value.

*In re American Home Mortgage Sec. Litig.*, No. 07-MD-1898, Consolidated Amended Class Action Complaint,  ¶ 99 (E.D.N.Y., filed June 4, 2008)

241.   On November 2, 2006 Steve Somerman, an American Home Vice President of Product and Sales Support in California and co-creator of the Company's "Choice Point Loans" program, sent an e-mail to the company's loan officers disclosing that the company approved loans regardless of the information available, stating:

> At AHM we pride ourselves on having a loan for virtually any borrower, regardless of whether or not they have the ability to verify their Income, Assets or Employment history.  With In-house programs that are able to cover 98% of all borrowers' documentation situations, the key to closing a loan is the ability to understand and utilize the proper doc type to fit the circumstances.  Review the AHM program summaries for the loan document types they allow and move forward successfully, meeting your borrowers needs.

*Id.* at ¶ 84.

242.   According to a March 2008 Wall Street Journal article, Kourosh Partow, a former sales executive at Countrywide who also worked at American Home, was convicted of mail and wire fraud.  Glenn R. Simpson, *Loan Data Focus of Probe*, The Wall Street Journal, Mar. 11, 2008.  In seeking a lighter sentence, Mr. Partow claimed that American Home had knowledge of loan documentation 'fraught with inaccuracies' and 'encouraged what could be characterized as manipulation . . . [i]n order to stay competitive, and increase sales. . . .'  *Id.*

243.   Moreover, "[s]ome American Home employees also said that the drive to fulfill [the founder, Michael] Strauss' mission of becoming the nation's top mortgage bank created such pressure to resell loans that some loan documents

1  could not be thoroughly scrutinized to ensure their validity."  Daniel Wagner and

2  Tami Luhby, *Mortgage Firm House of Cards?*, Newsday, Aug. 19, 2007.

### 4.   Ameriquest Mortgage Company

4       244.   Ameriquest Mortgage Company ("Ameriquest") originated loans for

5  the CBASS 2006-CB6 and ABFC 2006-HE1 Securitizations.  Government

6  investigations have discovered fraudulent practices involving Ameriquest's

7  underwriting guidelines and the company has been subject to indemnification

8  claims.

9       245.   A "multistate investigation of Ameriquest revealed that the company

10  engaged in the kinds of fraudulent practices that other predatory lenders

11  subsequently emulated on a wide scale . . . inflating home appraisals; increasing

12  the interest rates on borrowers' loans or switching their loans from fixed to

13  adjustable interest rates at closing. . . ."  Written testimony of Illinois Attorney

14  General Lisa Madigan before the FCIC, Jan. 14, 2010, at 4-5.  The investigation

15  resulted in a $325 million settlement.  *Id.* at 5.

16       246.   Moreover, Ameriquest ignored reports of fraud concerning its loans:

> Ed Parker, the former head of Ameriquest's Mortgage
> Fraud Investigations Department, told the Commission
> that he detected fraud at the company within one month
> of starting his job there in January 2003, but senior
> management did nothing with the reports he sent.  He
> heard that other departments were complaining he
> "looked too much" into the loans.  In November 2005, he
> was downgraded from "manager" to "supervisor," and
> was laid off in May 2006.

22  FCIC Report at 12.

23       247.   In September 2007, Wachovia filed a complaint alleging that

24  Ameriquest refused to repurchase loans due to breach of representation and

25  warranty pursuant to the Master Mortgage Loan Purchase Agreement.  *Wachovia*

26  *Bank, N.A., v. Ameriquest Mortgage Co.*, No. 07-18679 (N.C. Super. Ct. filed Sept.

27  17, 2007), at ¶ 5.  Wachovia alleged that the 135 loans it purchased were

28

1   nonperforming and that the loans did not adhere to Ameriquest's underwriting

2   guidelines. *Id.* at ¶¶15-16.

3         **5.    Argent Mortgage Company, LLC**

4         248.   Argent Mortgage Company, LLC ("Argent") originated loans in the

5   ABSHE 2004-HE6 Securitization.  As of September 9, 2007, Argent Mortgage

6   became a wholly-owned subsidiary of Citigroup, Inc. ("Citigroup").  Argent was

7   renamed Citi Residential Lending, which operated for several months before it was

8   shut down.

9         249.   Richard Bowen, a whistleblower and former Chief Underwriter for

10  Citigroup, testified that Citigroup "sampled the loans that were originated by

11  Argent, and we found large numbers . . . that were not underwritten according to

12  the representations that were there."  FCIC Commission Hearing Transcript, April

13  7, 2010, at 239:2-5.

14        250.   Argent Mortgage Company, LLC ranked third of "21 companies in

15  various combinations [to] occupy the Worst Ten slots in the Worst Ten metro

16  areas" for 2005-2007 originations.  *See* OCC Report.

17        251.   Orson Benn a former VP at Argent, a unit of Ameriquest was

18  convicted of racketeering in connection with mortgage fraud scheme:

19        Orson Benn, once a vice president at the nations largest
          subprime lender, spent three years during the height of
20        the housing boom tutoring Florida mortgage brokers in
          the art of fraud.  From his office in New York, he taught
21        them how to doctor credit reports, coached them to
          inflate income on loan applications, and helped them
22        invent phantom jobs for borrowers.

23  Jack Dolan, Matthew Haggman, and Rob Barry, *Home loan racket flourished in*

24  *Florida*, The Miami Herald, Jan. 29, 2009, *available at*

25  http://www.miamiherald.com/2008/12/07/878194_p4/home-loan-racket-

26  flourished-in.html.

27        252.   Benn "received a $3,000 kickback for each loan he helped secure.

28  When the loan was funded, the checks were frequently made out to the bogus

1  home construction company that had proposed the work, which would then

2  disappear with the proceeds." FCIC Report at 164. Moreover, "Sixteen of 18

3  defendants, including Benn, have been convicted or have pled guilty." *Id.* Benn

4  later testified that "the accuracy of loan applications was not a priority." Jack

5  Dolan, Matthew Haggman and Rob Barry, *Borrowers Betrayed, Part 4*, Miami

6  Herald, Dec. 7, 2008.

7        253.   Benn was not the only Argent underwriter to face criminal

8  prosecution. Ohio indicted nine former Argent account managers, supervisors, and

9  underwriters in a mortgage fraud scheme involving the falsification of loan

10  application documents:

> County Prosecutor Bill Mason and the Cuyahoga County Mortgage Fraud Task Force operating under authorization of Ohio Attorney General Mike DeWine's Office and Ohio's Organized Crime Investigations Commission announced the indictment of 13 defendants on mortgage fraud offenses involving nearly 13 million dollars in fraudulent loans.
>
> Six of the defendants, including an Argent supervisor and Argent account managers, were indicted on engaging in a pattern of corrupt activity for operating this criminal enterprise. They falsified mortgage loan documents on 100 loans for 100 houses that did not meet Argent's standards. Argent was a large subprime lender in Cuyahoga County.
>
> …
>
> The scheme entailed Argent account managers, Michael Scola, Angela Pasternak, and Denise (O'Brock) Kobus, coaching mortgage brokers, such as Dale Adams, Nick Myles, and James Sims, whom have already been charged for falsifying loan applications. In addition, these Argent account managers and Argent underwriter, DeeAnne Shaw, falsely stated that the conditions for approving said loans had been met.
>
> Defendants engaged in the enterprise were involved with buyers or purchasers of residential real estate mainly located in Cuyahoga County and Summit Counties. The loans were secured by a mortgage received by Argent who later sold the note or mortgage/securities to investors. The buyers, with the assistance of mortgage brokers and employees, agents or independent contractors of Argent, submitted signed false and fraudulent loan applications to Argent's processing center

located in Illinois in order for the buyer to purchase real
estate in Cuyahoga or Summit County.

Press Release, Ohio Prosecutor's Office, *Nine Former Argent Mortgage Company Account Managers, Supervisors and Underwriters Indicted*, June 22, 2011, *available at* http://www.prosecutormason.com/mnc.aspx?type= PressRelease&mcid=737.

254.   Another former underwriter and account manager at Argent, Jacqulyn Fishwick, stated that Argent was "fast and loose" with its underwriting.  "Fishwick said she saw account managers remove documents from files and create documents by cutting and pasting them." Mark Gillispie, *The subprime house of cards*, The Plain Dealer, May 11, 2008, *available at* http://blog.cleveland.com/metro/2008/05/ the_subprime_house_of_cards.html.

### 6.    Countrywide Home Loans, Inc.

255.   Defendant Countrywide Home Loans originated all of the loans or purchased such loans and represented that they conformed to Countrywide's underwriting guidelines in the CWL 2005-14, CWL 2007-9 and CWL 2007-10 Securitizations, and for a substantial number of loans in the CWALT 2006-OC1, CWL 2007-BC2 and CWALT 2007-OH2 Securitizations.

256.   In an April 13, 2006 e-mail, Countrywide Financial's Chief Executive Officer, Angelo Mozilo, stated that he had "personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s].  In my conversations with Sambol he calls the 100% subprime seconds as the 'milk' of the business.  Frankly I consider that product line to be the poison of ours."  *SEC v. Mozilo*, No. 09-03994, 2010 WL 3656068, at *17 (C.D. Cal. Sept. 16, 2010).

257.   A March 11, 2008 Wall Street Journal article, *Loan Data Focus of Probe*, stated that federal investigators found that "Countrywide's loan documents

1   often were marked by dubious or erroneous information about its mortgage clients.

2   . . .”  Glenn R. Simpson, *Loan Data Focus of Probe*, The Wall Street Journal, Mar.

3   11, 2008.

4        258.   On August 16, 2010, in its brief opposing summary judgment, the

5   SEC stated that “the ‘exceptions’ culture at Countrywide started at the top.

6   [Angelo] Mozilo himself was responsible for some of the exception loans made at

7   Countrywide.  Mozilo underwrote and approved loans pursuant to a program

8   coined as Friends of Angelo (“FOA”).  In many instances, Mozilo approved loans

9   that were in direct contravention of Countrywide’s own credit policies and

10   underwriting guidelines.”  *SEC v. Mozilo*, No. 09-cv-03994, ECF No. 289 (C.D.

11   Cal. Aug. 16, 2010).

12        259.   In its report, the FCIC singled out Countrywide for its role in the

13   financial crisis:

14            Lenders made loans that they knew borrowers could not
             afford and that could cause massive losses to investors in

15            mortgage securities.  As early as September 2004,
             Countrywide executives recognized that many of the

16            loans they were originating could result in “catastrophic
             consequences.”  Less than a year later, they noted that

17            certain high-risk loans they were making could result not
             only in foreclosures but also in “financial and

18            reputational catastrophe” for the firm.  But they did not
             stop.

19

20   *See* FCIC Report at xxii.

21        **7.      Decision One Mortgage Company LLC**

22        260.   Decision One Mortgage Company LLC (“Decision One”) originated

23   loans for the CWALT 2005-OC1 Securitization.  According to a 2011 Complaint,

24   from 2006 to 2007, certain information in Decision One’s loan files was

25   overlooked and the files were just “passed on” and approved regardless of the

26   merits.  Complaint ¶ 95 n.10, *Allstate Ins. Co., et al. v. Morgan Stanley, et al.*, No.

27   651840/2011 (N.Y. Sup. Ct. filed July 5, 2011).  In a separate complaint filed in

28   2010, Federal Home Loan Bank of Chicago alleged that Decision One’s internal

1   deficiency reports showed quality issues "in tens of millions of dollars worth of

2   defaulted loans," and that during an internal audit, Decision One "tore those loans

3   apart and found a lot of fraud."  *Federal Home Loan Bank of Chicago v. Banc of*

4   *America*, No. 10-ch-45033, Complaint ¶¶ 261-262, (Ill. Cir. Ct. filed Oct. 15,

5   2010).

6        261.   Further, according to The Record, a West Virginia legal journal,

7   Decision One has been accused by borrowers of intentionally relying on out-of-

8   town appraisers to inflate the values of homes to induce the borrowers to close on

9   loans.  Cara Bailey, *Three Suits Accuse Company of Predatory Lending*, The

10  Record, Jan. 12, 2007, *available at* http://www.wvrecord.com/news/188966-three-

11  suits-accuse-company-of-predatory-lending (last visited Aug. 14, 2012).

12       262.   Decision One ceased operations in September 2007.

13            **8.      First Franklin Financial Corporation**

14       263.   First Franklin Financial Corporation ("First Franklin") originated all

15  of the loans in the FFML 2005-FF12 and FFMER 2007-3 Securitizations.  First

16  Franklin Corp. ranked seventh on the OCC's list of "Worst Ten in the Worst Ten"

17  for 2005-2007 originations.  *See* OCC Report.

18       264.   First Franklin specialized in subprime mortgages for people with poor

19  credit ratings who could qualify for loans only at high interest rates.  First Franklin

20  grew from being a purchased by National City for $266 million in 1999 to

21  becoming a division of Merrill Lynch & Co. in 2006 for a purchase price of $1.3

22  billion.  *See* Roger Mezger, *How National City got to this point*, Cleveland Plain

23  Dealer, Oct. 9, 2008 (updated Oct. 10, 2008), available at

24  http://blog.cleveland.com/business/2008/10/how_national_city_got_to_this.html.

25  However, even Merrill Lynch did not assume all of First Franklin's loans, taking

26  on only $6 billion out of $16 billion in loans because the remaining loans were too

27  risky, even for subprime loans.  *Id*.

28

265.   The Comptroller of the State of New York filed a complaint against Merrill Lynch noting First Franklin's weak underwriting standards.  According to Wayne Bereman, an underwriter at First Franklin both before and after Merrill acquired the company, the underwriting standards weakened and loan production quotas intensified after the Merrill acquisition.  Further, under Merrill's ownership, First Franklin made an unprecedented number of "exceptions" to provide loans to applicants who failed to meet even the weakened underwriting guidelines.  Complaint ¶ 80, *DiNapoli v. Merrill Lynch & Co., Inc.*, No. 10 CV 5562, 2010 WL 2967301 (S.D.N.Y. July 22, 2010).

### 9.   Flagstar Bank, F.S.B.

266.   Flagstar Bank, F.S.B. ("Flagstar") originated loans in the CWALT 2007-OH2 Securitization.  Flagstar and certain of its directors and officers were the subject of an investigation for False Claims Act violations in connection with improper endorsements and false certifications of underwriting practices of federally insured loans.  *See* Press Release, *Flagstar Bancorp, Inc. (NYSE:FBC) Investor Alert: Investigation over Potential Wrongdoing*, June 20, 2012, available at http://www.sbwire.com/press-releases/flagstar-bancorp-inc-nysefbc-investor-alert-investigation-over-potential-wrongdoing-149257.htm.  On February 24, 2012, Flagstar entered a settlement with the United States Department of Justice ("DOJ") in which the company "admitted, acknowledged, and accepted responsibility for submitting false certifications to HUD."  *Id.*; *see also* http://www.freep.com/article/20120225/BUSINESS06/202250406/Flagstar-mortgage-fraud-lawsuit-settled-for-36-133-million.  The DOJ's investigation related to Flagstar's improper approval of residential home mortgage loans for government insurance and false certifications to the Department of Housing and Urban Development.  Flagstar agreed to pay $133 million to the United States in damages and penalties under the False Claims Act and to reform its business practices.

267.   As further evidence of its abandonment of underwriting standards, Flagstar received $190 million in buy-back requests in the fourth quarter of 2011 alone.  *See* Bill Starrels, *What's Behind Today's Underwriting Guidelines*, THE GEORGETOWNER, Mar. 7, 2012, available at http://www.georgetowner.com/articles/2012/mar/07/whats-behind-todays-underwriting-guidelines/.  In a litigation related to Flagstar's abandonment of its underwriting guidelines, Judge Jed S. Rakoff has permitted plaintiff's claims regarding breaches of the representations and warranties regarding adherence to Flagstar's underwriting guidelines to move forward.  *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB,* 11 CIV. 2375 JSR, 2011 WL 5335566, at *8 (S.D.N.Y. Oct. 31, 2011); *see* http://www.structuredfinancelitigation.com/2012/03/01/summary-judgment-denied-in-put-back-case-between-bond-insurer-and-bank/.

### 10.   Fremont Investment & Loan

268.   Fremont Investment & Loan ("Fremont") originated loans in the MSHEL 2007-1 Securitization.  It is now known that, Fremont **was one of the worst originators in the country**.  Fremont was ranked fifth out of  "21 companies in various combinations [to] occupy the Worst Ten slots in the Worst Ten metro areas" for 2005-2007 originations.  *See* OCC Report.

269.   On April 13, 2011, the U.S. Senate Permanent Subcommittee on Investigations issued a 646-page report entitled "Wall Street and the Financial Crisis" (the "Levin Report") which found that Fremont was "well known within the industry for issuing poor quality loans."  Levin Report at 11.  Indeed, Fremont was singled out by Senator Carl Levin in his opening remarks to the Senate Permanent Subcommittee and Investigations' hearing, noting that Fremont is "known for loans with high rates of delinquency."  Opening Statement of Senator Carl Levin, U.S. Senate Permanent Subcommittee on Investigations Hearing, *Wall Street and the Financial Crisis: The Role of Investment Banks*, Apr. 27, 2010 at 3.

270.   The Levin Report also stated:

> Fremont Investment & Loan was once the fifth largest subprime mortgage lender in the United States.  At its peak in 2006, it had $13 billion in assets, 3,500 employees, and nearly two dozen offices.  Fremont Investment & Loan was neither a bank nor a thrift, but an "industrial loan company" that issued loans and held insured deposits . . . .  In June 2008, Fremont General Corporation declared bankruptcy under Chapter 11. . . .

Levin Report at 237-38.

271.   In March 2007, the FDIC issued a cease and desist order to Fremont, due to "unsafe and unsound banking practices and violations of law," including operating with "a large volume of poor quality loans"; "unsatisfactory lending practices"; "excessive risk"; and "inadequate capital."  *In the Matter of Fremont Inv. & Loan, Brea, Cal.*, No. FDIC-07-035b, Order at 1-3.  The FDIC also found that Fremont was:

- operating with inadequate underwriting criteria;
- approving loans . . . with loan-to-value ratios approaching or exceeding 100 percent of the value of the collateral;
- making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms; and
- approving borrowers without considering appropriate documentation and/or verification of their income.

*Id.* at 2-4.

272.   In 2009, it was reported that this move by the FDIC was the first government action against a subprime lender.  *The New Yorker* quoted FDIC Chairwoman Sheila Bair as having said:

> Fremont was among the worst of the subprime offenders, using all the now familiar practices: targeting people with bad credit, ignoring traditional standards for underwriting home loans, paying third-party brokers handsomely to bring in gullible customers, and then infecting the larger financial system by selling off the hazardous loans.  "We ordered them out of the business," [Bair] said, "And they weren't happy about it."

1    Ryan Lizza, The Contrarian: Sheila Bair and the White House Financial Debate,

2    *The New Yorker*, July 6, 2009.

3         273.   A subsequent flood of investigative findings and news reports have

4    revealed that Fremont blatantly disregarded its underwriting standards for years in

5    order to satisfy RMBS issuers' ever increasing demand for subprime mortgages.

6    Fremont was high on the OCC's "Worst Ten in the Worst Ten" list, with the fifth

7    most foreclosures in the ten worst metropolitan areas for loans originated from

8    2005 to 2007.  *See* OCC Report.

9         274.   Indeed, after filing for bankruptcy in 2008, Fremont reported

10   receiving default notices on ***$3.15 billion*** in subprime mortgages it had sold to

11   investors.  Jonathan Stempel, *Fremont Gets Default Notices, Survival Threatened*,

12   Reuters, March 4, 2008.

13        275.   On December 9, 2008, the Supreme Judicial Court of Massachusetts

14   affirmed a preliminary injunction, finding that "Fremont made no effort to

15   determine whether borrowers could 'make the scheduled payments under the terms

16   of the loan,'" and that "Fremont knew or should have known that [its lending

17   practices and loan terms] would operate in concert essentially to guarantee that the

18   borrower would be unable to pay and default would follow."  *Commonwealth v.*

19   *Fremont Inv. & Loan*, 897 N.E.2d 548, 556, 558 (Mass. Super. Ct. 2008).  The

20   terms of the preliminary injunction were made permanent by a June 9, 2009

21   settlement.

22        276.   Specifically, on June 9, 2009, Massachusetts Attorney General Martha

23   Coakley announced a $10 million settlement with Fremont that resolved charges

24   "that the company was selling risky loan products that it knew was designed to fail,

25   such as 100% financing loans and 'no documentation loans.'"  As alleged in the

26   Attorney General's complaint:

27            Fremont issued thousands of subprime loans, with
             multiple layers of risk, through mortgage brokers who
28            regularly provided Fremont with false information that
             Fremont intentionally, recklessly or negligently failed to

1
2
3

> verify or audit. . . .  Fremont knew or should have known substantial numbers of its subprime loans, especially absent prompt refinancing, would foreseeably fail and result in foreclosure, but nonetheless made the loans to promptly package and sell to the secondary market.

4   *Commonwealth v. Fremont Inv. & Loan*, No. SU CV 2007-4373, 2007 WL

5   5180872, at ¶ 2 (Mass. Sup. Ct. Oct. 4, 2007).

6   277.   Roger Ehrnman, Fremont's former regulatory compliance and risk

7   manager, substantiated the findings of the FDIC and the Massachusetts Attorney

8   General when he told the FCIC that Fremont repeatedly attempted to place rejected

9   loans into the pools of mortgages that were to be sold to investors and "had a

10   policy of putting loans into subsequent pools until they were kicked out three

11   times." FCIC Report at 168.

### 11.   Impac Funding Corporation

13   278.   Impac Funding Corporation or its parent company Impac Mortgage

14   Holdings, Inc. (collectively, "Impac") originated all of the loans for the CWL

15   2005-IM3 and CWL 2006-IM1, IMM 2005-6 Securitizations.  On September 5,

16   2008, the State of Washington Department of Financial Institutions Division of

17   Consumer Services ("Washington DFI") filed a Statement of Charges and Notice

18   of Intention to Enter an Order to Revoke or Suspend License, Impose Fine, Order

19   Restitution, and Collect Examination and Investigation Fees against Impac.

20   Statement of Charges, C-07-343-08-SC0I (Sept. 5, 2008), available at

21   http://www.dfi.wa.gov/CS%20Orders/C-07-343-08-CO01.pdf.  The Washington

22   DFI reviewed loan files and found repeated violations, including failure to provide

23   disclosure to borrowers, untimely disclosures, and unauthorized fees. *Id*.

### 12.   New Century Mortgage Corporation

25   279.   New Century Mortgage Corporation ("New Century") originated

26   loans for the ABSHE 2004-HE6 and CBASS 2006-DB6 Securitizations.  New

27   Century ranks ***number one*** on the OCC's "Worst Ten in the Worst Ten" list of the

28   nation's most egregious originators. *See* OCC Report.  This means that more

1    foreclosures were instituted on mortgages originated by New Century in 2005

2    through 2007 in the ten cities with the highest foreclosure rates than any other

3    originator in the country.  This is the result of New Century's dramatic departure

4    from its own underwriting guidelines, which were supposed to prevent loans from

5    being made to borrowers who clearly did not have the ability to repay them.

6        280.   After New Century filed for bankruptcy in 2008, the Bankruptcy

7    Court Examiner found that:

8            New Century had a brazen obsession with increasing
             loan originations, without due regard to the risks
9            associated with that business strategy. . . .  Although a
             primary goal of any mortgage banking company is to
10           make more loans, New Century did so in an aggressive
             manner that elevated the risks to dangerous and
11           ultimately fatal levels."

12   Final Report of Michael J. Missal, Bankruptcy Examiner, *In re New Century TRS*

13   *Holdings, Inc.*, No. 07-10416 (KJC) at 3 (Bankr. Del. Feb. 29, 2008) ("N.C.

14   Bankruptcy Report").

15       281.   The Bankruptcy Court Examiner went on to say that "New Century . .

16   . layered the risks of loan products upon the risks of loose underwriting standards

17   in its loan originations to high risk borrowers." *Id.*

18       282.   Furthermore, the Bankruptcy Court Examiner concluded that there

19   was a systematic failure to correct underwriting issues until it was "too late to

20   prevent the consequences of longstanding loan quality problems in an adversely

21   changing market." *Id.* at 110.

22       283.   A former Vice President of Corporate Risk at New Century, Patricia

23   Lindsay, has testified that New Century systematically approved loans with 100%

24   financing to borrowers with extremely low credit scores and no proof of income.

25   *See* Testimony of Patricia Lindsay to the FCIC, Apr. 7, 2010, at 3.

26       284.   Ms. Lindsay further testified that appraisers faced extreme pressure

27   from their superiors, and deliberately distorted data "that would help support the

28   needed value rather than using the best comparables. . . ." *Id.*

285.   Finally, at least one court has already denied a motion to dismiss based on allegations that New Century's own statements about its supposed "improved underwriting controls and appraisal review process" were false or misleading statements of material fact.  *See In re New Century,* No. CV 07-00931 DDP (JTL), Dkt. No. 333 at 33-34 (C.D. Cal. Dec. 3, 2008).

### 13.   Option One Mortgage Corporation

286.   Option One Mortgage Corporation ("Option One") originated all of the loans in the ABFC 2006-OPT1, OOMLT 2006-2 and OOMLT 2007-6 Securitizations, and originated loans in the ABFC 2006-HE1 Securitization. Option One has also been identified through multiple reports and investigations for its faulty underwriting.  On June 3, 2008, for instance, the Attorney General for the Commonwealth of Massachusetts filed an action against Option One, and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans.  *See* Complaint, *Commonwealth v. H&R Block, Inc.*, CV NO. 08-2474-BLS (Mass. Super. Ct. June 3, 2008).  According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards . . . and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market."  *Id*. at ¶ 4.

287.   The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home," and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices."  *Id*. at ¶ 8. Option One's "origination policies . . . employed from 2004 through 2007 have resulted in an explosion of foreclosures." *Id*. at ¶ 10.

288.   On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction that prevented Option One from foreclosing on thousands of its loans issued to Massachusetts residents. *Commonwealth v. H&R Block, Inc.*, No. 08-2474-BLS1, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008).  On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction. *See Commonwealth v. Option One Mortgage Co.*, 916 N.E.2d 422 (Mass. App. Ct. 2009).

289.   On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, had agreed to settle the suit for approximately $125 million. *See* Massachusetts Attorney General Press Release, "H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions," Aug. 9, 2011.  Media reports noted that the suit was being settled amidst ongoing discussions among multiple states' attorneys general, federal authorities, and five major mortgage servicers, aimed at resolving investigations of the lenders' foreclosure and mortgage-servicing practices.  The Massachusetts Attorney General released a statement saying that no settlement should include a release for conduct relating to the lenders' packaging of mortgages into securitizations. *See, e.g.*, Bloomberg.com Aug. 9, 2011, *H&R Block, Massachusetts Reach $125 Million Accord in State Mortgage Suit*, http://www.bloomberg.com/news/2011-08-09/h-r-block-massachusetts-reach-125-million-accord-in-state-mortgage-suit.html.

### 14.   Ownit

290.   Ownit originated loans for the CBASS 2006-CB6 Securitization and was one of  "Only 21 companies in various combinations [to] occupy the Worst Ten slots in the Worst Ten metro areas" for 2005-2007 originations. *See* OCC Report.  In September 2005, Ownit sold a 20% share in the company to ML & Co. in exchange for $100 million dollars, and a $2.5 billion warehouse lending facility.

291. Ownit's founder and chief executive officer, William Dallas, who also co-founded another subprime lender, First Franklin Financial, that Merrill Lynch purchased for 1.3 billion, has admitted to weak underwriting standards of loans packaged for securitizations.

292. Mr. Dallas "recalls being asked to make more 'stated income' loans, in which lenders do not verify the information provided by borrowers and brokers with tax returns, pay stubs or other documentation.  The message, he said, was simple:  You are leaving money on the table -- do more of them."  Vikas Bajaj, *East Coast Money Lent Out West*, N.Y. Times, May 8, 2007.  He also added that "If I can sell it at a profit . . . why would I not do it?"  *Id.*

293. As reported in the New York Times,

> Mr. Dallas acknowledge[d] that standards were lowered, but he placed the blame at the feet of investors and Wall Street, saying they encouraged Ownit and other subprime lenders to make riskier loans to keep the pipeline of mortgage securities well supplied.  'The market is paying me to do a no-income-verification loan more than it is paying me to do the full documentation loans,' he said.  'What would you do?'

Vikas Bajaj & Christine Haughney, *Tremors at the Door: More People with Weak Credit Are Defaulting on Mortgages*, N.Y. Times, Jan. 26, 2007

294. In late 2006, just months after Defendants packaged and sold the CWL 2006-BC2 and OWNIT 2006-4 Certificates to HSH, Ownit filed for bankruptcy.  *See In re Ownit Mortgage Solutions, Inc.*, Case No. 06-12579 (KT) (N.D. Cal. filed Dec. 28, 2006).  Ownit's bankruptcy was the direct result of an inability to meet repurchase obligations on the enormous number of loans that were being "put back" to the troubled lender as a result of the extremely poor quality of those loans.  *See E. Scott Reckard , *Demise of Ownit Mortgage hits home*, L.A. times, Jan. 3, 2007.

### 15.    People's Choice Home Loan, Inc.

295.   People's Choice Home Loan, Inc. ("People's Choice") originated loans for the MLMI 2007-HE1 Securitization.  People's Choice was one of  only 21 companies in various combinations to occupy the Worst Ten slots in the Worst Ten metro areas for 2005-2007 originations.  *See* OCC Report.

296.   A Dateline investigation revealed that People's Choice had abandoned its stated underwriting guidelines.  Richard Greenberg & Chris Hansen, *'If you had a pulse, we gave you a loan'*, Dateline NBC, Mar. 22, 2009.  Available at http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-the_hansen_files_with_chris_hansen/t/if-you-had-pulse-we-gave-you-loan.  As stated by James LaLiberte, People's Choice's chief operating officer in charge of overseeing the underwriting guidelines and setting credit guidelines, **"The chief appraiser once said, 'Fraud is what we do.' That's how we got where we are today.'"**  *Id*.  LaLiberte presented Dateline with a list of nearly 13,000 loans that People's Choice funded in one year from April 2004 through March 2005, totaling more than $2 billion, and stated that many of the loans, were questionable, and some were possibly based on fraudulent information.

297.   People's Choice filed for bankruptcy in 2007.  *See In re People's Choice Home Loan, Inc.,* 07-10765 (C.D. Cal. filed Mar. 20, 2007).

### 16.    Wilmington Finance Inc.

298.   Wilmington Finance Inc. ("Wilmington") originated loans for the CWL 2007-BC2, CBASS 2006-CB6 and MSHEL 2007-1 Securitizations.  In 2011, a broker who obtained loans for Wilmington, Mary L. Francois, pled guilty to wire fraud in connection with submitting false data to get loans approved and to earn commissions.  *See Humble woman pleads guilty to mortgage scheme*, Associated Press, Apr. 5, 2011, available at http://abclocal.go.com/ktrk/story?section=news/local&id=8054201.  Francois admitted to submitting false loan applications and falsified documents on behalf of clients to mortgage lenders, including

1    Wilmington.  Francois worked out agreements with loan sellers such as

2    Wilmington that allowed her to pocket additional commissions as part of her

3    "payment for obtaining the loan."  *Id*.  Francois primarily obtained loans using

4    WMC Mortgage Corp. and Wilmington.

5        299.   Wilmington ceased originating mortgages in 2008.  *Wilmington*

6    *Finance cutting 335 jobs, mortgage operations*, Philadelphia Business Journal,

7    June 18, 2008, available at http://www.bizjournals.com/philadelphia/stories/

8    2008/06/16/daily20.html.

9                  **17.   WMC Mortgage Corp.**

10       300.   WMC Mortgage Corp. ("WMC") originated loans for the ABFC

11   2006-HE1 Securitization.  WMC ranked fourth on the OCC's November 13, 2008

12   "Worst Ten in the Worst Ten" list of the nation's most egregious originators from

13   2005 through 2007 in the ten cities with the highest foreclosure rates in the

14   country.  *See* OCC Report.

15       301.   WMC was founded in 1955, and in the late 1990s began issuing

16   subprime loans, spurred in part by a "Race to the Top" program that gave top sales

17   performers the use of Porsche Boxsters."  Michael Hudson, *Fraud and folly: The*

18   *untold story of General Electric's subprime debacle*, iWatch News by The Center

19   for Public Integrity, Jan. 6, 2012 (updated Jan. 23, 2012), available at

20   http://www.iwatchnews.org/2012/01/06/7802/fraud-and-folly-untold-story-

21   general-electric-s-subprime-debacle.  As reported in the Los Angeles Times, GE

22   acquired WMC near the height of the mortgage boom in 2004, giving it a major

23   presence in the growing subprime lending market, but by 2007 the WMC was

24   hemorrhaging money and the unit was shut down as the housing market buckled.

25   Michael Hudson and E. Scott Reckard, *GE lending unit said to be target of U.S.*

26   *probe*, L.A. Times, Jan. 20, 2012, available at http://articles.latimes.com/

27   2012/jan/20/business/la-fi-mortgage-probe-20120120.  By January 2012, the FBI

28

1    and U.S. Justice Department were looking into potentially criminal business

2    practices at WMC.  *Id.*

3        302.   In interviews with iWatch News, eight former WMC employees

4    claimed that WMC's management ignored them when they reported loans

5    supported by falsified documents, inflated incomes or other legerdemain.  Two of

6    these former employees say they were transferred and demoted because they

7    pressed too hard to expose corrupt practices.  Michael Hudson, *Fraud and folly:*

8    *The untold story of General Electric's subprime debacle*, iWatch News by The

9    Center for Public Integrity, Jan. 6, 2012 (updated Jan. 23, 2012), available at

10   http://www.iwatchnews.org/2012/01/06/7802/fraud-and-folly-untold-story-

11   general-electric-s-subprime-debacle.

12       303.   According to the iWatch news interviews of former employees, "Dave

13   Riedel, a former compliance manager at WMC, says sales reps intent on putting up

14   big numbers used falsified paperwork, bogus income documentation and other

15   tricks to get loans approved and sold off to Wall Street investors.  One WMC

16   official, Riedel claims, went so far as to declare: 'Fraud pays.'"  *Id.*  Riedel further

17   stated that the quality control team he supervised found many instances of

18   employees and external mortgage brokers fabricating loan data, including faking

19   proofs of loan applicants' employment and fabricating borrowers' incomes by

20   creating bogus W-2 tax forms with specialized software that allowed them to

21   create W-2s from scratch.  *Id.*  A former risk analyst at WMC, Victor Argueta,

22   stated that one top sales staffer escaped punishment even though it was common

23   knowledge he was using his computer to create fake documents, including "[b]ank

24   statements, W-2s, you name it, pretty much anything that goes into a file," to

25   bolster applicants' chances of getting approved.  *Id.*

26       304.   A class action lawsuit against PMI Mortgage Insurance Co. in the

27   Northern District of California highlighted WMC's failure to adhere to its

28   underwriting guidelines:

*PMI stated that WMC's actual practices deviate significantly from its representations for at least 120 loans sold to the securitization trust.* Such a deviation on a statistical basis would indicate that this was not an anomaly. *As early as March 6, 2007, Clayton, an entity engaged to act as the Credit Risk Manager for the securitization, began notifying the trustee through a series of letters that its initial investigation into a sample of the mortgage loans had uncovered breaches of WMC's representations and/or warranties underlying many of the mortgage loans.* As of October 2007, at least 30% of the entire pool of mortgage loans sold into the securitization trust were delinquent, a delinquency rate unheard of until those loans originated during and after 2006. . . . PMI's failure to properly audit loans upfront before such loans were sold by WMC represents a complete breakdown in the Company's due diligence processes.

*In re The PMI Group, Inc. Sec. Litig.*, No. 3:08-cv-01405-SI, 2009 WL 2350377 (N.D. Cal. July 24, 2009), at ¶ 85 (emphases added).

## VII.   ALTERNATIVELY, DEFENDANTS NEGLIGENTLY MISREPRESENTED THE CREDIT CHARACTERISTICS, UNDERWRITING STANDARDS, AND RATINGS ASSOCIATED WITH THE LOANS UNDERLYING THE TRUSTS

305.   Defendants had a duty to take reasonable care to ensure that they were not misrepresenting the special facts that they alone possessed and controlled with respect to CLTV and weighted CLTV ratios (*supra* Section IV.A), owner-occupancy rates (*supra* Section IV.B), adherence to the originators' underwriting guidelines (*supra* Section VI), the risk profiles reflected in the ratings granted to the Certificates (*infra* Section XII), and the timely transfer of notes and mortgages to the Trusts (*infra* Section VIII).  As described above, substantial evidence exists to show that Defendants knew that the information in the Offering Documents was false at the time they made the misrepresentations.  However, given the substantial misrepresentations that Plaintiffs have uncovered, Defendants' failure to inform Plaintiffs accurately about the loans purportedly underlying the Trusts was, at the very least, negligent.

306.   Moreover, because Plaintiffs could not possibly have known about the true quality of the collateral supposedly underlying the Trusts without access to the

1   loan files that Defendants exclusively possessed, Defendants knew that Plaintiffs

2   were reasonably relying on the truth of the representations in the Offering

3   Documents regarding the characteristics of the collateral.  Plaintiffs suffered losses

4   as a result of these misrepresentations, as further alleged, *infra*, Section XIV.

5   **VIII.  DEFENDANTS MADE MISLEADING MISSTATEMENTS
        REGARDING TRANSFER AND ASSIGNMENT OF THE
6       NOTES AND MORTGAGES TO THE TRUSTS**

7       307.   The Offering Documents for the Securitizations contained numerous

8   misrepresentations concerning the timely and effective transfer of notes and

9   mortgages to the Trusts.  Through investigation of publicly-recorded assignments

10  and satisfactions, Plaintiffs have discovered that Defendants' representations that

11  all of the notes and mortgages were transferred to the Trusts in bulk as of the

12  respective closing dates were false.  Many of the notes and mortgages Plaintiffs

13  found were not transferred to the Trusts at issuance of the certificates, or even

14  within three months thereafter.

15      308.   Plaintiffs conducted two investigations ("Investigations") of a large

16  number of assignments of mortgages ("Assignments") and satisfactions

17  ("Satisfactions") for the loans represented to be in the Loan Groups associated with

18  the particular tranche purchased by Plaintiffs.  Both investigations disclosed

19  evidence that Defendants' representations that all of the notes and mortgages were

20  being transferred to the Trusts as of the respective closing dates were false.

21      309.   The Assignments found in the Investigations purport to convey the

22  notes and mortgages to the Trust long after the Securitizations' closings.  These

23  Assignments, which are generally executed under penalty of perjury, are wholly

24  inconsistent with any purported previous assignment and transfer of these notes

25  and mortgages to the Trusts.

26      310.   The Offering Documents represented that the Trusts were to hold all

27  the notes and mortgages as of the dates the Trusts closed and the Certificates were

28  issued.  Not only was this not true, but upon information and belief, at the time the

Defendants represented that the notes and mortgages were being transferred to the Trusts by or at the Securitizations' closings, they knew they would not do so.  In fact, Defendants failed to effectuate such transfers in past or other securitizations, and this practice, motivated by Defendants' desire to secure even greater profits, was consistent and systemic.

311.   Plaintiffs reasonably relied on Defendants' representations in the Offering Documents for the Trusts, and therefore believed at the time they purchased the Certificates that the Trusts that issued the Certificates in fact held the mortgages on the underlying loans.  Plaintiffs' Investigations show this was not the case.

312.   This belief was an essential part of the contracts of sale for the Certificates in the Trusts.  Plaintiffs would not have purchased so-called "mortgage-backed" securities that were not actually backed by the mortgages represented to be in the pools, because when securities are not backed by actual mortgages or notes, the trusts are left without any legal recourse against borrowers that cease making payments.  In addition, valid and timely foreclosure is necessary to limit losses on defaulted loans as delays in foreclosure proceedings can significantly increase loss severities due to foregone interest, late charges, additional fees, and exposure to housing market declines which reduce the market value of the collateral and the liquidation proceeds.

**A.    Statements Regarding Assignments and Transfer of Notes and Mortgages to the Trusts**

313.   Defendants' representations about the valid transfer of title to the mortgage loans to the Trusts were false.  In many instances, the collateral did not properly secure the underlying loans and the Trusts could not foreclose on delinquent borrowers because Defendants either failed to timely create or failed to timely deliver the paperwork necessary to prove title to the mortgages.

314.   Contrary to their representations, Defendants did not properly transfer large numbers of loans to the Trusts.  In their rush to securitize and offload risky collateral onto investors such as Plaintiffs, Defendants did not comply with the strict rules governing transfers of mortgages, promissory notes and loan files.

315.   A critical feature of mortgage-backed securities is that they are actually "backed" by the mortgage loans and notes represented to be in the loan pools.  To accomplish this, the mortgages[13] must be assigned, and the accompanying promissory notes transferred to the trustees for each trust.  Each mortgage loan is supposed to be assigned from the originator to the depositor, and on or before issuance, from the depositor to the trust.

316.   Administration of RMBS trusts is typically governed by Pooling and Servicing Agreements ("PSAs").  The PSAs for the Trusts (and for most RMBS trusts) required that the promissory note and mortgage be transferred by endorsement.  State laws generally also require delivery of the executed note for the trustee to be able to enforce the loan against a defaulting borrower.

317.   Defendants represented in the Offering Documents that the Certificates would represent interests in the notes and mortgages outlined therein, *i.e.*, that they would be "mortgage-backed."  The Prospectus Supplement for the CWL 2007-BC2 Trust stated:  "The certificates will represent interests in a pool of adjustable rate and fixed rate, mortgage loans that are secured by first liens on one- to four-family residential properties, as described in this prospectus supplement."  CWL 2007-BC2 Pro. Supp dated April 26, 2007 at 2 of 328.  The Prospectus Supplements for the remaining Securitizations contained the same or substantially similar statements. *See* Appendix A.

---

[13]   In some States, the security instrument evidencing the debt is called a "deed of trust" rather than a "mortgage."  For purposes of this Complaint, Plaintiffs refer to both types of documents as "mortgages."

318.    Indeed, each of the Offering Documents described the Certificates as "Mortgage Pass-Through Certificates" and repeatedly used the term "mortgage-backed" in describing the Certificates. *Id.*

319.    According to the Prospectus Supplements for the Securitizations, each mortgage was to constitute a valid lien on the mortgaged property: "The Mortgage Loans are secured by mortgages, deeds of trust or other similar security instruments (each, a "MORTGAGE") which create a first or second lien on one- to four-family residential properties consisting of one- to four-family dwelling units and individual condominium units (each, a "MORTGAGED PROPERTY")." ABFC 2006-OPT1 Pro. Supp. dated August 8, 2006 at S-36.  The Prospectus Supplements for the remaining Securitizations contained the same or substantially similar statements. *See* Appendix A.

320.    Defendants further represented in the Offering Documents that the mortgages underlying the Securitizations were to be transferred and assigned to the Trusts on the closing dates.  The Prospectus Supplement for the CWALT 2006-OC1 Securitization stated:

> [O]n the closing date, the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee in trust for the benefit of the certificateholders all right, title and interest of the Depositor in and to each Mortgage Loan and all right, title and interest in and to all other assets included in Alternative Loan Trust 2006-OC1. . . .

CWALT 2006-OC1 Pro. Supp. dated January 27, 2006 at S-58.  Significantly, Defendants represented that this transfer would occur "[o]n the closing date." *Id.* The Prospectus Supplements for each of the remaining Securitizations contained the same or substantially similar statements. *See* Appendix A.

321.    Defendants also promised to deliver the promissory notes to the Trustees for the Trusts.  The Prospectus Supplement for the CWL 2007-OH2 Securitization represented:

> In connection with the transfer and assignment of a Mortgage Loan, the depositor will deliver or cause to be

> delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things . . . the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse. . . .

CWL 2007-OH2 Pro. Supp. dated June 28, 2007 at S-39.  The Prospectus Supplements for each of the remaining Securitizations contained the same or substantially similar statements.  *See* Appendix A.

322.   All of the Trusts were governed by New York law, which requires strict compliance with the PSA.  Failure to fully comply with the PSA, including the requirements for endorsement, timeliness and delivery of notes and mortgages, renders the transfers null and void.

323.   In addition, the Prospectus Supplements for the Trusts represented that an opinion of legal counsel regarding each of the Trust's REMIC status (*see infra* at ¶¶ 260-268) would be supplied:

> Upon the issuance of the Certificates, Tax Counsel will deliver its opinion concluding, assuming compliance with the Pooling and Servicing Agreement, for federal income tax purposes, that each REMIC created under the Pooling and Servicing Agreement will qualify as a REMIC within the meaning of Section 860D of the Code, and that the Regular Certificates will represent regular interests in a REMIC.

CWL 2007-9 Pro. Supp. dated June 7, 2007 at S-119..  The Prospectus Supplements for each of the remaining Securitizations contained the same or substantially similar statements.  *See* Appendix A.

324.   Despite the numerous representations in the Offering Documents, and the corresponding requirements of the PSAs, many of the mortgages and notes were never transferred or endorsed, rendering the assignments ineffective.  Given that the respective Trust's ownership of the notes and mortgages was an essential part of the securitization process, this was a material omission that rendered the above statements false and misleading.

325.   Further, as it was the Depositor Defendant's responsibility to effectuate the transfers, Defendants knew that the statements were false, and that

the mortgages would not be properly and timely assigned, at the time the representations were made.

### 1. Failure to Timely Transfer Notes and Mortgages To the Trusts

326.   Plaintiffs have investigated and analyzed loan-level information for the Securitizations to determine the accuracy of certain representations made in the Prospectus Supplements, including representations regarding the assignment and transfer of mortgages and notes to the Trusts.  In the Investigations, Plaintiffs reviewed Assignments and Satisfactions connected to mortgages represented to have been deposited into the Trusts on or before the closing dates.  Plaintiffs assessed thousands of documents from county clerk's offices across the country for the specific mortgage loans in the Loan Groups associated with the tranches Plaintiffs purchased.  Plaintiffs' Investigations reveal that only a very small number of the mortgages purportedly underlying the Securitizations were transferred to the Trust or Trustee at the time of the issuance of the Certificates or within three months thereafter, as was represented in the Offering Documents.

### 2. Failure to Timely Transfer Mortgages to the Trusts

#### (a) Satisfactions

327.   First, a substantial number of the sampled loans supposedly in the Securitizations were apparently never transferred to the Trusts.  This fact is demonstrated by the Satisfactions.  *See* Exhibit 1; Appendix B.  A Satisfaction is a release of the lien, issued by the then-present holder of the note and mortgage at the time the loan is paid off.  Satisfactions can thus demonstrate that, at a point in time after the Certificates were issued -- and thus after the date the Offering Documents represented the note and mortgage would be transferred to the Trustee on behalf of the Trust -- the respective note and mortgage referred to therein were held by a party other than the Trustee.

328.   The Satisfactions that were made on behalf of the original lender show that these notes were never transferred to the Trusts, because only the current holder of the note can release the borrower from the lien on the property.  Where the Satisfaction is in the name of the original lender, this indicates that the original lender still holds the note and never transferred it to the Trust.

329.   Plaintiffs' Investigations revealed numerous Satisfactions listing the original mortgage lender as the holder of the mortgage and note.  Satisfactions in which an entity other than the Trust or Trustee was identified as the holder of the note and mortgage at the time of the Satisfaction are attached as Exhibit 1, and quotations of the pertinent portions are set forth in Appendix B.  For example:

- **CWL 2005-IM3 0001, dated August 13, 2007:**  stating that Decision One Mortgage Company, LLC, the original mortgagee and "the owner and holder of [the] Mortgage[,] . . . hereby acknowledges fully [sic] payment and satisfaction of said Note and Mortgage, and surrenders the same as canceled, and hereby directs the Clerk of the . . . Circuit Court to cancel the same of record," more than one year and seven months after the closing date of December 21, 2005.

- **CWL 2006-IM1 0002, dated October 9, 2007:**  stating that Argent Mortgage Company, L.L.C., the original mortgagee and "holder of [the] mortgage, . . . does hereby acknowledge that it has received full payment and satisfaction of the same," and authorizes "the County Recorder . . . to discharge the same upon the record of said mortgage," more than one year and eight months after the closing date of January 30, 2006.

- **FFMER 2007-3 0001-03, dated August 7, 2009:**  stating that Wilshire Credit Corporation, "holder of [the] mortgage[,] . . . does hereby satisfy and discharge said mortgage," more than two years and two months after the closing date of May 30, 2007, and further describing a mortgage assignment chain from the original mortgagee to the sponsor for the trust more than four months after the closing date of May 30, 2007 and from the sponsor to Wilshire Credit Corporation thereafter.

330.   In these and each of the other numerous examples attached hereto, the satisfying party was not the trustee or acting on its behalf.  These documents, therefore, show that the mortgage and note were never transferred to the Trusts.

### (b)   Assignments

331.   The publicly filed Assignments provide further compelling evidence that of those mortgages that were purportedly transferred to the Trusts at some

point, many were assigned long after the Trusts had closed.  The language of these Assignments varies by jurisdiction, but many show that someone other than the Trustees held the mortgages as of the closing dates of the Securitizations.  Indeed, many of them make explicit what is implicit in the others:  that the Trustee not only failed to hold the mortgage as of the closing date of the respective Securitization, but also failed to hold the note establishing the borrower's debt.  A substantial number of Assignments involving loans purportedly underlying the Securitizations provide evidence that the Trust or Trustee did not hold the note and/or mortgage as of the closing date of the respective Securitization.  The Assignments evidencing that the Trust or Trustee failed to hold the note and/or mortgage as of the closing date of the respective Securitizations are included in Exhibit 2, and quotations of the pertinent portions are set forth in Appendix B.

332.   The following are just a few examples of Assignments that clearly demonstrate that the subject mortgage was not assigned to the Trusts until long after the Certificates were issued on their respective closing dates:

- **CBASS 2006-CB6 0003, dated October 2, 2008:**  stating that Ameriquest Mortgage Company, an originator for the trust, "hereby grants, assigns, and transfers to" the Trustee the Deed of Trust, "[t]ogether with the note," more than two years and two months after the closing date of July 31, 2006.

- **CWL 2005-14 0006, dated May 17, 2010:**  stating that Nations First Lending, Inc., "HEREBY GRANTS, ASSIGNS AND TRANSFERS TO" the Trustee the Deed of Trust, "TOGETHER WITH THE NOTE," more than four years and four months after the closing date of December 21, 2005.

- **SURF 2006-BC1 0003-04, dated May 13, 2010:**  stating that MERS, acting solely as nominee for Wilmington Finance, a division of AIG Federal Savings Bank, the original mortgagee, "hereby set[s] over, transfer[s] and assign[s] unto" the Trustee the Mortgage, "together with the Note," more than four years and two months after the closing date of February 21, 2006.

333.   In these and each of the other numerous examples attached hereto, the assignor party was not the trustee or acting on its behalf, and was often times the originator of the mortgage loan who was still holding the mortgage years after the

1  Securitization closed.  These documents therefore show that the first attempt to

2  transfer the mortgage and note to the Trust occurred long after the Trust closed,

3  contrary to the representations in the Offering Documents.

4      334.   In sum, Plaintiffs' Investigations compared the date of the

5  Assignments with the date of the issuance of the Certificates, and found that in

6  almost every case, there was no transfer of the mortgages into the Trusts at closing,

7  as was represented in the Offering Documents.  Further, in those instances where

8  an Assignment was executed to the Trust or Trustee, almost every Assignment was

9  dated more than three months after the Securitizations' closing, contrary to the

10  representations in the Offering Documents.  As shown below in Table 8, Plaintiffs

11  analyzed more than 3,300 mortgage loans from the Loan Groups supposedly

12  underlying the Certificates and found that in 18 of the 21 Trusts, 100% of the

13  sampled mortgage loans evidence a failure to transfer the mortgage loans at the

14  time of the closing or within three months of the closing of the Securitizations.

15  From this fact, it is reasonable to infer that ***none*** of the mortgage loans in those

16  Trusts were transferred at the issuance, or within three months of the issuance, of

17  the Certificates, if ever.  For the Trusts where assignments were made within three

18  months of the closing of the Securitization, only between 0.5% and 0.6% of the

19  loans sampled evidence assignments made within the time period specified in the

20  Offering Documents.

21  **Table 8**

| Trust | Loan Group As Represented In Pro. Supp. | Sample Size | Percentage of Sample Evidencing Assignments to the Trusts Within Three Months of Issuance |
|---|---|---|---|
| ABFC 2006-HE1 A2C | Loan Group 2 (Pro. Supp. at S-11) | 143 | 0% |
| ABFC 2006-OPT1 M1 | Loan Groups 1, 2, and 3 (Pro. Supp. at S-11) | 100 | 0% |
| ABSHE 2004-HE6 A1 | Loan Subgroup 1 (Pro. Supp. at S-95 – S-96) | 39 | 0% |
| CBASS 2006-CB6 A23 | Loan Group II (Pro. Supp. at S-10) | 199 | 0% |

| Trust | Loan Group As Represented In Pro. Supp. | Sample Size | Percentage of Sample Evidencing Assignments to the Trusts Within Three Months of Issuance |
|---|---|---|---|
| CWL 2005-14 3A2 | Loan Group 3 (Pro. Supp. at S-3, S-38) | 161 | 0% |
| CWL 2005-IM3 A3 | One Loan Group for Entire Trust (Pro. Supp. at 1, 29 of 233) | 44 | 0% |
| CWALT 2006-OC1 2A2 | Loan Group 2 (Pro. Supp. at S-8, S-9) | 169 | 0% |
| CWL 2006-IM1 A2 | One Loan Group for Entire Trust (Pro. Supp. at i, S-2) | 134 | 0% |
| CWL 2007-BC2 2A1 | Loan Group 2 (Pro. Supp. at S-5, S-9) | 176 | 0% |
| CWL 2007-9 2A3 | Loan Group 2 (Pro. Supp. at S-5, S-9 – S10) | 250 | 0% |
| CWL 2007-10 2A3 | Loan Group 2 (Pro. Supp. at S-5, S-9 - 10) | 290 | 0% |
| CWALT 2007-OH2 A2A | One Loan Group for Entire Trust (Pro. Supp. at S-2) | 271 | 0% |
| FFMER 2007-3 A2B | Loan Group two (Pro. Supp. at S-7 – S-8, S-54) | 262 | 0% |
| FFML 2005-FF12 A2B | Loan Group two (Pro. Supp. at S-6 – S-7, S-25) | 41 | 0% |
| IMM 2005-6 1A1 | Loan Group 1 (Pro. Supp. at 6, 7-8 of 284) | 34 | 0% |
| MLMI 2007-HE1 A2A | One Loan Group two (Pro. Supp. at S-7, S-8 – S-9, S-34) | 209 | 0.5% |
| MSHEL 2007-1 A3 | One Loan Group for Entire Trust (Pro. Supp. at S-6) | 169 | 0% |
| OOMLT 2007-6 2A2 | One Loan Group II (Pro. Supp. at 5-6, 10-11 of 235) | 30 | 0% |
| OOMLT 2006-2 M1 | Loan Groups I and II (Pro. Supp. at 12 of 252) | 56 | 0% |
| SURF 2006-BC1 M1 | Loan Groups one and two (Pro. Supp. at S-6, S-7) | 169 | 0.6% |
| SURF 2006-BC4 M1 | Loan Groups one and two (Pro. Supp. at S-7, S-8) | 210 | 0.5% |

335.   In short, Plaintiffs have found that the vast majority of the mortgages purportedly backing the Trusts since issuance were assigned to the Trusts well after the closing date, if ever, and large percentages of those mortgages were never assigned to the Trusts.

### 3.   Failure to Timely Transfer the Notes to the Trusts

336.   In addition to establishing that nearly all of the sampled mortgage loans were not timely transferred to the Trusts, the Assignments also show that the

1    promissory notes were not transferred to the Trusts at the time of Securitizations.

2    This is because the promissory notes are almost always contemporaneously

3    transferred with the assignment of the mortgage loans, as the language quoted

4    below reveals:

- **CWL 2005-14 0007-08, dated October 22, 2010:**  stating that First Residential Mortgage Network, Inc., the original mortgagee, "HEREBY GRANTS, ASSIGNS AND TRANSFERS TO" the Trustee the Mortgage, "TOGETHER WITH THE NOTE," more than four years and ten months after the closing date of December 21, 2005.

- **ABFC 2006-HE1 0009-10, dated May 28, 2009:**  stating that Ameriquest Mortgage Company, an originator for the trust, "does hereby grant, bargain, sell, assign, transfer and set over unto" the Trustee the mortgage, "together with the note," more than two years and five months after the closing date of December 14, 2006.

- **CWALT 2006-OC1 0009, dated December 10, 2009:**  stating that MERS, acting solely as nominee for Decision One Mortgage Company, LLC, the original mortgagee, "hereby assigns unto" the Trustee the Mortgage, "together with the Note," more than three years and ten months after the closing date of January 30, 2006.

14         337.   These documents, dated long after the closing date, clearly indicate a

15    contemporaneous transfer of the note, which -- contrary to what was represented in

16    the Offering Documents -- had ***not*** previously been transferred to, nor was held by,

17    the Trusts.

18         338.   Without the proper and timely transfer of the notes, the Trusts do not

19    have the legal right to collect principal and income payments from borrowers.

20    Moreover, without a properly transferred note, the Trusts may be prevented from

21    foreclosing on the property of a defaulted borrower or may encounter delays in

22    foreclosing on the property, thus incurring additional costs and losses for the

23    Trusts.

24         339.   As an additional check on whether notes were properly transferred to

25    the Trusts, Plaintiffs investigated foreclosure proceedings for notes that were

26    represented to have been endorsed and transferred to the Trusts at closing.

27    Because a promissory note is a negotiable instrument, a transfer of its ownership

28    requires that it be endorsed by the transferor, either to a named transferee or in

blank -- as specifically required by the Pooling and Servicing Agreement that established each of the Trusts.  While Plaintiffs do not generally have access to the notes without discovery given that the promissory notes are generally not recordable documents, such notes can appear in the public record in connection with foreclosure or bankruptcy proceedings.  A review of such proceedings involving 23 of the loans purportedly underlying the Securitizations revealed that the notes, which were represented in the Offering Documents to have been transferred to the Trusts, were never endorsed to the Trustees or in blank.  *See* Exhibit 3.  Without an endorsement in blank or to the Trusts, the Trusts never became holders of the notes.

### B.  Material Undisclosed Risks to Investors Resulting From the Failure to Assign the Mortgages and Notes to the Trusts

340.  The assignment of the mortgages and notes into the trust is perhaps the single most essential part of the mortgage-backed securitization process.  Without these transfers, the securities are not actually "mortgage-backed."

### 1.  Foreclosure and Contractual Remedy Consequences

341.  If Defendants fail to transfer the mortgages and notes to the Trusts, when borrowers default on their obligations, as they have done in record numbers since the Certificates were issued, the Trusts cannot legally foreclose on the mortgages.  Indeed, courts around the nation have barred RMBS trusts from foreclosing on the loans purportedly underlying the trusts due to improper or non-existent mortgage and/or note transfers.[14]  The Offering Documents and governing

---

[14]  *See, e.g., Naranjo v. SBMC Mortg.*, No. 11-cv-02229-L-WVG, ECF No. 20, at 6 (S.D. Cal. July 24, 2012); *In re Wilhelm*, 407 B.R. 392 (Bankr. D. Idaho 2009); *Beaumont v. Bank of N.Y. Mellon*, 81 So. 3d 553, 554 (Fla. Dist. Ct. App. 2012); *Lasalle Bank, N.A. v. Diaz*, No. 08 CH 21809, 2009 WL 1935920 (Ill. Cir. Cook Cnty. June 1, 2009); *U.S. Bank, N.A. v. Wilder*, No. 11 CV 7697, 2012 WL 2396723 (Kan. Dist. Ct. Johnson Cnty. June 25, 2012); *U.S. Bank, N.A. v. Ibanez*, 458 Mass. 637 (2011); *Bellistri v. Ocwen Loan Servicing, LLC*, 284 S.W.3d 619, 623-24 (Mo. Ct. App. 2009); *In re Bass*, 720 S.E.2d 18 (N.C. Ct. App. 2011); *Wells Fargo Bank, N.A. v. Ford*, 418 N.J. Super. 592, 593 (N.J. App. Div. 2011); *Deutsche Bank Nat'l Trust v. Brumbaugh*, 270 P.3d 151 (Okla. 2012); *Wells Fargo Bank, N.A. v. Lupori*, 8 A.3d 919 (Pa. Super. Ct. 2010); *U.S. Bank, N.A. v. Kimball*,

1    agreements applicable to the trusts involved in those suits contained bulk

2    assignment language substantially similar, if not identical, to the assignment

3    language in the Offering Documents and governing agreements for the Trusts.

4          342.   For example, in *Deutsche Bank National Trust Company v. Haque*,

5    No 20236/2011, 2012 N.Y. Slip Op. 51183(U), at *2 (N.Y. Sup. Ct., Queens Cnty.

6    June 20, 2012), the Court found that a pooling and servicing agreement "does not

7    establish that [the depositor] assigned the note to [the trustee]."  Therefore, the

8    Court found that in order to establish standing, the trustee must have had physical

9    possession of the note at the time the foreclosure proceeding was commenced.  *Id*.

10         343.   Moreover, apart from foreclosure, the only other remedy available to

11   the Trusts to collect on the obligation where a borrower ceases to make payments

12   is to bring an action in contract under the promissory note.  However, the Issuer

13   Defendants' failure to transfer the notes into the Trusts prevents the Trusts from

14   pursuing this remedy as well.  Delays in foreclosures due to improper

15   documentation result in unanticipated losses due to additional months or years of

16   foregone interest, late charges, and diminution in the market value of the collateral

17   as a result of declines in housing markets.  Where the mortgage and note have not

18   been transferred, the Trusts have no legal recourse if a borrower ceases to make

19   payments to the Trusts and must incur a significant loss.

20                    **2.    Tax Consequences**

21         344.   The second significant consequence of the Issuer Defendants' failure

22   to timely transfer qualified mortgages to the Trusts is that it affects the tax status of

23   the Trusts in the Securitizations.

24         345.   RMBS trusts may avoid taxation at the entity level if they qualify as

25   REMICs under the Internal Revenue Code and the Treasury regulations

26   promulgated thereunder.  RMBS trusts that qualify as REMICs become pass-

27

28   27 A.3d 1087 (Vt. 2011); *PHH Mortg. Corp. v. Kolodziej*, 798 N.W.2d 319 (Wis. Ct. App. Mar. 10, 2011).

1   through entities not subject to taxation on interest they collect or gains in the value

2   of the collateral they hold.  *See* Internal Revenue Code § 860A(a).

3       346.   However, trusts not qualifying as REMICs are simply considered

4   corporations and taxed at the applicable corporate tax rate.  *See* Internal Revenue

5   Code §§ 11(a), 7701(i)(1), 7704(a).  Certificateholders in RMBS trusts that do not

6   qualify as REMICs are subject to "double taxation."  Certificateholders are always

7   taxed on the income distributions they receive from the trust, regardless of whether

8   the trust is a REMIC or not.  However, if the trust is not a REMIC, then the trust

9   (and effectively investors) must pay additional taxes on interest collected and gains

10  in collateral value.  The trusts make those payments from funds that would

11  otherwise have been distributed to investors.

12      347.   To qualify as a REMIC, a trust must own assets principally consisting

13  of "qualified mortgages" or "permitted investments."  *See* Internal Revenue Code §

14  860D(a)(4).  If more than a *de minimis* amount of a trust's assets are something

15  other than qualified mortgages or permitted investments, the trust will not qualify

16  as a REMIC and will be taxed as a corporation.

17      348.   In addition, to qualify as a REMIC, a trust must be a passive

18  investment vehicle rather than an active real estate lending business.  In other

19  words, the trust's assets must consist of a fixed pool of mortgages that were

20  assigned to the trust no later than three months after the "startup day" (*i.e.*, day

21  interests in the trust are issued).  *See* Internal Revenue Code § 860D(a)(4).  The

22  REMIC may not receive new contributed mortgages into its pool after the startup

23  day, nor any new mortgages into its pool after the three-month deadline.  Any

24  mortgages added after that three-month window do not constitute "qualified

25  mortgages."

26      349.   If any new mortgages are transferred to the trust after three months,

27  the REMIC will lose its favorable tax status, with several adverse consequences to

28  investors: (1) the trust's income will be subject to corporate double taxation; (2)

1   the income from the late transferred mortgages will be subject to a 100% tax; and

2   (3) if late transferred mortgages are received through contribution, the value of the

3   mortgages will be subject to a 100% tax.  *See* Internal Revenue Code §§ 860D,

4   860F(a), 860G(d).

5       350.   If a trust that previously elected REMIC status is later found never to

6   have qualified as a REMIC, or is found to have ceased qualifying as a REMIC, the

7   trust is subject to retroactive taxation at the prevailing corporate tax rate and

8   potential additional penalties for underpayment of tax and/or fraudulently

9   purporting to be a REMIC.  *See* Internal Revenue Code §§ 6501(c), (e); 6662(a);

10  6663(a).  These taxes and penalties are ultimately borne by investors.

11      351.   As a consequence of Defendants' failure to transfer notes and

12  mortgages, the Trusts are subject to action by the Internal Revenue Service to

13  collect back taxes, interest and penalties.  The Trusts are also subject to future

14  taxation as a corporation rather than a REMIC.  Should the IRS take action,

15  certificateholders, including Plaintiffs, will suffer a substantial loss of future cash

16  flows they would otherwise expect to collect from the Trusts.  This risk

17  significantly diminishes the value of the Certificates.

18      352.   In sum, Defendants knowingly or recklessly made false

19  representations in the Offering Documents that the Depositor Defendant would

20  transfer all notes and mortgages to the Trusts prior to the issuance of the

21  Certificates and that the Trusts would qualify for favorable REMIC tax status.

22  Defendants knew these representations to be false because failure to properly

23  "back" the securitizations had been the Defendants' practice for years.

24  **IX.   ALTERNATIVELY, DEFENDANTS MADE NEGLIGENT**
    **MISREPRESENTATIONS CONCERNING THE MORTGAGES**
25  **AND NOTES UNDERLYING THE SECURITIZATIONS**

26      353.   Defendants knew they were not properly and timely transferring the

27  mortgages and notes to the Trusts, because they were responsible for actually

28  making the transfers.  Thus, both the fact of the transfer and the timing of the

1    transfer, were completely within their knowledge.  Also, Plaintiffs have discovered

2    evidence that Defendants failed to timely transfer notes and mortgages in previous

3    securitizations.  Yet, Defendants did not correct this practice with respect to the

4    Securitizations.

5          354.   Nevertheless, even if Defendants were unaware that the notes and

6    mortgages were not timely and properly transferred to the Trusts, then their false

7    representations to Plaintiffs that proper transfers would be timely effected was due

8    entirely to their own negligent conduct, because they could have and should have

9    verified those statements.

10         355.   Because Plaintiffs could not possibly have known about Defendants'

11   failure to timely assign and transfer the mortgages and notes at the time they

12   purchased the Certificates, Defendants knew that Plaintiffs were relying on the

13   truth of the representations in the Offering Documents regarding such transfers.

14         356.   Because of Defendants' superior knowledge with respect to the

15   transfer of the mortgages and notes to the Trusts as described above, Defendants

16   had a duty to take reasonable care to ensure that they were not misrepresenting the

17   information that they alone possessed and controlled.  Given the substantial

18   misrepresentations that Plaintiffs have uncovered, Defendants' failure to inform

19   Plaintiffs accurately about the loans underlying their Trusts was, at the very least,

20   negligent.

**X.   DEFENDANTS KNEW THEIR REPRESENTATIONS**
21   **WERE MATERIALLY FALSE AND MISLEADING**
22   **AND HAD A DUTY TO DISCLOSE TO PLAINTIFFS**

23        **A.   Defendants Knew That the Securitizations Would Not Be**
          **Mortgage-Backed as Represented**
24

25         357.   The Depositor Defendants were responsible for depositing the

26   mortgages and notes into the Trusts, pursuant to the terms of the Offering

27   Documents.  At the time Defendants represented that the notes and mortgages

28   would be transferred to the Trusts, Defendants knew that those representations

were false because in years prior to the issuance of the Certificates, the ongoing practice of the Depositor Defendants, which were affiliated with and controlled by Defendants, was to not transfer mortgages into the RMBS trusts that Defendants securitized.  The Defendants therefore knew that the vast majority of the mortgages and notes here had not, in fact, been transferred to the Trusts prior to the issuance of the Certificates.

358.   Defendants intentionally engaged in the practice of not making proper transfers of notes and mortgages to the Trusts in order to receive a substantial financial benefit at the Plaintiffs' expense (and that of other investors).  Based on Plaintiffs' investigations, as well as testimony and articles describing the failure to transfer notes and mortgages to RMBS trusts, Plaintiffs have recently learned that Defendants, as well as other participants in the RMBS industry, failed to transfer notes and mortgages to RMBS trusts as a matter of industry-wide business practice.  This business practice enabled Defendants to avoid the time and expense of effectuating thousands of physical deliveries and assignments, and ultimately prevented the RMBS trusts from collecting in foreclosure proceedings.  It also exposed the trusts to potentially enormous tax liabilities which could be passed on to investors.

359.   A preliminary investigation by Plaintiffs revealed that the pattern by Defendants of not transferring notes and mortgages to trusts pre-dated the issuance of the Certificates.  It is apparent that the Depositor Defendants knowingly engaged in a continuing and deliberate practice of not effectuating transfers of notes and mortgages to RMBS trusts that they created, marketed, and sold. Accordingly, the Depositor Defendants knew and intended, when drafting the Offering Documents for the Securitizations, that contrary to the express representation in the Offering Documents that the Securitizations would be backed by mortgages, the originators of the loans to be included in the Securitizations would not transfer endorsed notes and mortgages to Depositor Defendants and that

1  the Depositor Defendants would not transfer endorsed notes and mortgages to the

2  Trusts as of the date of the Securitizations' closings.  The other Defendants

3  similarly knew and intended, when they created, marketed, and sold the

4  Certificates to Plaintiffs, that contrary to the express representation in the Offering

5  Documents that the Securitization would be backed by mortgages, endorsed notes

6  and mortgages were not being transferred to the Trusts as of the dates of the

7  respective Securitization's closing.

8      360.   That the Depositor Defendants' practice was to not transfer the

9  mortgages and notes into RMBS trusts was a fact peculiarly within Defendants'

10  knowledge.  Plaintiffs could not have known that the Depositor Defendants were

11  not carrying out the transfer and assignment of the notes and mortgages to the

12  Trusts.

13      361.   As alleged above, given the substantial overlap in management

14  between the Underwriter Defendants and the other Defendants, and the

15  Underwriter Defendants' involvement in the offerings prior to the Trusts, the

16  Underwriter Defendants also knew or were reckless in not knowing that the

17  Depositor Defendants were not timely assigning and transferring the mortgages

18  and notes to the Trusts prior to the Underwriter Defendants' sale of the Certificates

19  to Plaintiffs.  The Underwriter Defendants nevertheless transmitted Offering

20  Documents that they knew, or but for their recklessness would have known,

21  contained false representations concerning the transfer of the notes and mortgages.

22  The Sponsor Defendants worked closely with the Depositor Defendants in

23  effectuating the offering of the Securitizations, and the Controlling Parent

24  Defendants dominated and controlled each of the other Defendants in their

25  respective group, including the Underwriter Defendants, as described above.  Each

26  of the Defendants are thus liable for the fraud as well.

27

28

**B.   Having Misrepresented Certain Characteristics of the Securitizations, Defendants Had A Duty to Correct Their False and Misleading Statements**

362.   As described above, Defendants made false and misleading representations in the Offering Documents regarding LTV/CLTV ratios, owner-occupancy rates, adherence to the originators' underwriting guidelines, the risk profiles reflected in the ratings granted to the Certificates, the status of transfers of the notes and mortgages to the Trusts, whether the Securitizations were "mortgage-backed," and the Trusts' qualification as REMICs.  Plaintiffs relied on the false and misleading information provided by Defendants in deciding whether to purchase the Certificates, and continued to rely upon the accuracy of the information provided by Defendants in holding the Certificates.  Defendants knew that the representations described above were false, and therefore had a duty to disclose the accurate information to Plaintiffs and other investors.  Defendants' failure to correct the statements or update investors such as Plaintiffs regarding the accuracy of the statements enabled Defendants to continue to conceal the fraud.

363.   With respect to LTV/CLTV ratios, Defendants knew, based on their own due diligence and due diligence done for them by third-party vendors, that the originators failed to conform to the appraisal standards described in the Offering Documents and deliberately inflated their appraisals in order to achieve the target LTV/CLTV ratios required by Defendants' underwriting guidelines for the Loan Groups in the Securitizations.  As a result, the LTV/CLTV ratios in the Offering Documents were false, which Defendants knew or should have known when they published the Offering Documents.

364.   Defendants also knew that the owner-occupancy rates included in the Offering Documents were false, but failed to correct their false statements.  Defendants had access to the loan files, whereas Plaintiffs did not, and Defendants therefore had the information necessary to easily verify or disprove the owner-occupancy status of the properties.  Defendants also received reports from Clayton

1   and/or Bohan that included an analysis of the occupancy status of the properties.

2   Despite having this knowledge, Defendants provided inaccurate owner-occupancy

3   rates in the Offering Documents.

4        365.   Defendants further knew, or should have known, contrary to the

5   representations in the Offering Documents, that the Originator Defendant and the

6   other originators for the Securitizations were not adhering to their underwriting

7   practices and guidelines, including the prevalence and type of exceptions being

8   applied to the underlying loans.  Despite the fact that Defendants' due diligence

9   identified a substantial number of the loans that did not comply with the stated

10  underwriting guidelines or suffered from other material defects, those loans were

11  nevertheless included in the Loan Groups for the Securitizations.

12       366.   As to the credit ratings assigned to the Certificates, Defendants knew

13  that the credit ratings were materially misleading and did not reflect the true credit

14  quality of the Certificates because those ratings were obtained as a result of

15  intentional manipulation by Defendants.

16       367.   Finally, Defendants knew, despite their representations in the Offering

17  Documents, that the notes and mortgages would not be transferred to the Trusts

18  and that the Certificates would not be mortgage-backed as represented.  Therefore,

19  as Defendants knew, the Trusts did not qualify as REMICs and the failure to

20  properly transfer the notes and mortgages to the Trusts created delays and other

21  problems and expenses in attempting to foreclose on the collateral.

22       368.   None of the risk factors contained in the Offering Documents

23  disclosed that (a) the LTV/CLTV ratios and owner-occupancy rates may be false,

24  (b) originators may fail to adhere to their underwriting guidelines, (c) the

25  depositors had a practice of not transferring notes and mortgages to trusts, and

26  therefore, the notes and mortgages would not be transferred to the Trusts; (d) as a

27  result of the failure to transfer the notes and mortgages to the Trusts, the trustees

28  may not be able to foreclose on the notes and mortgages purportedly backing the

1   Trusts or may incur higher than expected costs in attempting to foreclose, (e) the

2   risk profiles reflected in the ratings granted to the Certificates were inaccurate, or

3   (f) the Trusts may not qualify as REMICS.

4          369.   By providing false and misleading information regarding CLTV

5   ratios, owner-occupancy rates, adherence to underwriting practices and guidelines,

6   the credit ratings assigned to the Certificates, the fact of whether the notes and

7   mortgages would be transferred and assigned to the Trusts, and that the Certificates

8   would be "mortgage-backed," Defendants established a duty to disclose corrective

9   or clarifying information and to inform Plaintiffs and other investors of the

10  accurate information regarding the Securitizations.  Defendants' silence despite

11  knowledge of the falsity of their representations constituted continuing

12  concealment of the fraud.

13  **XI.   IN THE ALTERNATIVE, PLAINTIFFS AND THE UNDERWRITER**
    **DEFENDANT OPERATED UNDER A MUTUAL MISTAKE WITH**
14  **RESPECT TO THE TRANSFER OF THE MORTGAGES AND**
    **NOTES INTO THE TRUSTS**

15         370.   Alternatively, if the Underwriter Defendants were acting with the

16  understanding -- albeit incorrect -- that all of the mortgages and notes had been

17  transferred to the Trusts at the time the Certificates it sold to Plaintiffs were issued,

18  then this was a mutual mistake of material fact.  Plaintiffs are therefore entitled to

19  rescission of the purchases of all of these Certificates.

20         371.   The mutually mistaken facts -- that all of the mortgages and notes had

21  been transferred to the Trusts prior to issuance of these Certificates and that the

22  Trusts qualified for REMIC classification -- were highly material to all the parties,

23  and existed at the time the Certificates were purchased.  The transfers were critical

24  to Plaintiffs, because without valid, timely transfers of the mortgages and notes,

25  Plaintiffs stood to lose millions of dollars through unrecoverable defaults and

26  adverse tax consequences.

27

28

372.    Indeed, without transferring the mortgages and notes into the Trusts, these so-called "mortgage-backed securities" were not actually backed by the mortgages represented to be in the Trusts.  The sale of Certificates backed by residential mortgages was the essence of the contracts between Plaintiffs and the Underwriter Defendants.  Plaintiffs would not have purchased these Certificates had they known they were not properly backed by collateral and/or notes.  Upon discovery of this mutual mistake, Plaintiffs promptly brought this action.

373.    Because of the existence of material mutual mistakes, the contracts under which Plaintiffs purchased from the Underwriter Defendants the Certificates are void *ab initio*, and Plaintiffs are therefore entitled to rescission of their purchases of the Certificates.

## XII.  THE ISSUER DEFENDANTS FAILED TO DISCLOSE THAT THEY OBTAINED THE RATINGS OF THE CERTIFICATES BY PROVIDING FALSE REPRESENTATIONS TO THE RATINGS AGENCIES

374.    As represented in the Prospectus Supplements, ratings are designed to assess the risk of a security and the likelihood of receipt of distributions from the mortgage loans:  "[t]he ratings on the certificates address the likelihood of the receipt by holders of the certificates of all distributions on the underlying mortgage loans to which they are entitled."  SURF 2006-BC1 Pro. Supp. dated February 16, 2005 at S-11.  The Prospectus Supplements for the remaining Securitizations contain the same or substantially similar representations.  *See* Appendix A.

375.    In order to convince investors to purchase the Certificates, the Issuer Defendants obtained and marketed inflated ratings for the Certificates by misrepresenting the risk profile of the underlying loans to the rating agencies.

376.    All of the Certificates that Plaintiffs purchased received high investment-grade ratings that were touted in the Offering Documents.  As detailed in Table 9, all of the Certificates were subsequently downgraded at an alarming rate and all but one of the Certificates are currently rated as "junk".

**Table 9**

| Certificate | Rating Agency | Initial Rating | Effective Date | Current Rating | Effective Date |
|---|---|---|---|---|---|
| ABFC 2006-HE1 A2C | Moody's | Aaa | 12/14/2006 | Ca | 6/3/2010 |
| | S&P | AAA | 12/20/2006 | CCC | 8/4/2009 |
| ABFC 2006-OPT1 M1 | Moody's | Aa1 | 8/31/2006 | C | 6/3/2010 |
| | S&P | AA+ | 8/16/2006 | CCC | 8/11/2011 |
| ABSHE 2004-HE6 A1 | Moody's | Aaa | 9/12/2004 | Aaa | 4/12/2012 |
| | S&P | AAA | 9/2/2004 | AAA | 11/16/2012 |
| CBASS 2006-CB6 A23 | Moody's | Aaa | 8/14/2006 | Caa3 | 4/12/2010 |
| | S&P | AAA | 8/3/2006 | CCC | 7/18/2011 |
| CWL 2005-14 3A2 | Moody's | Aaa | 12/21/2005 | Ba2 | 4/14/2010 |
| | S&P | AAA | 12/28/2005 | BB+ | 11/16/2012 |
| CWL 2005-IM3 A3 | Moody's | Aaa | 12/21/2005 | Caa3 | 5/11/2010 |
| | S&P | AAA | 12/30/2005 | D | 2/26/2013 |
| CWALT 2006-OC1 2A2 | Moody's | Aaa | 1/30/2006 | Caa3 | 8/13/2010 |
| | S&P | AAA | 2/1/2006 | CC | 6/25/2009 |
| CWL 2006-IM1 A2 | Moody's | Aaa | 1/30/2006 | Ca | 7/22/2010 |
| | S&P | AAA | 2/1/2006 | CCC | 9/2/2009 |
| CWL 2007-BC2 2A1 | Moody's | Aaa | 5/11/2007 | WR | 8/21/2012 |
| | S&P | AAA | 5/1/2007 | NR | 8/3/2012 |
| CWL 2007-9 2A3 | Moody's | Aaa | 6/7/2007 | Ca | 4/14/2010 |
| | S&P | AAA | 6/14/2007 | CCC | 9/23/2011 |
| CWL 2007-10 2A3 | Moody's | Aaa | 7/9/2007 | Ca | 4/14/2010 |
| | S&P | AAA | 7/3/2007 | CCC | 9/30/2009 |
| CWL 2007-OH2 A2A | Moody's | Aaa | 7/13/2007 | C | 11/23/2010 |
| | S&P | AAA | 7/5/2007 | CCC | 7/15/2011 |
| FFMER 2007-3 A2B | Moody's | Aaa | 6/4/2007 | Caa3 | 4/6/2010 |
| | S&P | AAA | 6/5/2007 | CCC | 3/2/2010 |
| FFML 2005-FF12 A2B | Moody's | Aaa | 12/28/2005 | B1 | 7/15/2011 |
| | S&P | AAA | 12/29/2005 | BBB+[15] | 10/3/2012 |
| IMM 2005-6 1A1 | Moody's | Aaa | 9/9/2005 | Caa2 | 5/11/2010 |
| | S&P | AAA | 10/3/2005 | CC | 4/21/2010 |
| MLMI 2007-HE1 A2A | Moody's | Aaa | 3/28/2007 | Ca | 7/9/2010 |
| | S&P | AAA | 3/27/2007 | CCC | 8/4/2009 |
| MSHEL 2007-1 A3 | Moody's | Aaa | 3/16/2007 | Ca | 7/5/2010 |
| | S&P | AAA | 3/4/2007 | CCC | 7/9/2009 |
| OOMLT 2007-6 2A2 | Moody's | Aaa | 5/30/2007 | Caa3 | 8/6/2010 |
| | S&P | AAA | 6/4/2007 | CCC | 3/26/2010 |
| OOMLT 2006-2 M1 | Moody's | Aa1 | 6/29/2006 | C | 3/17/2009 |
| | S&P | AA+ | 6/29/2006 | D | 6/21/2011 |
| SURF 2006-BC1 | Moody's | Aa1 | 2/21/2006 | C | 6/18/2010 |
| | S&P | AA+ | 3/2/2006 | B- | 10/21/2011 |
| SURF 2006-BC4 M1 | Moody's | Aa1 | 9/27/2006 | C | 3/17/2009 |
| | S&P | AA+ | 9/28/2006 | CC | 3/2/2010 |

---

[15]   This rating is not considered "junk" under Standard & Poor's rating scale, but the "B1" rating assigned by Moody's is considered a "junk"-level rating.

377.   The high initial ratings were only achieved because Defendants misled the rating agencies concerning, among other things, the CLTV ratios, owner-occupancy rates and adherence to underwriting guidelines.  These misrepresentations caused a dramatic understatement of cumulative loss projections by understating both the likely rates of default and the resultant loss severity of defaulted loans.  By understating the cumulative loss projections, Defendants were able to limit the amount of credit enhancement necessary for the Securitizations -- which was a key component in offering the Securitizations to investors such as Plaintiffs -- and enabled Defendants to maximize their profitability on the Securitizations by paying less for credit enhancement.  The analysis conducted by the rating agencies (and by Plaintiffs) therefore showed a much lower level of risk of loss due to the misrepresentations, and the ratings were not an accurate reflection of the true risk in the Securitizations.

378.   Defendants knew through their due diligence (*see infra* Section V) that the collateral data they supplied to the rating agencies was inaccurate.  Had an accurate picture of the Loan Groups and cumulative loss projections been supplied to the rating agencies, the rating agencies never would have given the Certificates the high ratings that they did and Defendants would not have been able to sell the Securitizations to investors such as Plaintiffs because the required levels of credit enhancement would have made the Securitizations not economically feasible.  Defendants were therefore well aware that the ratings they represented in their Offering Documents were false and misleading.

### XIII.  PLAINTIFFS REASONABLY RELIED ON DEFENDANTS' MISREPRESENTATIONS IN THEIR DECISIONS TO PURCHASE THE CERTIFICATES

379.   Plaintiffs had specific, rigorous investment criteria that were strictly adhered to when RMBS purchases were considered and approved.  The decisions to invest in the Certificates were made by Plaintiffs' Treasury and Credit

Departments in New York[16], exclusively by employees of the New York Branch, and all funding for the RMBS investments was planned, executed and managed by the New York Branch's Treasury Department using funds from the New York Branch's separate New York-based bank account.[17]

380.   Plaintiffs relied on the representations in the Offering Documents, including the numerous misrepresentations described above, in connection with their decision to invest in the Certificates.  But for Defendants' misrepresentations concerning the underlying collateral and the rating of the Certificates, Plaintiffs would not have purchased the Certificates.  Similarly, had Plaintiffs been aware of the lack of timely and valid transfers of the notes and mortgages to the Trusts, or that the Trusts would not qualify for REMIC classification, they would not have purchased the Certificates.

### A.   DZ's Investment Criteria

381.   DZ had strict RMBS investment requirements, necessitated by the fact that DZ' New York Branch was pledging securities purchased in order to satisfy the Federal Reserve Bank's contingency liquidity requirements.  Under the Federal Reserve Discount Window program, which was the primary pledge program used by DZ, the Federal Reserve only permitted AAA rated RMBS to be pledged as collateral.  During the period of Plaintiffs' investment in the Certificates, RMBS, such as the ones issued and sold by Defendants, were one of the very few types of

---

[16]  Plaintiff DG HYP made the purchase decisions for the CWALT 2007-OH2 Certificate.

[17]  The New York Branch maintains financial separateness from the German head office by maintaining separate books of account.  These accounts include separate profit and loss statements based on the New York Branch's banking activities, including investments in loans and securities in the United States with U.S. Dollars.  With the sole exception of Plaintiff DG HYP's purchase of the CWALT 2007-OH2 Certificate, Plaintiffs' purchases of the Certificates were booked by the New York Branch and the Certificates have never left New York.  Again excepting the CWALT 2007-OH2 Certificate, the Certificates that Plaintiffs still own are currently held at the New York Branch's custodial account with J.P. Morgan Chase & Co. in New York.  The New York Branch executed the sales of the Certificates through the New York Branch.

1   securities that satisfied the Federal Reserve's requirements and provided a positive

2   yield versus DZ's own cost of funds.

3       382.   In order to ensure that their RMBS purchases met the strict ratings and

4   pledge requirements set by the Federal Reserve, DZ applied a rigorous investment

5   process that included multiple levels of review and approval.  DZ also maintained

6   and followed an investment policy that focused on the attributes ultimately

7   misrepresented by Defendants, including LTV/CLTV, owner-occupancy, and

8   information that led to the faulty investment-grade ratings provided by the ratings

9   agencies.  In particular, each of DZ's RMBS investments were required to have a

10  "AAA" rating for purposes of collateral pledging at the Federal Reserve discount

11  window.  DZ's other RMBS investments were required to have at least a "AA"

12  rating.  All of DZ's RMBS investments were required to satisfy the limits imposed

13  on LTV/CLTV ratios and owner-occupancy rates.

14      383.   DZ's investment criteria required that each of the Certificates receive

15  at least a "AA" rating from at least two ratings agencies.  However, because the

16  ratings of the Certificates were based on Defendants' misrepresentations

17  concerning the Loan Groups and the purported transfer of the mortgages and notes

18  to the Trust, the ratings for these Certificates were artificially inflated.  The ratings

19  given to the Trusts were only achieved because Defendants deliberately misled the

20  rating agencies concerning, among other things, the LTV/CLTV ratios, owner-

21  occupancy rates and adherence to underwriting guidelines.  The Issuer Defendants

22  knew through their due diligence (*see supra* Section IV) that the credit risk data

23  they supplied to the ratings agencies was inaccurate.  Had an accurate picture of

24  the Loan Groups been supplied to the ratings agencies, the ratings agencies would

25  not have given the Certificates the high ratings that they did.  Thus, if Defendants

26  had accurately disclosed the LTV/CLTV ratios and owner-occupancy rates, and

27  thus obtained accurate ratings for the Certificates, then Plaintiffs would not have

28

1   invested in the Securitizations because they would not have met Plaintiffs'

2   investment guidelines.

3       **B.    Plaintiffs' Reliance on the Offering Documents was Reasonable**

4       384.   Plaintiffs received the Offering Documents for each Securitization

5   directly from the Underwriter Defendants, which solicited Plaintiffs to purchase

6   the Certificates.  The Underwriter Defendants specifically intended to solicit

7   Plaintiffs' investments in the Securitizations.  Defendants transmitted the Offering

8   Documents to the New York Branch in New York and New York Branch

9   employees communicated with Defendants with regard to the marketing and

10  ultimate purchase of the Certificates.  Employees of the New York Branch

11  performed all due diligence on, and analysis of, the Certificates in New York,

12  including reviewing the Offering Documents that the Underwriter Defendants

13  provided, and New York Branch employees made the ultimate decision to invest in

14  the Certificates.  If the Securitization complied with Plaintiffs' investment criteria

15  and policies based on such factors as the ratings and the quality and character of

16  the underlying Loan Groups, including the LTV/CLTV ratios, owner-occupancy

17  rates, and ratings, then Plaintiffs would authorize the purchase of Certificates.

18  Plaintiffs conducted at least two levels of review to verify that the Certificates

19  satisfied their respective investment guidelines.

20      385.   Throughout this investment approval process, Plaintiffs relied on

21  Defendants' representations and statements in the Offering Documents in

22  performing its due diligence, and in determining whether the Securitization

23  complied with its investment criteria.  Plaintiffs also relied on Defendants'

24  representations and statements in the Offering Documents that the Trusts qualified

25  for REMIC classification and that the Trusts would be pass-through entities,

26  thereby avoiding double-taxation of the distributions paid to Plaintiffs.  Had

27  Plaintiffs been aware of the lack of timely and valid transfers of the notes and

28

mortgages to the Trusts, or that the Trusts would not qualify for REMIC classification, they would not have purchased the Certificates.

386. Plaintiffs' reliance on Defendants' representations in the Offering Documents was reasonable because Plaintiffs' review and analysis could not uncover the fact that the representations of material fact were false. As alleged above, the Offering Documents contained certain information purporting to describe the loans. More detailed but still limited information was contained in the "loan tapes," but these loan tapes were never provided to Plaintiffs. Even if they had been, such would still not provide investors with the information necessary to discover the fraud. This is because the loan tapes are simply rows of numerical data -- data that, as alleged above, was itself false. Thus, without the loan *files* containing the backup materials standing behind those numerical descriptions -- documents that were never made available to investors, and which could not have been given to the Plaintiffs without violating rules regarding the selective dissemination of material, non-public information -- even having the loan tapes full of (false) data would not have revealed the fraud. Plaintiffs' employees in New York monitored the performance of the Certificates after purchase and interacted with the Trustees as necessary, and even after purchase of the Certificates Plaintiffs were not able to uncover Defendants' fraud.

387. Defendants had sole access to certain special facts -- the loan files for the loans purportedly to be pooled in the Securitizations. The loan files contained detailed information on each borrower, the borrower's credit application and the property securing the loan. This data was key information and was fundamental to verifying the accuracy of the data presented by Defendants. It was, for example, used by Clayton for its due diligence of the loans. Only with such data, to which Plaintiffs did not have access, would Plaintiffs reasonably have been able to discover the Defendants' misrepresentations. Plaintiffs' review and analysis of the

Securitizations was limited to the information, data, and representations supplied by Defendants, which contained material misrepresentations and/or omissions.

388. As a representative of Moody's testified before Congress,

> [S]ubprime RMBS and their offshoots offer little transparency around the composition and characteristics of the underlying loan collateral. ***Potential investors are not privy to the information that would allow them to understand clearly the quality of the loan pool.*** Loan-by-loan data, the highest level of detail, is generally not available to investors.

*See* Fons, Jerome S., Statement to the House, Hearings before the Committee on Oversight and Government Reform: The State of the Credit Rating Industry, Oct. 22, 2008, at 2, available at http://oversight-archive.waxman.house.gov/documents/20081022102726.pdf, accessed June 14, 2012 (emphasis added).  Only with such data, which was not available to Plaintiffs, would Plaintiffs reasonably have been able to discover Defendants' misrepresentations.

389. Indeed, Defendants encouraged Plaintiffs to rely on nothing more than the statements in the Prospectuses and Prospectus Supplements in evaluating the transactions.  The Offering Documents stated:

> You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus.  We have not authorized anyone to provide you with different information.

CWALT 2007-OH2 Pro. Supp. dated June 28, 2007 at 407 of 408.  The Offering Documents for the remaining Securitizations contain the same or substantially similar representations, as set forth in Appendix A.

390. But for Defendants' misrepresentations, Plaintiffs would not have invested in the Certificates.

## XIV.  PLAINTIFFS SUFFERED SIGNIFICANT LOSSES DUE TO DEFENDANTS' MISCONDUCT

391.   Plaintiffs paid a purchase price for the Certificates that was far in excess of what they were actually worth at the time of purchase.  Plaintiffs paid the purchase prices they did based on the false representations in the Offering Documents that the Certificates were "mortgage-backed," and the representations that made the credit risk of the Certificates appear much lower than it was in reality.  Once the true nature of the Certificates and their credit risk materialized, the market values of the Certificates declined.  All of Plaintiffs' Certificates received investment grade ratings at issuance as a result of the Issuer Defendants' misrepresentations concerning the credit risk of the underlying Loan Groups and the transfer of notes and mortgages to the RMBS Trusts.  All of the Certificates have received ratings downgrades, and all but one of the Certificates have been downgraded to "junk" status.

392.   Moreover, borrower defaults skyrocketed since Plaintiffs purchased the Certificates.  *See*, *e.g.*, ¶ 29 *supra*.  "Loss severity," the measure of the value lost to the Trust as a result of a default (and therefore the value lost to the Certificate-holders, who ultimately receive distributions from the recoveries in foreclosure or collection actions), has risen sharply as well.  Because of failures to transfer the notes and mortgages to the Trusts, foreclosures become slower, more expensive, and more difficult -- if even possible -- to obtain.  All of this is a direct result of the poor quality of the underlying loans and the failure to transfer the notes and mortgages to the Trusts, which was concealed from investors through the misrepresentations in the Offering Documents.  The circumstances that Defendants misrepresented and/or failed to disclose impaired cash flow and thus caused a decline in the market value of the Certificates from the inflated purchase prices paid by Plaintiffs, causing damages to Plaintiffs in an amount to be determined at trial.

393.   The significantly lower-than-expected returns on the Certificates were a direct result of the misrepresentations and omissions in the Offering Documents because those misrepresentations and omissions concealed the poor quality of the underlying loans.  The lower credit quality of the underlying loans made defaults more likely to occur and thus resulted in lower cash flow for the Trusts, and correspondingly, lower distributions to the Certificate-holders, such as Plaintiffs.  Furthermore, the failure to transfer the notes and mortgages to the Trusts converted the Certificates into unsecured securities, thereby subjecting investors such as Plaintiffs to the credit risk and quality of the depositors and/or originators of the Trusts.  Moreover, as RMBS market participants reassessed the risks and potential adverse consequences resulting from the failure to transfer notes and lower-than-reported credit quality of the underlying mortgage loans -- whether for RMBS in general or the particular Certificates purchased by Plaintiffs -- the market value of the Certificates declined.  With respect to the Certificates Plaintiffs sold, Plaintiffs incurred significant losses.  With respect to the Certificates Plaintiffs continue to hold, those Certificates have suffered substantial principal writedowns, and are currently priced well below the price Plaintiffs paid for them.

394.   All losses on the Certificates have been and will be suffered in New York because it is the New York Branch's U.S. profit and loss statements that are diminished as a result of the Certificates' losses.  These losses are carried on the separate books of account maintained by the New York Branch.  The losses incurred by the New York Branch on the Certificates contributed to a decline in the number of employees at the New York Branch, and directly impacted the New York Branch's pledge requirements at the Federal Reserve discount window.  Losses suffered by the New York Branch are accounted for in the New York Branch's accounting records, which are maintained in New York and are separate from the German head office's records.  Further, the New York Branch's losses are reflected on DZ's New York City, New York State and Federal tax returns and

Federal and State regulatory reports, and only gains or profits generated by the New York Branch can offset RMBS or other related tax loss carry-forwards on its tax returns.  Finally, Plaintiffs would suffer any tax ramifications (including for Defendants' failure to maintain REMIC status) in New York alone.

## XV.   THE SUCCESSOR LIABILITY OF THE BANK OF AMERICA DEFENDANTS

### A.   BOA Is Liable as a Successor-in-Interest to Countrywide

395.   In 2008, Bank of America "de facto" merged with Countrywide Financial, consolidating and merging with the Countrywide Defendants and acquiring substantially all of the assets of all the Countrywide Defendants. Because of the manner in which this merger was carried out, Defendants BOA Corp. and BOA N.A. and non-party NB Holdings are the successors in liability to Countrywide and are jointly and severally liable for the wrongful conduct alleged herein of the Countrywide Defendants.

396.   On January 11, 2008, Bank of America announced that it would purchase Countrywide Financial for approximately $4.1 billion.  *See* Press Release, BOA Corp., Bank of America Agrees to Purchase Countrywide Financial Corp., (Jan. 11, 2008).  Based upon the steps taken to consummate this transaction, BOA Corp., BOA N.A., and NB Holdings became the successors-in-interest to Countrywide Financial because (1) there was continuity of ownership between Bank of America and Countrywide; (2) Countrywide ceased ordinary business soon after the transaction was consummated; (3) there was continuity of management, personnel, physical location, assets and general business operations between Bank of America and Countrywide; (4) Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of Countrywide's business; and (5) Bank of America assumed Countrywide's mortgage repurchase and tort liabilities.  BOA Corp., BOA N.A., and NB Holdings also became the successors-in-interest to Countrywide because a series of transactions between July

1, 2008 and November 7, 2008, which were not arm's length transactions and which gave inadequate consideration to Countrywide, were structured in such a way as to leave Countrywide unable to satisfy its massive contingent liabilities.

**B.     The Structuring of Bank of America's Merger with Countrywide**

397.   BOA Corp.'s Form 8-K, dated January 11, 2008, states that under the terms of the merger "shareholders of Countrywide [] receive[d] [0].1822 of a share of Bank of America Corporation's stock in exchange for each share of Countrywide." *See* BOA Corp., Form 8-K, Ex. 99.1 at 2 (Jan. 11, 2008).  In other words, former Countrywide shareholders became Bank of America shareholders.

398.   On July 1, 2008, a subsidiary of BOA Corp. completed the merger with Defendant Countrywide Financial, the parent of all of the Countrywide entities.  BOA Corp.'s Form 10-Q for the period ending September 30, 2009, reported, "On July 1, 2008, the Corporation [*i.e.*, Bank of America] acquired Countrywide through its merger with a subsidiary of the Corporation. The acquisition of Countrywide significantly expanded the Corporation's mortgage originating and servicing capabilities, making it a leading mortgage originator and servicer." BOA Corp., Form 10-Q at 9 (Nov. 6, 2008).  According to the 10-Q, Countrywide's "results of operations were included in the Corporation's results from their dates of acquisition (July 1, 2008.)" *Id.* at 7.  The Form 10-Q also acknowledged pending litigation against Countrywide.  *Id.* at 35.

399.   Following this initial transaction and over the course of the next few months, Bank of America planned to and did enter into a series of transactions with Countrywide Financial and its various subsidiaries, which Bank of America then controlled.  These transactions were designed both to integrate Countrywide's operations with Bank of America's and to leave Countrywide Financial without any source of income and with insufficient assets to cover its massive contingent liabilities arising from Countrywide's mortgage origination, securitization, and

1   servicing practices.  Moreover, these transactions were not negotiated at arm's

2   length because after July 1, 2008, Bank of America owned Countrywide Financial.

3       400.   In particular, on July 2, 2008, Countrywide Home Loans, a subsidiary

4   of Countrywide Financial (controlled by Bank of America as of this date),

5   completed the sale of some or substantially all of its assets to NB Holdings,

6   another wholly-owned subsidiary of BOA Corp.  Specifically, Countrywide Home

7   Loans sold NB Holdings its membership interests in Countrywide GP, LLC and

8   Countrywide LP, LLC, whose sole assets were equity interests in Countywide

9   Home Loans Servicing LP, in exchange for an approximately $19.7 billion

10  promissory note.  Countrywide Home Loans Servicing LP was the operating entity

11  which serviced the vast majority of residential mortgage loans for Countrywide

12  and was an operating business. Countrywide Home Loans also sold a pool of

13  residential mortgages to NB Holdings for approximately $9.4 billion.  NB

14  Holdings is Countrywide Home Loans' successor.

15      401.   On November 7, 2008, after obtaining the necessary consents and

16  approvals, two additional transactions occurred that facilitated the completion of

17  Bank of America's merger with Countrywide.  First, in exchange for

18  approximately $1.76 billion, Countrywide Home Loans sold Bank of America

19  substantially all of its remaining assets.  Second, in exchange for promissory notes

20  of approximately $3.6 billion Bank of America acquired 100 percent of

21  Countrywide Financial's equity interest in various subsidiaries, including

22  Countrywide Bank, FSB.  In connection with this transaction, Bank of America

23  also assumed approximately $16.6 billion of Countrywide's public debt and related

24  guarantees.  These two transactions completed Bank of America's transfer of

25  substantially all of the operating and income generating assets of Countrywide out

26  of the Countrywide entities.  In February of 2009 Countrywide Bank, FSB, filed an

27  application to become a National Association, and in April of 2009, Countrywide

28  Bank NA was merged into BOA N.A.  Similarly, on July 1, 2011, BAC Home

1    Loans Servicing, L.P. (f/k/a Countrywide Home Loans Servicing, L.P.) was

2    merged into BOA N.A. As a result of these mergers, BOA N.A. assumed all of the

3    liabilities of Countrywide Bank, NA and BAC Home Loans Servicing, L.P. (f/k/a

4    Countrywide Home Loans Servicing, L.P.).

5        402.   At the time of the November 2008 transactions, Countrywide Bank,

6    FSB was the largest Countrywide subsidiary. Countrywide Financial's 2007 10-K

7    revealed that "as of December 31, 2007, over 90% of [Countrywide's] monthly

8    mortgage loan production occurred in Countrywide Bank" and that as of January 1,

9    2008 Countrywide's "production channels ha[d] moved into the Bank, completing

10   the migration of substantially all of [Countrywide's] loan production activities

11   from CHL to the Bank." *See* Countrywide Financial Form 10-K at 4 and F-90

12   (Feb. 29, 2008). By transferring to itself Countrywide Bank, FSB, along with

13   substantially all of the assets of Countrywide Home Loans, Bank of America left

14   the remaining Countrywide entities with only illiquid assets, no ongoing business,

15   no ability to generate revenue, and insufficient assets to satisfy their contingent

16   liabilities. This conclusion is echoed by Bruce Bingham, who prepared a report on

17   behalf of BoNY, trustee for Countrywide-issued residential mortgage-backed

18   securities, attempting to value Countrywide Financial. *See* Bruce B. Bingham,

19   Valuation Analysis of Countrywide Financial Corp. (June 6, 2011) (the "Bingham

20   Report"). The Bingham Report found that Countrywide Financial "has negative

21   earnings," "minimal operating revenues," "does not originate, securitize, or service

22   real estate loans" and "has no operations that by themselves are economically

23   viable on a go-forward basis." *See id.*

24       403.   The transactions between Countrywide and Bank of America were

25   intentionally structured so that Countrywide's massive contingent liabilities

26   relating to its mortgage origination, securitization, and servicing practices

27   remained with Countrywide, while all of its assets and businesses that generated

28   revenue were sold to Bank of America, thus leaving Countrywide unable to satisfy

1  these liabilities.  Not only did Bank of America control the Countrywide entities at

2  the time these transactions were entered into, but Bank of America did not provide

3  adequate consideration for the assets it received from Countrywide.  In other

4  words, in self-dealing transactions, and in exchange for inadequate consideration,

5  Bank of America intentionally rendered Countrywide insolvent and unable to

6  satisfy its creditors.  Moreover, Bank of America was fully aware of

7  Countrywide's contingent liabilities when it transferred these assets out of

8  Countrywide. For example, in an interview published on February 22, 2008 in the

9  legal publication Corporate Counsel, a Bank of America spokesperson

10  acknowledged Countrywide's liabilities:

> Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country. Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations. **'We bought the company and all of its assets and liabilities,' spokesman Scott Silvestri says. 'We are aware of the claims and potential claims against the company and have factored these into the purchase**.'

16  *See* Amy Miller, *Countrywide in Crosshairs as Mortgage Crisis Fuels Litigation*,

17  Corporate Counsel, Feb. 22, 2008 (emphasis added).

18  404.   One significant entity that Bank of America did not acquire was

19  Countrywide Securities, which acted as Countrywide's broker-dealer and

20  underwriter.  However, on October 29, 2008, just before the November

21  transactions, this entity withdrew its registration as a broker dealer from FINRA.

22  *See* Financial Industry Regulatory Authority (FINRA), BrokerCheck Report for

23  Countrywide Securities Corporation, Aug. 17, 2011 at 2.  Without this registration,

24  Countrywide Securities was unable to continue in the business in which it had

25  primarily been engaged (securities dealing and underwriting) and so as of October

26  29, 2008, Countrywide Securities effectively ceased doing business.  This is yet

27  more evidence that Countrywide is no longer engaged in revenue producing

28  activities.

## C.    Countrywide Ceases Doing Business and Is Rebranded as Bank of America

405.   On April 27, 2009, Bank of America rebranded Countrywide Home Loans as "Bank of America Home Loans."  *See* Press Release, BOA Corp., Bank of America Responds to Consumer Desire for Increased Transparency (Apr. 27, 2009).  Many former Countrywide locations, employees, assets and business operations now continue under the Bank of America Home Loans brand.  On the Form 10-K submitted by BOA Corp. on February 26, 2010, both Countrywide Capital Markets and Countrywide Securities were listed as Bank of America subsidiaries.  *See* BOA Corp., Form 10-K, Ex. 21 at 13 (Feb. 26, 2010).

406.   As is customary in large corporate mergers, at least some of the Countrywide Defendants retained their pre-merger corporate names following their merger with Bank of America.  However, Countrywide's operations are fully consolidated into Bank of America's and the Countrywide Defendants have lost any independent identity they had maintained following the merger.  Bank of America announced in its April 27, 2009 press release that "[t]he Countrywide brand has been retired" and that Bank of America would operate its home loan and mortgage business through a new division named Bank of America Home Loans, which "represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans."  Press Release, BOA Corp., Bank of America Responds to Consumer Desire for Increased Transparency (Apr. 27, 2009).

407.   A May 2009 article published by HousingWire magazine reported that "the move to shutter the Countrywide name" was essentially complete and noted that Bank of America would be migrating some of its mortgage operations over to a technology platform it acquired from Countrywide to originate and service loans. Barbara Desoer, the then-head of the combined mortgage, home equity and insurance business of Bank of America and Countrywide Financial, explained that

the integration of Countrywide Financial and Bank of America platforms was a critical goal.  *Q&A with BofA Mortgage Chief Barbara Desoer*, HousingWire Magazine (May 2009).

408.   Desoer stated in an October 2009 issue of Mortgage Banking that "it was the highlight of the year . . . when we retired the Countrywide brand and launched the Bank of America Home Loans brand."  Robert Stowe England, *A New Look at Bank of America Home Loans*, Mortgage Banking (Oct. 2009). Desoer explained "the first year is a good story in terms of the two companies [coming] together and meeting all the major [goals and] milestones that we had set for ourselves for how we would work to integrate the companies."  *Id.* In the same profile, Mary Kanaga, a Countrywide transition executive who helped oversee integration, likened the process of integration to the completion of a mosaic: "Everything [i.e., each business element] counts.  Everything has to get there, whether it is the biggest project or the smallest project. It's very much putting a puzzle together.  If there is a missing piece, we have a broken chain and we can't complete the mosaic." *Id.*

409.   Countrywide's former web address, www.countrywide.com, now takes users to Bank of America's website. The Bank of America website announced that the companies merged and the now-discontinued Countrywide website previously redirected inquiries about the merger to the Bank of America webpage regarding the merger.  Bank of America noted on its website that it was "combining the valuable resources and extensive product lines of both companies."

410.   The April 27, 2009 press release made clear that Bank of America planned to complete its integration of Countrywide Financial into Bank of America "later this year."  The press release explained that Bank of America was in the process of rebranding former Countrywide "locations, account statements, marketing materials and advertising" as Bank of America Home Loans, and stated that "the full systems conversion" to Bank of America Home Loans would occur

1    later in 2009.  *See* Press Release, BOA Corp., Bank of America Responds to

2    Consumer Desire for Increased Transparency (Apr. 27, 2009).  "Bank of America

3    Home Loans" is thus a direct continuation of Countrywide's operations, and the

4    Bank of America Defendants have represented that Bank of America Home Loans

5    is a "trade name" rather than a separate legal entity.  It is a Bank of America trade

6    name or brand and thus a part of Bank of America.

7        411.   As of September 21, 2009, former Countrywide bank deposit accounts

8    were reportedly converted to Bank of America accounts.  And on November 9,

9    2009, online account services for Countrywide mortgages were reportedly

10   transferred to Bank of America's Online Banking website. Bank of America Home

11   Loans continued to operate out of Countrywide's offices in Calabasas, California,

12   with substantially the same employees as the former Countrywide entities.

13       412.   Mortgage contracts and legal documents state that BAC Home Loans

14   Servicing, LP is the entity "formerly known as" Countrywide Home Loans

15   Servicing, a Countrywide subsidiary, which clearly shows that BAC Home Loans

16   Servicing, LP is the direct successor to Countrywide Home Loans, since it is a

17   mere continuation of Countrywide's business.

18       413.   Bank of America's heritage website,

19   http://message.bankofamerica.com/heritage/, lists Countrywide as one of the list of

20   companies Bank of America has acquired under its "Merger History" tab. The

21   "Merger History" tab also states that Bank of America, in connection with the

22   acquisition of Countrywide "rebranded its mortgage offerings as Bank of America

23   Home Loans."  Lastly, under the "Merger History" tab, the website states that the

24   acquisition of Countrywide resulted in the launch of Bank of America Home

25   Loans, making the bank the nation's largest mortgage originator and servicer.

26       414.   Bank of America has described the transaction through which it

27   acquired Countrywide Financial and its subsidiaries as a merger of the mortgage

28   operations of both companies and made clear that it intended to integrate

Countrywide Financial and its subsidiaries into Bank of America fully by the end of 2009. Public statements by Bank of America and Countrywide confirm that Bank of America intended for the two companies to combine into one:

- In a July 1, 2008 Bank of America press release, Desoer stated "Now we begin to combine the the two companies and prepare to introduce our new name and way of operating." Press Release, BOA Corp., Bank of America Completes Countrywide Financial Purchase (July 1, 2008).

- That press release also stated that the bank "anticipates substantial cost savings from combining the two companies. Cost reductions will come from a range of sources, including the elimination of positions announced last week, and the reduction of overlapping technology, vendor and marketing expenses. In addition, [Countrywide] is expected to benefit by leveraging its broad product set to deepen relationships with existing Countrywide customers." *Id.*

- BOA Corp., in its 2008 Annual Report, stated that by acquiring Countrywide, it became the "No. 1 provider of both mortgage originations and servicing" and, "as a combined company," it would be recognized as a "responsible lender who is committed to helping our customers become successful homeowners." *See* BOA Corp. 2008 Annual Report, at 14 (Mar. 2009).

- In a January 11, 2008 Bank of America press release, Angelo Mozilo stated that "the combination of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world." Press Release, Bank of America, Bank of America Agrees to Purchase Countrywide Financial Corp. (Jan. 11, 2008).

- Former CEO of BOA Corp. Ken Lewis on an October 6, 2008 earnings call responded to a question about the formal guaranteeing of Countrywide's debt, stating "The normal process we followed is what are the operational movements that we'll make to combine the operations. When we do that we've said the debt would fall in line." Transcript of Q3 Earnings Call at 16-17, BOA Corp. Q3 2008 Earnings Call (Oct. 6, 2008).

### D. Bank of America Takes Steps To Expressly and Impliedly Assume Countrywide Financial's Liabilities

415. Substantially all of Countrywide Financial's and Countrywide Home Loans' assets were transferred to Bank of America on November 7, 2008 "in connection with the integration of [Countrywide] with [Bank of America's] other businesses and operations," along with certain of Countrywide's debt securities and related guarantees. BOA Corp., Form-8-K (Nov. 10, 2008). According to the Bank of America website, while the integration was being completed

1   "Countrywide customers . . . ha[d] access to Bank of America's 6,100 banking
2   centers." Press Release, BOA Corp., Bank of America Responds to Consumer
3   Desire for Increased Transparency (Apr. 27, 2009).

4          416.   Countrywide Financial ceased filing its own financial statements in
5   November 2008, and its assets and liabilities have been included in Bank of
6   America's recent financial statements.  Bank of America has paid to restructure
7   certain of Countrywide Financial's home loans on its behalf, including permitting
8   Countrywide Financial and Countrywide Home Loans to settle the lawsuits
9   brought by state attorneys general and agreeing to modify up to 390,000
10  Countrywide loans.  *See* Press Release, Mortgage-Foreclosure.com, Bank of
11  America Modified 50,000 Loans in Countrywide Settlement (May 26, 2009).  In
12  June 2011, Bank of America announced on that it would settle for $8.5 billion with
13  BoNY (as Trustee) for Countrywide residential mortgage-backed security trusts.
14  See BOA Corp., Form 8-K at 2 (June 29, 2011).

15         417.   As stated above, in purchasing Countrywide Financial and its
16  subsidiaries for 27 percent of its book value, Bank of America was fully aware of
17  the pending claims and potential claims against Countrywide and factored them
18  into the transaction.

19         418.   Moreover, on October 6, 2008, during an earnings call, Joe Price,
20  BOA Corp.'s Chief Financial Officer, stated that "As we transfer those operations
21  [*i.e.*, Countrywide Financial and its subsidiaries] our company intends to assume
22  the outstanding Countrywide debt totaling approximately $21 billion." *See*
23  Transcript of Q3 Earnings Call at 7, Bank of America Corp. Q3 2008 Earnings
24  Call (Oct. 6, 2008).

25         419.   Similarly, former BOA Corp. CEO Lewis was quoted in a January 23,
26  2008 New York Times article reporting on the acquisition of Countrywide
27  Financial and its subsidiaries, in which he acknowledged that Bank of America
28

knew of the legal liabilities of Countrywide Financial and its subsidiaries and impliedly accepted them as part of the cost of the acquisition:

> We did extensive due diligence. We had 60 people inside the company for almost a month. It was the most extensive due diligence we have ever done. So we feel comfortable with the valuation. We looked at every aspect of the deal, from their assets to potential lawsuits and we think we have a price that is a good price.

*See* Julie Creswell, *Bank of America Joins Parade of Mortgage-Related Losses*, N.Y. Times, Jan. 23, 2008 (emphasis added).

420.    Bank of America has made additional statements showing that it has assumed the liabilities of Countrywide.  In a press release announcing the merger, Lewis stated that he was aware of the "issues within the housing and mortgage industries" and said that "the transaction [with Countrywide] reflects those challenges."  *See* Press Release, BOA Corp., Bank of America Agrees to Purchase Countrywide Financial Corp. (Jan. 11, 2008).  Despite these challenges, Lewis stated in September 2009 that "The Merrill Lynch and Countrywide integrations are on track and returning value already."  Press Release, BOA Corp., Ken Lewis Announces His Retirement (Sept. 30, 2009).

421.    Likewise, in BOA Corp.'s Form 10-K for 2009, Bank of America acknowledged that, "[W]e face increased litigation risk and regulatory scrutiny as a result of the Merrill Lynch and Countrywide acquisitions."  *See* BOA Corp., Form 10-K at 8 (Feb. 26, 2010).

422.    Brian Moynihan, BOA Corp.'s CEO and President, testified before the Financial Crisis Inquiry Commission on January 13, 2010, that "our primary window into the mortgage crisis came through the acquisition of Countrywide ….  The Countrywide acquisition has positioned the bank in the mortgage business on a scale it had not previously achieved.  There have been losses, and lawsuits, from the legacy Countrywide operation, but we are looking forward."  Press Release, BOA Corp., Testimony to the FCIC, Brian T. Moynihan, President and Chief

1   Executive Officer, BOA Corp. (Jan. 13, 2010).  Addressing investor demands for

2   refunds on faulty loans sold by Countrywide, Moynihan stated: "There's a lot of

3   people out there with a lot of thoughts about how we should solve this, but at the

4   end of the day, we'll pay for the things that Countrywide did."  *See* Hugh Son &

5   David Mildenberg, *Bank of America in 'Hand-to-Hand Combat' Over Mortgage*

6   *Disputes*, CEO Says, Bloomberg, Nov. 16, 2010.

7        423.   Similarly, Jerry Dubrowski, a spokesman for Bank of America, was

8   quoted in an article published by Bloomberg in December 2010 that the bank will

9   "act responsibly" and repurchase loans in cases where there were valid defects

10  with the loans.  Hugh Son & Dakin Campbell, *BofA's 'Sloppy' Prime Mortgages*

11  *Add to Pressure for Buybacks*, Bloomberg, Dec. 1, 2010.

12       424.   During an earnings call for the second quarter of 2010, Charles Noski,

13  BOA Corp.'s Chief Financial Officer, stated that "we increased our reps and

14  warranties expense by $722 million to $1.2 billion as a result of our continued

15  evaluation of exposure to repurchases including our exposure to repurchase

16  demands from certain monoline insurers."  *See* Transcript of Q2 Earnings Call,

17  BOA Corp. Q2 2010 Earnings Call (July 16, 2010).  And during the earnings call

18  for the third quarter of 2010, Noski stated that "[t]hrough September, we've

19  received $4.8 billion of reps and warranty claims related to the monoline-insured

20  deals, of which $4.2 billion remains outstanding, and approximately $550 million

21  were repurchased."  *See* Transcript of Q3 Earnings Call, BOA Corp. Q3 2010

22  Earnings Call (Oct. 19, 2010).

23       425.   Bank of America has reached various settlement agreements in which

24  it has directly taken responsibility for Countrywide's liabilities.  As part of the

25  settlement agreement with state attorneys general, Bank of America agreed to

26  forgive up to 30 percent of the outstanding mortgage balances owed by former

27  Countrywide customers.  The loans were made before Bank of America acquired

28  Countrywide.  *See* Press Release, BOA Corp., Bank of America Announces

1  Nationwide Homeownership Retention Program for Countrywide Customers (Oct.
2  6, 2008) .

3      426.   In October 2010, the New York Times reported that Bank of America
4  is "on the hook" for $20 million of the disgorgement that CEO Mozilo agreed to
5  pay in his settlement agreement with the SEC.  *See* Peter J. Henning, *When*
6  *Disgorgement Comes Cheap*, N.Y. Times, Oct. 18, 2010.  The agreement and plan
7  of merger between Bank of America and Countrywide provided that all
8  indemnification provisions "shall survive the merger and shall continue in full
9  force and effect . . . for a period of six years." *Id.*  According to the article,
10  "[b]ecause Countrywide would have had to pay Mr. Mozilo's disgorgement, Bank
11  of America took on the same obligation, even though it had nothing to do with the
12  company's operations at the time." *Id.*

13      427.   On April 15, 2011, Assured Guaranty Ltd. ("Assured") reached a
14  comprehensive $1.1 billion settlement with Bank of America regarding its
15  liabilities with respect to 29 RMBS transactions insured by Assured.  The
16  settlement agreement covered Bank of America and Countrywide-sponsored
17  securitizations, as well as certain other securitizations containing concentrations of
18  Countrywide-originated loans for which Assured was the primary insurer. *See*
19  *Assured Guaranty Ltd. Announces Settlement with Bank of America*, Businesswire,
20  Apr. 15, 2011.  Bank of America also recently announced a $165 settlement with
21  the National Credit Union Administration of claims relating to the offering and
22  sale of RMBS, which included claims against the Countrywide Defendants.

23      428.   On May 26, 2011, Bank of America agreed to pay more than $22
24  million to settle charges that it improperly foreclosed on the homes of active-duty
25  members of the U.S. military between January 2006 and May 2009.  In a public
26  statement concerning the settlement, Bank of America Executive President Terry
27  Laughlin said: "While most cases involve loans originated by Countrywide and the
28  improper foreclosures were taken or started by Countrywide prior to our

1    acquisition, it is our responsibility to make things right."  Justin Blum, *BofA,*
2    *Morgan Stanley Settle Claims on Military Foreclosures*, Bloomberg, May 26,
3    2011.

4           429.   Under the proposed $8.5 billion settlement announced June 28, 2011
5    between Bank of America and BoNY (as Trustee for certain Countrywide RMBS),
6    Bank of America is responsible for payment of the settlement, indemnification of
7    the Trustee, and payment of legal fees.  *See* Press Release, "BOA Corp., Bank of
8    America Announces Agreement on Legacy Countrywide Mortgage Repurchase
9    and Servicing Claims" (June 29, 2011).

10          430.   Bank of America's public statements accepting responsibility for
11   Countrywide's contingent liabilities arising from Countrywide's mortgage
12   origination, securitization and servicing practices, along with Bank of America's
13   actual settlement of such liabilities demonstrates that Bank of America and
14   Countrywide intentionally structured the transfer of substantially all Countrywide's
15   assets in such a way as to leave minimal and inadequate assets remaining in
16   Countrywide to cover these liabilities.

17          431.   Bank of America has also generated substantial earnings from the
18   absorption of Countrywide's mortgage business.  For example, a BOA Corp. press
19   release regarding the company's 2009 first quarter earnings stated that "[n]et
20   revenue nearly quadrupled to $5.2 billion primarily due to the acquisition of
21   Countrywide and from higher mortgage banking income as lower interest rates
22   drove an increase in mortgage activity."  Lewis was quoted as saying, "We are
23   especially gratified that our new teammates at Countrywide and Merrill Lynch had
24   outstanding performance that contributed significantly to our success."  Press
25   Release,  BOA Corp., Bank of America Earns $4.2 Billion in First Quarter (Apr.
26   20, 2009).

27          432.   A press release regarding BOA Corp.'s 2009 second quarter earnings
28   similarly stated that "[n]et revenue rose mainly due to the acquisition of

1   Countrywide and higher mortgage banking income as lower interest rates spurred

2   an increase in refinance activity."   Press Release, BOA Corp., Bank of America

3   Earns $3.2 Billion in Second Quarter (July 17, 2009).  The press release explained

4   that "higher mortgage banking income, trading account profits and investment and

5   brokerage services income reflected the addition of Merrill Lynch and

6   Countrywide." *Id.*  BOA Corp. reported that its "average retail deposits in the

7   quarter increased $136.3 billion, or 26 percent, from a year earlier, including

8   $104.3 billion in balances from Merrill Lynch and Countrywide." *Id.*

9        433.   BOA Corp.'s 2009 annual report stated that "[r]evenue, net of interest

10   expense on a fully taxable-equivalent . . . basis, rose to $120.9 billion, representing

11   a 63 percent increase from $74.0 billion in 2008, reflecting in part the addition of

12   Merrill Lynch and the full-year impact of Countrywide."  BOA Corp. also reported

13   that "[m]ortgage banking income increased $4.7 billion driven by higher

14   production and servicing income . . . primarily due to increased volume as a result

15   of the full-year impact of Countrywide . . . ."  Insurance income also increased

16   $927 million "due to the full-year impact of Countrywide's property and casualty

17   businesses."  BOA Corp., Form 10-K at 30, 32 (Feb. 26, 2010).

18        434.   The above allegations demonstrate Bank of America's de facto

19   merger with Countrywide and its assumption of Countrywide's liabilities, making

20   Defendants BOA Corp. and BOA N.A. liable for the Countrywide Defendants'

21   liabilities as successors-in-interest.

**FIRST CLAIM FOR RELIEF**
**Common Law Fraud**
**(Against All Defendants)**

22

23

24        435.   Plaintiffs repeat and re-allege the allegations above as if fully set forth

25   herein.

26        436.   The Issuer Defendants issued the Securitizations pursuant to the

27   Offering Documents, and are responsible for the representations contained therein.

28   The Underwriter Defendants reviewed the Offering Documents and, knowing of

1  their falsity, delivered them to Plaintiffs in order to solicit Plaintiffs' investment in

2  the Securitizations and then sold the Certificates to Plaintiffs by means of the false

3  statements. Because the Underwriter Defendants provided Plaintiffs with

4  information that they knew to be false, the Underwriter Defendants adopted those

5  statements, intending for Plaintiffs to rely on them. As discussed above, the BOA

6  Defendants are liable for the Countrywide Defendants' liabilities as successors-in-

7  interest.

8      437.  The Offering Documents contained numerous misrepresentations, as

9  fully set forth above, including with respect to LTV and CLTV ratios, owner-

10  occupancy rates, adherence to underwriting guidelines regarding the loan pools

11  underlying the Securitizations, the risk profiles reflected in the ratings, and the

12  transfer of the underlying notes and mortgages.

13      438.  These misrepresentations were material to Plaintiffs in their decision

14  to invest in the Certificates.

15      439.  Defendants were aware that the misrepresentations were false and

16  misleading through their own knowledge and through their affiliates' conduct and

17  based on their due diligence investigation of the loans underlying the

18  Securitizations, or were reckless in failing to investigate the facts underlying the

19  misrepresentations.

20      440.  Plaintiffs and their agents reviewed Offering Documents for each of

21  the Securitizations, and Plaintiffs received reports from their agents of the data

22  contained in the Offering Documents, and Plaintiffs reasonably relied on the

23  misrepresented data in the Offering Documents in determining to purchase the

24  Certificates. Plaintiffs would not have purchased the Certificates but for those

25  misrepresentations.

26      441.  Plaintiffs have suffered massive losses as a direct result of the

27  misrepresentations of the Issuer Defendants in the Offering Documents, and are

28  therefore entitled to relief.

**SECOND CLAIM FOR RELIEF**
**Fraudulent Concealment**
**(Against All Defendants)**

442.   Plaintiffs repeat and re-allege the allegations above as if fully set forth herein.

443.   Defendants securitized and sold the Certificates to Plaintiffs pursuant to the Offering Documents.

444.   Prior to the securitization of each of the loan pools into the Trusts, the Defendants were in possession of and/or otherwise received detailed loan files containing material information concerning the credit quality of the loans. Specifically, the loan files contain the underlying documentation that the borrowers submitted in connection with their loan applications, together with additional information, such as appraisals and credit assessments.  Plaintiffs did not have access to the loan files or the information contained therein.  Based on standard industry practice and data privacy laws, had Plaintiffs requested access to the loan files, they would have been denied it.

445.   Moreover, prior to the securitization of each of the loan pools into the Trusts, the Defendants conducted due diligence on the loans underlying the Securitizations.  This due diligence provided the Issuer Defendants with additional material information regarding the loans and mortgages underlying the sale of the Certificates, such as the existence of interim second liens, and adherence to underwriting guidelines (together with the additional non-public facts set forth in Paragraphs 80-378, the "Concealed Material Facts").

446.   Plaintiffs did not have access to the Concealed Material Facts.

447.   The Defendants' knowledge of the Concealed Material Facts was superior to that of Plaintiffs.  The Defendants were aware that Plaintiffs lacked access to the Concealed Material Facts.  Because of this superior knowledge, the Issuer Defendants had a duty to disclose the Concealed Material Facts to Plaintiffs.

448.   The Defendants did not disclose the Concealed Material Facts to Plaintiffs, but rather intentionally hid them from Plaintiffs and other investors in order to make the investments appear less risky than they actually were.

449.   Plaintiffs could not have detected the Concealed Material Facts through the exercise of ordinary intelligence.

450.   Had the Concealed Material Facts been disclosed to Plaintiffs, they would not have purchased the Certificates.

451.   Plaintiffs have suffered significant losses as a direct result of the Defendants' fraudulent concealment of the Concealed Material Facts from Plaintiffs, and are therefore entitled to relief.

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Fraud
**(Against the Underwriter Defendants, the Originator Defendant, and the Controlling Parent Defendants)**

452.   Plaintiffs repeat and re-allege the allegations above as if fully set forth herein.

453.   In addition to their own fraud, the Underwriter Defendants also played an essential role in the Issuer Defendants' fraud because the Underwriter Defendants delivered the Offering Documents prepared by the Issuer Defendants that contained the false statements.

454.   Moreover, the Underwriter Defendants had actual knowledge that the statements in the Offering Documents concerning the credit quality and timely transfer of the underlying loans were false.  The Underwriter Defendants' actual knowledge of the fraud is directly inferable from its substantial involvement in the securitization process, and the fact that top executives of the Issuer Defendants were also high-ranking employees of the Underwriter Defendants.

455.   Some of the Controlling Parent Defendants also shared high-ranking employees with the Issuer Defendants and Underwriter Defendants, and they all controlled and directed – and profited from – their activities.

456.   The Underwriter Defendants and the Controlling Parent Defendants therefore knowingly provided substantial assistance to the Issuer Defendants' fraud, and the Underwriter Defendants and the Controlling Parent Defendants are liable for aiding and abetting that fraud.

457.   The Originator Defendant also aided and abetted the Depositor Defendants' fraud by knowingly supplying the latter with falsely inflated appraisals and owner-occupancy data, with the knowledge and intention that such data would be provided to investors to be relied upon in making investment decisions.  The Originator Defendant are therefore liable for aiding and abetting the Issuer Defendants' fraud.

## FOURTH CLAIM FOR RELIEF
### Negligent Misrepresentation
### (In the Alternative Against All Defendants)

458.   Plaintiffs repeat and re-allege the allegations above as if fully set forth herein.

459.   Defendants participated in and controlled the structuring and marketing of the Securitizations, and the preparation of the Offering Documents, for the purpose of selling the Certificates to investors such as the Plaintiffs.

460.   Defendants knew that the Offering Documents would be transmitted to potential investors such as the Plaintiffs and would be relied on by those potential investors in deciding whether to purchase the Certificates.

461.   Defendants had superior knowledge regarding the quality of loans in the pools of the Securitizations, the originators' lack of adherence to their own underwriting guidelines, and the failure to transfer notes and mortgages to the Trusts.  In fact, the Plaintiffs could not gain access to such information.  Based on information and belief, and industry custom and practice, had Plaintiffs requested such access, it would have been denied.

462.   Defendants' superior knowledge of the true facts regarding the quality of loans in the pools of the Securitizations, the originators' lack of adherence to

1   their own underwriting guidelines, and the failure to transfer notes and mortgages

2   to the Trusts, together with Defendants' knowledge that potential investors such as

3   the Plaintiffs would rely on the representations in the Offering Documents, gave

4   rise to a special relationship between the Defendants and the Plaintiffs in which the

5   Defendants had a duty to make full and accurate disclosures to Plaintiffs of

6   material matters regarding the Securitizations.

7        463.   The Offering Documents contained numerous misrepresentations, as

8   fully set forth above, including with respect to LTV and CLTV ratios, owner-

9   occupancy rates, adherence to underwriting guidelines regarding the loan pools

10  underlying the Securitizations, the risk profiles reflected in the ratings, and the

11  transfer of the underlying notes and mortgages.

12       464.   These misrepresentations were material to Plaintiffs in their decision

13  to invest in the Certificates.

14       465.   Defendants were aware that the misrepresentations were false and

15  misleading based on their active participation in matters being misrepresented

16  and/or their due diligence investigation of the loans underlying the Securitizations,

17  or were reckless in failing to investigate the misrepresentations.

18       466.   Plaintiffs reviewed Offering Documents for each of the

19  Securitizations, and Plaintiffs reasonably relied on the misrepresented data therein

20  in determining to purchase the Certificates.  Plaintiffs would not have purchased

21  the Certificates but for those misrepresentations.

22       467.   Plaintiffs have suffered significant losses as a direct result of

23  Defendants' misrepresentations.

**FIFTH CLAIM FOR RELIEF**
**Rescission Based Upon Mutual Mistake**
**(Against the Underwriter Defendants)**

26       468.   Plaintiffs repeat and re-allege the allegations above as if fully set forth

27  herein.

28

469.   As set forth above, there is ample evidence to suggest that the Underwriter Defendants were aware of the misrepresentations in the Offering Documents and substantially assisted in their preparation and distribution. Alternatively, however, if the Underwriter Defendants did not know that the mortgages and notes were not timely transferred to the Trusts, then the parties' mutual mistake as to these essential facts upon which the sale of the Certificates purchased from the Underwriter Defendants was predicated entitles Plaintiffs to rescission of the sales of these Certificates.

470.   The transfer of the mortgages and notes to the Trusts was a particularly crucial fact that went to the heart of each of the sales of the Certificates and the Trusts.  Without proper transfers, the trustee for the Trusts has no legal right to foreclose on the collateral in the event a borrower defaults, foreclosures become slower and more costly, and the Trusts do not qualify for REMIC classification.  Further, without proper and timely transfers, the Trusts bear a substantial risk of being subjected to heavy tax assessments and penalties which are ultimately borne by investors such as Plaintiffs.  If there was a mistake as to this essential term, there could have been no meeting of the minds.

471.   These were significant risks that were undisclosed due to the misrepresentations in the Offering Documents, and were contrary to Plaintiffs' investment objectives, and contradicted the Underwriter Defendants' purported investment offers.  Had Plaintiffs known that the mortgages and notes had not been properly transferred to the Trusts, they would not have purchased these Certificates from the Underwriter Defendants.

472.   In entering into a contract for the purchase and sale of interest in the RMBS trusts at issue, Plaintiffs and the Underwriter Defendants each intended the contracts to provide for an investment in trusts that actually owned residential mortgages and underlying promissory notes at the time of investment, and to a material extent the Trusts did not.

473. Plaintiffs acted promptly to seek rescission upon discovering this mistake.

474. Therefore, if the Underwriter Defendants were unaware of the misrepresentations in the Offering Documents regarding the transfer of the notes and mortgages when it sold Certificates to Plaintiffs, then a mutual mistake of a material fact existed at the time of the contract, and the transactions are void.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs pray for relief as follows:

An award in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' fraud, and/or fraudulent concealment, and/or negligence, and/or aiding and abetting fraud, and/or mutual mistake, in an amount to be proven at trial, including:

(a) Rescission and/or rescissory damages for recovery of the consideration paid for the Certificates;

(b) Plaintiffs' damages caused by Defendants' fraud, and/or fraudulent concealment, and/or negligence, and/or aiding and abetting fraud, including any diminution in value of the Certificates, as well as lost principal and lost interest payments thereon;

(c) Punitive damages on Plaintiffs' fraud claims;

(d) Prejudgment interest;

(e) Reasonable costs and expenses incurred in this action, including attorneys' fees and costs; and

(f) Any such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

1    Dated:  April 12, 2013            LABATON SUCHAROW LLP

2

3                        By: _Martis Alex_

4                        Joel H. Bernstein
                       jbernstein@labaton.com

5                        Mark S. Arisohn
                       marisohn@labaton.com

6                        Martis Alex (Bar No. 77903)
                       malex@labaton.com

7                        Corban S. Rhodes
                       crhodes@labaton.com

8                        140 Broadway
                       New York, New York  10005

9                        Telephone: (212) 907-0700
                       Facsimile:  (212) 818-0477

10

11                        MOTLEY RICE LLP
                       Mark I. Labaton (Bar No. 159555)

12                        mlabaton@motleyrice.com
                       Robert Zabb (Bar No. 114405)

13                        rzabb@motleyrice.com
                       1801 Century Park East, Suite 475

14                        Los Angeles, CA  90067
                       Telephone: (310) 552-7992

15                        Facsimile:  (310) 552-8054

16                        *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28